1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

*Amended and Restated LLC Agreement of JL Powell LLC*

*EXECUTION COPY*

JL POWELL LLC

AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

Dated as of March 10, 2010

THE COMPANY INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH COMPANY INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................................ 1

**ARTICLE II ORGANIZATIONAL MATTERS** ............................................... 6
    2.1    **Formation of Company.** ........................................................... 6
    2.2    **Limited Liability Company Agreement.** ................................. 6
    2.3    **Name.** ........................................................................................ 7
    2.4    **Purpose.** ................................................................................... 7
    2.5    **Principal Office; Registered Office.** ....................................... 7
    2.6    **Term.** ........................................................................................ 7
    2.7    **No State-Law Partnership.** ...................................................... 7

**ARTICLE III CAPITAL CONTRIBUTIONS** .................................................. 7
    3.1    **Members** ................................................................................... 7
    3.2    **Capital Account.** ...................................................................... 9
    3.3    **No Withdrawal.** ...................................................................... 10
    3.4    **Loans From Members.** .......................................................... 10

**ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS** ............................... 10
    4.1    **Distributions.** ......................................................................... 10
    4.2    **Allocations.** ............................................................................ 11
    4.3    **Indemnification and Reimbursement for Payments on Behalf of a Member.** ................................................................ 12

**ARTICLE V CLASS C UNITS** ........................................................................ 12
    5.1    **Class C Units.** ........................................................................ 12
    5.2    **Repurchase Option; Forfeiture.** .......................................... 13

**ARTICLE VI MANAGEMENT** ........................................................................ 15
    6.1    **Authority of Board.** .............................................................. 15
    6.2    **Actions of the Board.** ............................................................ 16
    6.3    **Composition.** ......................................................................... 16
    6.4    **Proxies.** .................................................................................. 16
    6.5    **Meetings, Voting, Etc.** ........................................................... 17
    6.6    **Delegation of Authority; Officers.** ....................................... 18
    6.7    **Purchase of Units.** ................................................................ 18
    6.8    **Limitation of Liability.** ......................................................... 19

**ARTICLE VII RIGHTS AND OBLIGATIONS OF MEMBERS** ................... 20
    7.1    **Limitation of Liability.** ......................................................... 20
    7.2    **Lack of Authority.** ................................................................. 20
    7.3    **No Right of Partition.** ........................................................... 20
    7.4    **Indemnification.** .................................................................... 20
    7.5    **Members Right to Act.** .......................................................... 21
    7.6    **Conflicts of Interest.** ............................................................. 23

**ARTICLE VIII BOOKS, RECORDS, ACCOUNTING AND REPORTS**...........................23
    **8.1**    **Records and Accounting.**..............................................23
    **8.2**    **Fiscal Year.**...................................................................23
    **8.3**    **Reports.**.........................................................................23
    **8.4**    **Transmission of Communications.**..............................24

**ARTICLE IX TAX MATTERS**..............................................................24
    **9.1**    **Preparation of Tax Returns.**.........................................24
    **9.2**    **Tax Elections.**...............................................................24
    **9.3**    **Tax Controversies.**.......................................................24

**ARTICLE X TRANSFER OF COMPANY INTERESTS**...................24
    **10.1**    **Transfers by Members.**.................................................24
    **10.2**    **Right of First Refusal**...................................................24
    **10.3**    **Participation Rights.**....................................................26
    **10.4**    **Drag-Along Rights**.......................................................27
    **10.5**    **Permitted Transfers.**....................................................28
    **10.6**    **Sale of the Company.**...................................................28
    **10.7**    **IPO.**...............................................................................31
    **10.8**    **Legend.**.........................................................................31
    **10.9**    **Void Transfers.**............................................................32

**ARTICLE XI PREEMPTIVE RIGHTS**................................................32
    **11.1**    **Generally.**.....................................................................32
    **11.2**    **Offer to Subscribe.**......................................................32
    **11.3**    **Oversubscription Rights.**.............................................32
    **11.4**    **Exceptions.**...................................................................32

**ARTICLE XII EXCHANGE OF CUSTOMER LISTS**........................33

**ARTICLE XIII ADMISSION OF MEMBERS**.....................................33
    **13.1**    **Substituted Members.**..................................................33
    **13.2**    **Additional Members.**....................................................33

**ARTICLE XIV WITHDRAWAL AND RESIGNATION OF MEMBERS;**
    **REDEMPTIONS**.............................................................33
    **14.1**    **Withdrawal and Resignation of Members.**.................33

**ARTICLE XV DISSOLUTION AND LIQUIDATION**.......................34
    **15.1**    **Dissolution.**..................................................................34
    **15.2**    **Liquidation and Termination.**......................................34
    **15.3**    **Deferment; Distribution in Kind.**................................35
    **15.4**    **Cancellation of Certificate.**.........................................35
    **15.5**    **Reasonable Time for Winding Up.**..............................36
    **15.6**    **Return of Capital.**........................................................36

**ARTICLE XVI VALUATION**...............................................................36

**ARTICLE XVII GENERAL PROVISIONS**.........................................36
    **17.1**    **Amendments.**................................................................36

| | | |
|---|---|---|
| **17.2** | **Title to Company Assets.** | 37 |
| **17.3** | **Addresses and Notices.** | 37 |
| **17.4** | **Binding Effect.** | 38 |
| **17.5** | **Creditors.** | 38 |
| **17.6** | **Waiver.** | 38 |
| **17.7** | **Counterparts.** | 38 |
| **17.8** | **Applicable Law.** | 38 |
| **17.9** | **Severability.** | 38 |
| **17.10** | **Further Action.** | 38 |
| **17.11** | **Delivery by Facsimile.** | 38 |
| **17.12** | **Offset.** | 39 |
| **17.13** | **Entire Agreement.** | 39 |
| **17.14** | **Remedies.** | 39 |
| **17.15** | **Descriptive Headings; Interpretation.** | 39 |

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# JL POWELL LLC

## a Delaware Limited Liability Company

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of JL Powell LLC (the "Company") is made and entered into effective as of March 10, 2010 (the "Effective Date") by and among the Members of the Company.

WHEREAS, Blue Highways Holdings III, LLC as the initial Member entered into that certain Limited Liability Company Agreement of the Company, dated as of February 24, 2010 (the "Initial Agreement"); and

WHEREAS, in connection with the Company's acquisition of all or substantially all of the business and assets of JL Powell, Inc. ("JL Powell"), in exchange for issuance of the Class B Units to JL Powell and admission of the JL Powell as an additional Member pursuant to the Contribution Agreement of even date between the Company and JL Powell (the "Contribution Agreement"), and related transactions, the Members desire to amend and restate the terms of the Initial Agreement effective as of the date hereof, at which time the Initial Agreement will be superseded entirely by this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Capitalized terms used in this Agreement but not otherwise defined herein shall have the following meanings:

"Additional Member" means a Person admitted to the Company as a Member pursuant to Section 12.2.

"Affiliate" of any Person means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question and in the case of any Management Member includes all of his or her children, grandchildren, siblings, and parents, including step relations.

"Approved Sale" shall have the meaning set forth in Section 10.6.1.

"Base Rate" means, on any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"BHH" means Blue Highways Holdings III LLC, and its successors and assigns.

"Board" means the Board of Directors of the Company.

"Business" means the direct-to-consumer business of selling men's apparel to customers via retail store, catalog or internet.

"Capital Account" means the capital account maintained for a Member pursuant to Section 3.2.

"Capital Contribution" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property which a Member contributes to the Company pursuant to Section 3.1 or 6.1.

"Cause" has the meaning set forth for such term in the applicable Management Member's employment agreement with the Company or, in the absence of any such employment agreement, means (i) the commission of, or the entering of a plea of guilty or no contest to, a felony or other crime involving moral turpitude, or the commission of any act or omission involving misappropriation, embezzlement, dishonesty or fraud with respect to the Company or any of its customers, vendors or suppliers, (ii) conduct causing the Company substantial public disgrace or disrepute or economic harm, (iii) failure to perform duties as reasonably directed by the Board or the relevant officer to whom such Management Member reports, (iv) any act or omission aiding or abetting a competitor, supplier or customer of the Company to the material disadvantage or detriment of the Company, (v) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company or (vi) any other breach by the Management Member of this Agreement or any other agreements with the Company.

"Certificate" means the Company's Certificate of Formation as filed with the Secretary of State of Delaware.

"Class A Member" means a Member holding Class A Units.  BHH is the initial Class A Member.

"Class A Preferred Return Amount" means, with respect to each Class A Member, the amount of such Class A Member's aggregate Capital Contributions plus a six percent (6%) compounded annual return from the date of each such Capital Contribution, as reduced by distributions to such Class A Member, and with compounding ceasing to the extent of such distributions.

"Class A Unit" means a Unit having the rights and obligations specified with respect to Class A Units in this Agreement.

"Class B Contribution" means the assets of JL Powell contributed to the Company as of the Effective Date pursuant to the Contribution Agreement.

"Class B Member" means a Member holding Class B Units. JL Powell has been admitted to the Company as the initial Class B Member effective upon issuance of Class B Units to JL Powell as of the Effective Date.

"Class B Member Investment" means, the agreed Fair Market Value of the Capital Contribution made by the Class B Member on the Effective Date as set forth on Schedule I hereto.

"Class B Preferred Return Amount" means, with respect to each Class B Member, the amount of such Class B Member's aggregate Capital Contributions plus a six percent (6%) compounded annual return from the date of each such Capital Contribution, as reduced by distributions to such Class B Member, and with compounding ceasing to the extent of such distributions.

"Class B Unit" means a Unit having the rights and obligations specified with respect to Class B Units in this Agreement.

"Class C Units" means a Unit having the rights and obligations specified with respect to Class C Units in this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as amended through the date hereof. Such term shall, at the Board's sole discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions.

"Contribution Agreement" has the meaning set forth in the Recitals to this Agreement.

"Control" whether or not capitalized means either (i) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting stock of a corporation, or in the case of any Entity which is not a corporation, the ownership, directly or indirectly, of at least fifty percent (50%) of the beneficial ownership interests in such Entity or (ii) irrespective of stock ownership or other beneficial ownership, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del.L. § 18-101, et seq., as it may be amended from time to time, and any successor to the Delaware Act.

"Direct Competition" means, with respect to any Management Member, during the term of such Member's employment with or service to the Company and during the one year period immediately following such Management Member's Termination Date, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engaging in or owning or holding any ownership interest in or assisting any person or entity engaged in the Business; provided, however, it shall not be Direct Competition for any Management Member to (i) work for or provide services to any entity that is in Direct Competition with the Company if such entity derives less than 5% of its revenue from the Business and the Executive does not otherwise, directly or indirectly, participate or provide services with respect to the Business, or (ii) hold securities of any entity (whether or not engaged in the Business) that are listed on a national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934 so long the

applicable Management Member and his Affiliates, taken together, are not the beneficial owners of more than percent (5%) of any class of securities of any entity that is engaged in the Business.

"Distribution" means each distribution made by the Company to a Member with respect to Units, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; provided that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any securities, (b) any recapitalization or exchange of securities of the Company, and any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units, or (c) any salary, fees or expense reimbursement that are required to be and are paid to any Member.

"Entity" means any corporation, company, limited liability company, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other legal entity.

"Equity Securities" means (i) Units or other equity interests in the Company (including classes or groups thereof having such relative rights, preferences, powers and duties as may from time to time be established by the Board, including rights, preferences, powers and/or duties senior to existing classes and groups of Units and other equity interests in the Company), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other equity interests in the Company and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other equity interests in the Company.

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company.

"Fair Market Value" means, with respect to any asset or equity interest, its fair market value determined according to Article XVI.

"Fiscal Year" means the Company's annual accounting period established pursuant to Section 8.2.

"Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Hurdle Return" means, as of any time, an amount representing a 40% internal rate of return as determined by the Board in good faith on the Class B Member Investment, taking into account all distributions or other proceeds received on or prior to such date by any current or former Class B Members in respect of Class B Units (other than any amounts paid by any Class B Member to acquire Class B Units from any other Class B Member).

"IPO" means the initial sale pursuant to a registration statement filed under the Securities Act of any equity securities of the Company, whether by the Company or any holder of equity securities of the Company.

"Liquidity Event" means (a) any sale of all or substantially all (as defined in the Model Business Corporation Act) of the assets of the Company on a consolidated basis in one transaction or series of related transactions, (b) any sale of all or substantially all of the Units (or a transaction having a similar effect as contemplated by Section 10.5) in one transaction or series of related transactions (but excluding any sales to Affiliates and any sales of Units in a Public Sale), or (c) a merger or consolidation or other transaction which accomplishes one of the foregoing.

"Majority in Interest" means Members holding a majority of the total number of outstanding Voting Units.

"Management Member" means a Member holding Class C Units.

"Member" means each of the members named on Schedule I and Schedule II attached hereto and any Person admitted to the Company as a Substituted Member or Additional Member; but only so long as such Person is shown on the Company's books and records as the owner of one or more Units.

"Participating Class C Unit" a Class C Unit, the Participation Threshold of which is zero (taking into account any adjustments described in clauses (i) and (ii) of Section 5.1.3).

"Participation Threshold" means, with respect to each outstanding Class C Unit, an amount determined, and adjusted from time to time, in accordance with Sections 5.1.2 and 5.1.3 hereof.

"Percentage Share" means the aggregate interest, expressed as a percentage of outstanding Units, owned by each Class A Member and Class B Member in the Company as set forth on Schedule 1 (as amended from time to time to reflect the issuance of Equity Securities pursuant to Article III) to this Agreement.

"Person" means an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association or other entity.

"Public Sale" means any sale of equity securities of the Company (other than rights to acquire equity securities of the Company) to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Solvent" means, with respect to the Company, that (a) the property of the Company, at a present fair saleable valuation, exceeds the sum of its debts (including contingent and unliquidated debts); (b) the present fair saleable value of the property of the Company exceeds the amount that will be required to pay the Company's probable liability on its existing debts as they become absolute and matured; (c) the Company has adequate capital to carry on its

business; and (d) the Company does not intend or believe it will incur debts beyond its ability to pay as such debts mature.

"Substituted Member" means a Person that is admitted as a Member to the Company pursuant to Section 13.1.

"Taxable Year" means the Company's accounting period for federal income tax purposes determined pursuant to Section 9.2.

"Tax Matters Partner" has the meaning given to such term in Section 6231 of the Code.

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof.  Such term shall, at the Board's sole discretion, be deemed to include any future amendments to such regulations and any corresponding provisions of succeeding regulations (whether or not such amendments and corresponding provisions are mandatory or discretionary.

"Unit" means a fractional part of the interests held by a Member in this Company as provided in this Agreement, including a Member's interest in Company income, loss, gain, deduction, other items and Distributions, whether a Class A Unit, a Class B Unit, or a Class C Unit; provided that any class or group of Units issued shall have the relative rights, preferences, powers and duties set forth in this Agreement.

"Unvested Units" means, (i) except as otherwise provided in Section 5.1, the Class C Units issued to any Management Member which have not vested as provided by the Board in the written document(s) providing for the issuance of such Class C Units.

"Vested Units" means, (i) except as otherwise provided in Section 5.1, the Class C Units issued to any Management Member which have vested as provided by the Board in the written document(s) providing for the issuance of such Class C Units.

"Voting Units" means the Class A Units and Class B Units of the Company.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1 Formation of Company.** The Company was formed on February 24, 2010 pursuant to the provisions of the Delaware Act.

**2.2 Limited Liability Company Agreement.** The rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and the Delaware Act.  On any matter upon which this Agreement is silent, the Delaware Act shall control.  Any provision of this Agreement in violation of the Delaware Act shall be void and of no effect to the extent of such violation without affecting the validity of the other provisions of this Agreement.

**2.3 Name.**The name of the Company shall be "JL Powell LLC." The Board in its sole discretion may change the name of the Company at any time and from time to time. Notification of any such change shall be given to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.4 Purpose.**The purpose and business of the Company shall be any business which may lawfully be conducted by a limited liability company formed pursuant to the Delaware Act.

**2.5 Principal Office; Registered Office.**The principal office of the Company shall be at 16860 Three Oaks Road, Three Oaks, Michigan 49128, or such other place as the Board may from time to time designate. The Company may maintain offices at such other place or places as the Board deems advisable. Notification of any such change shall be given to all Members. The address of the registered office of the Company in the State of Delaware shall be c/o The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be The Corporation Trust Company.

**2.6 Term.**The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XV.

**2.7 No State-Law Partnership.**The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the last sentence of this Section 2.7, and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

**3.1 Members**The total number of Units which the Company has authority to issue initially is 1,136,363 Units, consisting of 570,000 authorized Class A Units, 430,000 authorized Class B Units, and 136,363 non-voting Class C Units. The Board may at any time, without the consent of the Members and without the need for any amendment hereunder, increase the number of Class A Units, Class B Units, and /or Class C Units that the Company has the authority to issue and may authorize the issuance of such other Equity Securities as the Board in its discretion may determine. All Units issued hereunder shall be certificated in accordance with this Agreement, unless otherwise determined by the Board.

3.1.1   Each Class A Member named on Schedule I attached hereto (or such Person's predecessor in interest) has made Capital Contributions to the Company as set forth on Schedule I in exchange for the Class A Units specified thereon. Each Class B Member

named on Schedule I attached hereto (or such person's predecessor in interest) has contributed or agreed to contribute the assets described on Schedule I attached hereto in exchange for the Class B Units specified thereon.

3.1.2   Each Member who is issued Units by the Company following the date of this Agreement pursuant to the authority of the Board pursuant to Section 5.1 shall make the Capital Contributions (if any) to the Company determined by the Board pursuant to the authority of the Board pursuant to Section 5.1 in exchange for such Units.

3.1.3   Each Member shall be entitled to a certificate signed by the Company's Chief Executive Officer or Chief Financial Officer, certifying the number of Units in the Company held by such Member.  All certificates for Units shall be consecutively numbered or otherwise identified.  The name of the person to whom the Units thereby are issued and the date of issue shall be entered on the books of the Company.  Units of the Company shall only be transferred on the books of the Company by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Company of the certificate for such Units endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the Company may reasonably require.  In that event, it shall be the duty of the Company to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction on its books.

3.1.4   (i) If Board determines from time to time that an amount of additional cash is required for the operation or management of the Company or otherwise in connection with its business ("Required Funds") and that the Required Funds cannot be borrowed on reasonable terms, the Board may request, by written notice to each Class A Member and Class B Member ("Funds Request"), that the Class A Members and Class B Members contribute to the Company their Percentage Share of the Required Funds.  Each Member may, but is not required to, within forty-five (45) days after receipt of the Funds Request ("Contribution Date"), contribute to the Company, in cash, its Percentage Share of the Required Funds ("Additional Contribution").

In no event shall this Agreement be construed by the parties hereto or by any third party to require that any Member loan or contribute any portion of any Required Funds or make any Additional Contribution whatsoever to the Company.  If the Members choose to contribute, they shall make their contributions in cash to the Company on or before the Contribution Date.

(ii) If any Class A Member or Class B Member ("Non-Contributing Member") fails to make the entirety of its Additional Contribution pursuant to Section 3.1.4(i) above on or before the Contribution Date therefor (the amount of any Additional Contribution not so contributed being the "Deficiency"), the Class A Members and Class B Members who made the entirety of the Capital Contribution requested of them in the Funds Request pursuant to Section 3.1.4(i) above ("Contributing Members") may in each such event elect, but shall not be obligated, to lend the Deficiency to a Non-Contributing Member as described below.  If more than one Contributing Member wishes to make such loan, they shall do so pro rata in accordance with the ratio of their respective Percentage Shares, and in any case where there are multiple

such loans, the provisions of Section 3.1.4(iii) below shall apply separately with respect to each pro rata portion of the Deficiency (and the term "Deficiency" shall be so construed).

(iii) All or any portion of the Deficiency may be paid by such Contributing Member (in accordance with the provisions of Section 3.1.4(ii) above) on behalf of the Non-Contributing Member, in which event the Capital Account of the Non-Contributing Member shall be credited with the amount of such contribution and such amount shall constitute a debt ("Contribution Loan") owed by such Non-Contributing Member to such Contributing Member. A Contribution Loan shall bear interest at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law) until paid and shall be payable (with interest as aforesaid) only out of Distributions and other amounts otherwise payable to the Non-Contributing Member (as hereinafter provided). If a Contribution Loan is outstanding to a Non-Contributing Member, then any Distribution to be made by the Company to the Non-Contributing Member shall be deemed received by the Non-Contributing Member and shall instead be paid to the Contributing Member, to be applied against such Contribution Loan, first to interest and then to principal, until the full amount of such Contribution Loan, including accrued interest, is paid. If more than one Contribution Loan from the same Contributing Member to the same Non-Contributing Member is outstanding at the time of any Distribution, then such Distribution shall be made in payment first of accrued, unpaid interest and then principal to the Contributing Member in order of priority based on the inverse chronological order in which the Contribution Loans were made (i.e., the most recent Contribution Loan to be paid first in full). If more than one Contribution Loan was made to the same Non-Contributing Member with respect to the same Deficiency, then such Contribution Loans shall be paid pro rata (on the basis of the amount outstanding of such loans) to the Contributing Members and otherwise in accordance with the preceding sentence. All Contribution Loans, with interest as aforesaid, shall be nonrecourse as to the Non-Contributing Member, and shall be secured by the Non-Contributing Member's Membership Interest, and the Non-Contributing Member hereby grants a security interest in such Membership Interest to the Contributing Member and hereby irrevocably appoints each Contributing Member as its attorney-in-fact, coupled with an interest, with full power to prepare and execute any documents, instruments and agreements, including, but not limited to, any note evidencing the Contribution Loans, and such Uniform Commercial Code financing statements, continuation statements, and other security instruments as may be appropriate to perfect and continue such security interest in favor of the Contributing Member or Members. Said security interest shall terminate upon full repayment in full of the principal of and all accrued interest on the Contribution Loans. Any Additional Contribution so contributed by the Contributing Member or Members on behalf of a Non-Contributing Member shall be deemed made by the Non-Contributing Member except as otherwise provided herein.

Contribution Loans to a Non-Contributing Member with respect to a Non-Contributing Member's Deficiency shall be made by the Contributing Member or Members within fifteen days of such Contribution Date.

**3.2 Capital Accounts.** The Company shall maintain a separate Capital Account for each Member in accordance with the rules of Section 1.704-1(b)(2)(iv) of the U.S. Treasury Regulations (the "Treasury Regulations"), and this Section 3.2 shall be interpreted and applied in a manner consistent with said Section of the Treasury Regulations. The Managing Member may

adjust the Capital Accounts of its Members to reflect revaluations of Company property whenever the adjustment would be permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(f). In the event that the Capital Accounts of the Members are so adjusted, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property and (ii) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Section 704(c) of the Code. In the event that Code Section 704(c) applies to Company property, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property. The Capital Accounts shall be maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members in liquidation or otherwise. The amounts of all distributions to Members shall be determined pursuant to Section 4.1. Notwithstanding any provision contained herein to the contrary, no Member shall be required to restore any negative balance in its Capital Account.

**3.3 No Withdrawal.** No Person shall be entitled to withdraw any part of such Person's Capital Contribution or Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

**3.4 Loans From Members.** Loans by Members to the Company shall not be considered Capital Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amount of any such advances shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such advances are made.

**ARTICLE IV**

**DISTRIBUTIONS AND ALLOCATIONS**

**4.1 Distributions.**4.1.1 Subject to the provisions of <u>Section 4.1.2</u> and <u>Section 4.1.3</u>, the Board may in its sole discretion make Distributions at any time and from time to time. Except as otherwise set forth in this <u>Section 4.1</u> or <u>Article V</u>, each Distribution shall be made only in the following order and priority:

      (a) first, to the Class A Members in proportion to their Class A Unit holdings until the Class A Members have received aggregate distributions equal to the Class A Preferred Return Amount;

      (b) second, to the Class B Members in proportion to their Class B Unit holdings until the Class B Members have received aggregate distributions equal to the Class B Preferred Return Amount; and

(c) thereafter, to the Class A Members, Class B Members, and Participating Class C Members in proportion to the total number of Class A Units, Class B Units, and Participating Class C Units held by them.

If the amount (or any portion thereof) to be distributed pursuant to <u>Section 4.1.1</u> with respect to any particular Distribution exceeds the amount of any outstanding Class C Unit's Participation Threshold (determined immediately prior to such Distribution), then such Class C Unit shall constitute a Participating Class C Unit for purposes of <u>Section 4.1.1</u> only after a portion of the amount to be distributed in such Distribution equal to such Class C Unit's Participation Threshold has first been distributed to the holders of outstanding Units (including outstanding Class C Units that have lesser Participation Thresholds (determined immediately prior to such Distribution)).

4.1.2   Unless the Board determines that doing so would be imprudent in light of the current and projected capital requirements of the Company, the Company shall make cash advances against Distributions to the Members within 90 days following the end of each Fiscal Year in an amount equal to the excess, if any, of (x) the aggregate state and federal income tax liability such Member would have incurred which is attributable to its ownership of Units for all prior Fiscal Years (calculated as if such Member were a natural Person resident in the state of California and taxable at the maximum rates provided for under applicable federal and California state income tax laws), over (y) all prior cash distributions made to such Member pursuant to this Section 4.1.2 and Section 4.1.1 above.  Amounts otherwise to be distributed to the Members pursuant to this Section 4.1.2 shall be reduced by the amount of any prior advances made to such Members pursuant to this Section 4.1.2 so that, to the extent possible, each Member receives the same aggregate distributions that it would have received if this Section 4.1.2 were not included in this Agreement.  Notwithstanding anything to the contrary in this Section 4.1.2, no Tax Distributions shall be made with respect to any taxable income or gain arising from the occurrence of a transaction constituting a Liquidity Event or Approved Sale.

4.1.3   Each Distribution pursuant to <u>Section 4.1.1</u> and <u>Section 4.1.2</u> shall be made to the Persons shown on the Company's books and records as Members as of the date of such Distribution; <u>provided</u>, <u>however</u>, that any transferor and transferee of Units may mutually agree as to which of them should receive payment of any Distribution under <u>Section 4.1.2</u>.

**4.2 Allocations.** All items of Company income, gain, loss and deduction as determined for book purposes shall be allocated among the Members and credited or debited to their respective Capital Accounts in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible (i) that such allocations satisfy the economic effect equivalence test of Treasury Regulations Section 1.704-1(b)(2)(ii)(i) (as provided hereinafter) and (ii) that all allocations of items that cannot have economic effect (including credits and nonrecourse deductions) are allocated to the Members in accordance with the Members' interests in the Company.  To the extent possible, items that can have economic effect shall be allocated in such a manner that the balance of each Member's Capital Account at the end of any taxable year (increased by the sum of (a) such Member's "share of partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(g)(1) and (b) such Member's share of "partner nonrecourse debt minimum gain" as defined in Treasury Regulations Section 1.704-

2(i)(5)) would be positive to the extent of the amount of cash that such Member would receive (or would be negative to the extent of the amount of cash that such Member would be required to contribute to the Company) if the Company sold all of its property for an amount of cash equal to the book value (as determined pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)) of such property (reduced, but not below zero, by the amount of nonrecourse debt to which such property is subject) and all of the cash of the Company remaining after payment of all liabilities (other than nonrecourse liabilities) of the Company were distributed in liquidation immediately following the end of such taxable year in accordance with Section 15.2. The Board shall have discretion and authority to exercise on behalf of the Company any discretion the Company has with respect to available methods of allocation and related determinations and elections.

**4.3 Indemnification and Reimbursement for Payments on Behalf of a Member.** If the Company is obligated to pay any amount to a Governmental Entity (or otherwise makes a payment to a Governmental Entity) that is specifically attributable to a Member or a Member's status as such (including federal withholding taxes, state personal property taxes, and state unincorporated business taxes), then such Person shall indemnify the Company in full for the entire amount paid (including interest, penalties and related expenses). The Board may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company under this Section 4.3. A Member's obligation to make contributions to the Company under this Section 4.3 shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 4.3, the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 4.3, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Base Rate plus three percentage points per annum (but not in excess of the highest rate per annum permitted by law).

## ARTICLE V

## CLASS C UNITS

**5.1 Class C Units.** From time to time after the date hereof, the Board shall have the power and discretion to approve the issuance of authorized but unissued non-voting Class C Units to any employee, officer, manager, consultant or service provider of the Company (each such person, a "Management Member") in accordance with the terms of this Section 5.1. The Board shall have power and discretion to approve which employees, officers, managers, consultants or service providers shall be offered and issued such Class C Units, the number of Class C Units to be offered and issued to each Management Member and the purchase price therefore, if any. In connection with any approved issuance of Class C Units to a Management Member hereunder, such Management Member shall, unless already a Member and party to this Agreement, as a condition to such issuance, execute a counterpart to this Agreement, accepting and agreeing to be bound by all terms and conditions hereof, and shall enter into such other documents and instruments to effect such issuance as are required by the Board.

5.1.2    The Members anticipate that Class C Unit awards will be structured in a manner intended to allow them to qualify as "profits interests" (as that term is defined in Revenue Procedure 93-27), however, Class C Unit awards also may in the discretion of the Board be structured as "capital interests" (as that term is defined in Revenue Procedure 93-27).

On the date of each grant of Class C Units that is intended to constitute a "profits interest" (or to have similar tax characteristics to a profits interest) to a Management Member who is, or, as a result of such grant, becomes a Member or Additional Member pursuant to such grant, the Board shall establish an initial "Participation Threshold" amount with respect to each such Class C Unit granted on such date.  Unless otherwise determined by the Board, the Participation Threshold with respect to a Class C Unit intended to qualify as a profits interest shall be equal to or greater than the amount that would be distributed with respect to all Units pursuant to Section 4.1.1 in a hypothetical transaction in which the Company sold all of its assets for Fair Market Value and distributed the proceeds therefrom in liquidation of the Company pursuant to Section 15.2 (as determined immediately prior to the issuance of such Class C Unit, but taking into account all Capital Contributions, if any, with respect to all Units issued as part of the issuance of such Class C Unit). The Board may designate a series number for each subset of Class C Units consisting of Class C Units having the same Participation Threshold, which Participation Threshold differs from the Participation Thresholds of all Class C Units not included in such subset.  It is anticipated that initial grants of Class C Units will be made within thirty (30) days after the Effective Date.  Upon grant of any Class C Units, the Board will set forth on Schedule II to this Agreement the identity of the Management Members to whom such Class C Units have been granted, the number of Class C Units granted, and the applicable Participation Threshold.

5.1.3    Each Class C Unit's Participation Threshold shall be adjusted after the grant of such Class C Unit in the following manner: (i) in the event of any Distribution pursuant to Section 4.1.1 or 4.1.2 or any redemption or repurchase of Units by the Company, the Participation Threshold of each Class C Unit outstanding at the time of such Distribution, redemption, or repurchase shall be reduced (but not below zero) by the amount of such Distribution or the amount paid by the Company to redeem or repurchase such Units; and (ii) in the event of any Capital Contribution with respect to Units issued after such Class C Unit is issued, the Participation Threshold of such Class C Unit outstanding at the time of such Capital Contribution shall be increased by the amount of such Capital Contribution.

5.1.4    Each award of Class C Units will be evidenced by an award agreement in such form as may be approved by the Board setting forth the terms and conditions applicable to such award of Class C Units (each, a "Class C Unit Award Agreement").  Each award of Class C Units shall be subject to the terms and conditions of this Agreement and any other terms and conditions set forth in the applicable Class C Unit Award Agreement.  Unless otherwise determined by the Board and specified in any Class C Unit Award Agreement or otherwise specified in any employment agreement with the applicable Management Member, each award of Class C Units shall be subject to vesting over a period of four years from the date of grant in equal quarterly installments subject to the Management Member's continued employment.

**5.2 Repurchase Option; Forfeiture.**Unless otherwise provided by the Board in the written document(s) providing for the issuance of any Class C Units, in the event a Management Member ceases to be employed by the Company for any reason (the date of such cessation or termination, the "Termination Date"), all Unvested Units held by such Management Member shall expire and be forfeited to the Company, and such Management Member's Vested Units shall be subject to repurchase first by the Company and second by the

Members (exclusive of the Management Member whose Class C Units are the subject of such repurchase right) pursuant to the terms and conditions set forth in this <u>Section 5.2</u> (the "<u>Repurchase Option</u>"); provided, however, that if such Management Member's employment with the Company is terminated by the Company for Cause or resignation, all of such Management Member's Vested Units (in addition to all of such Management Member's Unvested Units) shall be forfeited to the Company and, ceasing thereupon to be a Management Member, such person shall cease by virtue thereof to be a Member as of the occurrence of such termination for Cause.

       5.2.2   The purchase price for Vested Units subject to repurchase pursuant to the Repurchase Option (the "<u>Available Units</u>") shall be equal to Fair Market Value of the Vested Units; provided, however, that, except as otherwise provided in any employment agreement with the applicable Management Member, if such Management Member willfully and materially engages in Direct Competition, the purchase price shall be equal to $0.

       5.2.3   The Company shall be entitled to exercise the Repurchase Option for all or any portion of the Available Units by delivering written notice (the "<u>Company Repurchase Notice</u>") to the holder of Available Units within one year after the Termination Date. The Company Repurchase Notice shall set forth the number of Available Units to be acquired from the holder thereof, the aggregate consideration to be paid for such Available Units and the time and place for the closing of the transaction; if the Company does not elect to purchase all of the Available Units pursuant to the Repurchase Option, the Company Repurchase Notice shall also set forth a statement that the other Members are entitled to exercise the Repurchase Option for all or any portion of the Available Units that the Company has not elected to purchase.

       5.2.4   If for any reason the Company does not elect to purchase all of the Available Units, the Class A Members and Class B Members shall be entitled to exercise the Repurchase Option for all or any portion of the Available Units that the Company has not elected to purchase (the "<u>Remaining Available Units</u>").  As soon as practicable after the Company has determined that there will be Remaining Available Units the Company shall give written notice (the "<u>Member Option Notice</u>") to the Class A Members and Class B Members setting forth the number of Remaining Available Units and the purchase price for the Remaining Available Units. The Class A Members and the Class B Members may, by giving written notice to the Company within thirty (30) days after the Member Option Notice has been furnished, elect to purchase all or any portion of their pro-rata share (based upon the total number of Units held by each of them) of the Remaining Available Units and any Member who fully-subscribes for their pro-rata share of the Remaining Available Units may also elect to purchase all or any part of any Remaining Available Units that the other Members do not elect to purchase. If any Member or Members do not elect to purchase their full pro-rata share of the Remaining Available Units and two or more Members elect to purchase Remaining Available Units in excess of their pro-rata shares ("<u>Oversubscription</u>") for a total number of remaining Remaining Available Units in excess of the number available for Oversubscription, the remaining Remaining Available Units available for Oversubscription under this <u>Section 5.2.4</u> shall be allocated to such oversubscribing Members pro rata based on the number of Units then held by them (exclusive of any unvested Class C Units).  As soon as reasonably practicable, the Company shall notify each Member who has elected to purchase Remaining Available Units as to the number of Remaining Available Units being purchased from such

holder by the Members (the "Member Repurchase Notice"). At the same time the Company delivers the Member Repurchase Notice to the holder of such Remaining Available Units, the Company shall also deliver written notice to the Class A Members and Class B Members confirming the number of Remaining Available Units the Members have elected to purchase, the aggregate purchase price and the time and place of the closing of the transaction.

5.2.5   The closing of the purchase of the Available Units pursuant to the Repurchase Option shall take place on the date designated by the Company in the Company Repurchase Notice or the Member Repurchase Notice, as applicable, which date shall be a business day not more than sixty (60) days nor less than five (5) days after the delivery of the later of either such notice to be delivered. Each of the Company and/or the purchasing Members shall pay for the Available Units or Remaining Available Units (as the case may be) to be purchased pursuant to the Repurchase Option by delivery of a cashier's or certified check or wire transfer of funds (except that the Company shall be permitted to reduce the payments to a holder of Available Units hereunder by the aggregate of all amounts due the Company by such holder of Available Units that are evidenced in writing from the holder to the Company and all tax or other withholding obligations). The purchasers of Available Units and/or Remaining Available Units hereunder shall be entitled to (i) receive from the transferor thereof representations and warranties regarding good title to such securities, free and clear of any liens or encumbrances, regarding the transferor's authorization and/or capacity to sell such securities and that the agreement containing such representations and warranties is a valid and binding agreement, enforceable against such transferor in accordance with its terms, without violation of any agreement, contract or other provision to which such transferor is party and (ii) require that signatures be guaranteed by a national bank or reputable securities broker. Upon delivery of the Company Repurchase Notice or the Member Repurchase Notice, as applicable, the Vested Units to be repurchased shall automatically represent solely the right to receive the applicable repurchase price and such Vested Units shall no longer be deemed to be outstanding.

5.2.6   The Repurchase Option set forth in this Section 5.2 shall continue to apply to Vested Units following any Transfer.

### ARTICLE VI

### MANAGEMENT

**6.1 Authority of Board.** The business and affairs of the Company shall be managed under the direction of the Board who may exercise all the powers of the Company except as otherwise provided by law or by this Agreement. In the event of a vacancy in the Board of Directors, the remaining Directors, except as otherwise provided by law, may exercise the powers of the full Board until the vacancy is filled. Without limiting the generality of the foregoing, the Board shall have sole and complete discretion in determining whether to issue Equity Securities, the number and class of Equity Securities to be issued at any particular time, the Capital Contribution or purchase price for any Equity Securities issued, and all other terms and conditions governing the issuance of Equity Securities. The Board of Directors shall serve as the "manager" of the Company within the meaning of the Act.

**6.2 Actions of the Board.** The Board may act (i) through meetings and written consents pursuant to Section 6.5 and (ii) through any Person or Persons to whom authority and duties have been delegated pursuant to Section 6.6.

**6.3 Composition.** The Board shall initially consist of five (5) individual Directors. The Class A Members voting separately as a class shall have the right to elect three (3) Directors (the "Class A Directors"), provided that the each Class A Director's candidacy for election to the Board shall be subject to the approval of the Class B Members, not to be unreasonably withheld. The Class B Members voting separately as a class shall have the right to elect two (2) Directors (the "Class B Directors"), provided that each Class B Director's candidacy for election to the Board shall be subject to the approval of the Class A Members, not to be unreasonably withheld. The Board of Directors shall select a non-executive Chair of the Board of Directors (the "Chair"), who initially shall be Bruce A. L. Willard, to have the general duties, powers and responsibilities of the Chair of the board of directors of a corporation.

6.3.2   The following persons shall be the initial Class A Directors and Class B Directors:

| Class A Directors | | Class B Directors | |
|---|---|---|---|
| 1. | Bruce A.L. Willard | 1. | Joshua L. Powell |
| 2. | William End | 2. | Martin Laird Koldyke |

6.3.3   Each such person is hereby decreed duly appointed to the Board as of the date of this Agreement.

6.3.4   Except as otherwise provided by law, this Agreement, or any Employment Agreement or other written agreement between the applicable Director and the Company, Directors shall hold office until their successors are elected and qualified or until their earlier resignation or removal. Any Director may resign by delivering his written resignation to the Company. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event. Any Director may be removed with or without cause by vote of the class of Members who appointed such Director. Upon the death, retirement, resignation or removal of any Director, the class of Members who appointed such Director shall have the right to designate a replacement Director.

**6.4 Proxies.** A Director may vote at a meeting or by written consent of the Board or any committee thereof either in person or by proxy executed in writing by such Director. A telegram, telex, cablegram or similar transmission by the Director, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Director shall (if stated thereon) be treated as a proxy executed in writing for purposes of this Section 6.4. Proxies for use at any meeting of the Board or any committee thereof or in connection with the taking of any action by written consent shall be filed with the Board, before or at the time of the meeting or execution of the written consent as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the majority of the Board who shall

decide in good faith all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes. A Director proxy shall be valid only for the meeting or action for which the proxy was given. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and that the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the votes that are the subject of such proxy are to be voted with respect to such issue.

**6.5 Meetings, Voting, Etc.** Meetings of the Board and any committee thereof shall be held at the principal office of the Company or at such other place as may be determined by the Board or such committee. Regular meetings of the Board shall be held on such dates and at such times as shall be determined by the Board. Special meetings of the Board or any committee may be called by any two Directors (or, in the case of a special meeting of any committee of the Board, by any member thereof) on at least 24 hours' prior notice to the other Directors, which notice shall state the purpose or purposes for which such meeting is being called. The actions taken by the Board or any committee at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Director as to whom it was improperly held signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof. The actions by the Board or any committee thereof may be taken by vote of the Board or any committee at a meeting of the Directors thereof or by written consent (without a meeting, without notice and without a vote). A meeting of the Board or any committee may be held by conference telephone or similar communications equipment by means of which all individuals participating in the meeting can be heard.

6.5.2    Each Director shall have one vote on all matters submitted to the Board or any committee thereof (whether the consideration of such matter is taken at a meeting, by written consent or otherwise). In all cases, the affirmative vote (whether by proxy or otherwise) of members of the Board holding a majority of the votes of all members of the Board shall be the act of the Board. Except as otherwise provided by the Board when establishing any committee, the affirmative vote (whether by proxy or otherwise) of members of such committee holding a majority of the votes of all members of such committee shall be the act of such committee.

Notwithstanding the foregoing or anything to the contrary herein, the following actions and determinations may only be taken and made with the Special Consent of the Board:

A.    increase in the authorized capital of the Company;

B.      causing the Company to commence any proceeding with respect to itself under any law relating to bankruptcy or reorganization or seeking the appointment of a receiver or similar official for its assets;

C.      except as permitted by Article XV, causing the liquidation or dissolution of the Company;

D.      causing the Company to elect to be classified as an association taxable  as a corporation for federal income tax purposes; and

E.      any amendment to the Certificate of Formation or this Agreement.

6.5.3    JL Powell's relationship and agreements with QuickFeat International, Ltd. and any other Affiliate of BHH or any Affiliate of a Person with an ownership interest in BHH (collectively "BHH Affiliates") as in existence prior to the Effective Date shall continue as arms-length, third party arrangements and agreements.  The Company will not enter into or materially modify any agreements or arrangements with any BHH Affiliates without the Special Consent of the Board.  As used in this Agreement, the term "Special Consent" means the consent or affirmative vote of a majority of the members of the Board, including the consent or affirmative vote of at least one of the Class B Directors.

6.5.4    The Company shall pay the reasonable out-of-pocket expenses incurred by each Director in connection with attending the meetings of the Board and any committee thereof (unless such expenses shall have been paid or are required to be paid by any other Person).  The Board, in its discretion may authorize the Company to pay any  Director who is not an employee of the Company reasonable fees for service as a  Director.  Except as otherwise provided in the immediately preceding sentence or elsewhere in this Agreement or in any separate agreement, the Directors shall not be compensated for their services as members of the Board.

**6.6 Delegation of Authority; Officers.** The Board may, from time to time, delegate to one or more Persons (including any Director or officer of the Company and including through the creation and establishment of one or more committees) such authority and duties as the Board may deem advisable.  In addition, the Board may assign titles (including, without limitation, managing director, chairman, chief executive officer, president, principal, vice president, secretary, assistant secretary, treasurer, or assistant treasurer) and delegate certain authority and duties to such persons; provided, however, in no event shall the Board delegate authority to any officer to cause or permit the Company to make any single expenditure in excess of $100,000 other than for payment of inventory, catalog paper and printing and postage.  Any number of titles may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.  Any delegation pursuant to this Section 6.6 shall be in writing and may be revoked at any time by the Board in its sole discretion.

**6.7 Purchase of Units.**  The Board may cause the Company to purchase or otherwise acquire Units, or may purchase or otherwise acquire Units on behalf of the Company.  As long as

such Units are owned by or on behalf of the Company such Units will not be considered outstanding for any purpose.

**6.8 Limitation of Liability.** Except as otherwise provided herein or in an agreement entered into by such Person and the Company, no Director, or any of such Director's Affiliates, or any person delegated authority under <u>Section 6.6</u> shall be liable to the Company or to any Member for any act or omission performed or omitted by such Director in the Director's capacity as a member of the Board pursuant to authority granted to such Person by this Agreement; <u>provided that</u>, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's gross negligence, willful misconduct or knowing violation of law or for any present or future breaches of any representations, warranties or covenants by such Person or its Affiliates contained herein or in the other agreements with the Company, including without limitation the Contribution Agreement. The Board may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and no Director or any of such Director's Affiliates shall be responsible for any misconduct or negligence on the part of any such agent appointed by the Board (so long as such agent was selected in good faith and with reasonable care). The Board shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Board in good faith reliance on such advice shall in no event subject the Board or any Director thereof to liability to the Company or any Member.

6.8.2   Whenever this Agreement or any other agreement contemplated herein provides that the Board shall act in a manner which is, or provide terms which are, "fair and reasonable" to the Company or any Member, the Board shall determine such appropriate action or provide such terms considering, in each case, the relative interests of each party to such agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable United States generally accepted accounting practices or principles.

6.8.3   Whenever in this Agreement or any other agreement contemplated herein, the Board is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, the Board shall be entitled to consider such interests and factors as it desires, <u>provided that</u>, the Board shall act in good faith.

6.8.4   Whenever in this Agreement the Board is permitted or required to take any action or to make a decision in its "good faith" or under another express standard, the Board shall act under such express standard and, to the extent permitted by applicable law, shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein, and, notwithstanding anything contained herein to the contrary, so long as the Board acts in good faith, the resolution, action or terms so made, taken or provided by the Board shall not constitute a breach of this Agreement or any other agreement contemplated herein or impose liability upon the Board, any Director thereof or any of such Director's Affiliates.

## ARTICLE VII

### RIGHTS AND OBLIGATIONS OF MEMBERS

**7.1 Limitation of Liability.** Except as provided in this Agreement or in the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and no Member shall be obligated personally for any such debts, obligation or liability solely by reason of being a Member of the Company.  Except as otherwise provided in this Agreement, a Member's liability (in its capacity as such) for Company liabilities and losses shall be limited to the Company's assets; provided that a Member shall be required to return to the Company any Distribution made to it in clear and manifest accounting or similar error.  The immediately preceding sentence shall constitute a compromise to which all Members have consented within the meaning of the Delaware Act.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

**7.2 Lack of Authority.**  No Member in its capacity as such (other than through its Director or as a Director or Officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures on behalf of the Company.  The Members hereby consent to the exercise by the Board and the Directors of the powers conferred on them by law and this Agreement.

**7.3 No Right of Partition.**  No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

**7.4 Indemnification.**  Subject to Section 4.3, the Company hereby agrees to indemnify and hold harmless any Person (each an "Indemnified Person") to the fullest extent permitted under the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Company is providing immediately prior to such amendment), against all expenses, liabilities and losses (including attorneys' fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Member or is or was serving as a Director, officer, director, principal, member, employee or agent of the Company or is or was serving at the request of the Company as a Director, officer, director, principal, member, employee or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise; provided that (unless the Board otherwise consents) no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' gross negligence, willful misconduct or knowing violation of law or for or with respect to any present or future breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates contained herein or in any other agreement with the Company, including without

limitation the Contribution Agreement.  Reasonable expenses, including attorneys' fees, incurred by any such Indemnified Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company.

       7.4.2   The right to indemnification and the advancement of expenses conferred in this <u>Section 7.4</u> shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, by-law, vote of Directors or otherwise.

       7.4.3   The Company may maintain insurance, at its expense, to protect any Indemnified Person against any expense, liability or loss described in this <u>Section 7.4</u> whether or not the Company would have the power to indemnify such Indemnified Person against such expense, liability or loss under the provisions of this <u>Section 7.4</u>.

       7.4.4   Notwithstanding anything contained herein to the contrary (including in this <u>Section 7.4</u>), any indemnity by the Company relating to the matters covered in this <u>Section 7.4</u> shall be provided out of and to the extent of Company assets only and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

       7.4.5   If this <u>Section 7.4</u> or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this <u>Section 7.4</u> to the fullest extent permitted by any applicable portion of this <u>Section 7.4</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

   **7.5 Members Right to Act.**  For situations which the approval of the Members (rather than the approval of the Board on behalf of the Members) is required, the Members shall act through meetings and written consents as described in this <u>Section 7.5</u>.

       7.5.2   Except as otherwise provided by this Agreement or as otherwise expressly required by the Delaware Act, an act approved by the holders of a majority of the outstanding Class A Units and Class B Units (together, the "<u>Voting Units</u>"), voting as a single class, shall be the act of the Members, and the holders of Class C Units shall have no right to vote on any matters to be voted on or determined by the Members of the Company.  Any Member entitled to vote at a meeting of Members or to express consent or dissent to Company action in writing without a meeting may authorize another person or persons to act for it by proxy.  A photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall (if stated thereon) be treated as a proxy executed in writing for purposes of this <u>Section 7.5.2</u>.  No proxy shall be voted or acted upon after eleven months from the date thereof, unless the proxy provides for a longer period.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and that the proxy is coupled with an interest.  Should a proxy designate two or more Persons to act as proxies, unless that

instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or, if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the votes that are the subject of such proxy are to be voted with respect to such issue. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the majority of the Board who shall decide in good faith all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes.

7.5.3 The actions by the Members permitted hereunder may be taken at a meeting called by Members holding a majority of the Voting Units on at least five days' prior written notice to the other Members entitled to vote, which notice shall state the purpose or purposes for which such meeting is being called. The actions taken by the Members entitled to vote or consent at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held after regular call and notice if (but not until), either before, at or after the meeting, the Members entitled to vote or consent as to whom it was improperly held signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof. The actions by the Members entitled to vote or consent may be taken by vote of the Members entitled to vote or consent at a meeting or by written consent (without a meeting, without notice and without a vote) so long as such consent is signed by the Members having not less than the minimum number of Voting Units that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the action so taken without a meeting shall be given to those Members entitled to vote or consent who have not consented in writing. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof.

**7.6 Conflicts of Interest.**   Each Member, its Affiliates and each of their respective stockholders, directors, officers, controlling persons, partners, members, and employees (collectively, the "Member Group") shall bring to the Company all investment or business opportunities of which any of the foregoing become aware and which they believe are, or may be, reasonably within the scope and investment objectives of the Company which would likely be beneficial to the Business of the Company, or are otherwise competitive with the Business of the Company provided, however, the Members: (i) expressly acknowledge and agree that Blue Highways Holdings III, the initial Class A Member, and its Member Group are permitted to have, and may presently or in the future have such types of investments or other business relationships and shall not be required to bring any investment or business opportunities of any kind to the Company and (ii) hereby waive any claim against the initial Class A Member, any member of its Member Group or any Director designated by the Class A Members pursuant to Section 6.3 based on the corporate opportunity doctrine, any alleged unfairness to the Company or such Member or otherwise that would require the initial Class A Member, any member of its Member Group or any Director designated by the Class A Members pursuant to Section 6.3 to offer any opportunity relating thereto to the Company.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**8.1 Records and Accounting.**The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's Business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 8.3 or pursuant to applicable laws.   All matters concerning (i) the determination of the relative amount of allocations and distributions among the Members pursuant to Articles III, IV and V and (ii) accounting procedures and determinations, and other determinations, to the extent not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board in its reasonable judgment and the Board's determination shall be final and conclusive as to all Members absent manifest clerical error.

**8.2 Fiscal Year.**The Fiscal Year of the Company shall end on December 31 of each calendar year or shall be such other annual accounting period as may be established by the Board.

**8.3 Reports.**The Company shall, to the extent required by the Delaware Act, deliver or cause to be delivered to each Member with reasonable promptness, such other information and financial data concerning the Company as any Member shall from time to time reasonably request; provided that furnishing such information shall not be financially burdensome on the Board, the Company or unreasonably time consuming for the Board or the employees of the Company.

8.3.2   The Company shall use commercially reasonable efforts to deliver or cause to be delivered, within 120 days after the end of each Fiscal Year, to each Person who was a Member at any time during such Fiscal Year all information necessary for the preparation of such Person's United States federal and state income tax returns.

**8.4 Transmission of Communications.**Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice or other communication received from the Board to such other Person or Persons.

## ARTICLE IX

## TAX MATTERS

**9.1 Preparation of Tax Returns.**The Company shall arrange for the preparation and timely filing of all returns required to be filed by the Company.

**9.2 Tax Elections.**The Taxable Year shall be the Fiscal Year set forth in Section 8.2, unless the Board shall determine otherwise in its sole discretion and in compliance with applicable laws.  The Board shall, in its sole discretion, determine whether to make or revoke any available election pursuant to the Code.  Each Member will upon request supply any information necessary to give proper effect to such election.

**9.3 Tax Controversies.**Blue Highways Holdings III is hereby designated the Tax Matters Partner and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services reasonably incurred in connection therewith.  Each Member agrees to cooperate with the Company and to do or refrain from doing any or all things reasonably requested by the Company with respect to the conduct of such proceedings.  The Tax Matters Partner shall keep all Members fully informed of the progress of any examinations, audits or other proceedings, and all Members shall have the right to participate at their expense in any such examinations, audits or other proceedings.  Notwithstanding the foregoing, the Tax Matters Partner shall not settle or otherwise compromise any issue in any such examination, audit or other proceeding without first obtaining approval of the Board.

## ARTICLE X

## TRANSFER OF COMPANY INTERESTS

**10.1   Transfers by Members.**   No Member may sell, transfer, assign, pledge, encumber or otherwise directly or indirectly dispose of any interest in any Units (a "Transfer"), without the prior written consent of the Board, which consent may be withheld in the Board's sole discretion, except Transfers pursuant to and in accordance with this Article X.

**10.2   Right of First Refusal**.

10.2.1 If any Class B Member ("Selling Member") desires to accept an offer (which must be in writing and for cash, be irrevocable by its terms for at least 60 days and be a bona fide third party offer as determined in good faith by the Board) from any prospective purchaser to purchase all or any part of the Units at any time owned by the Selling Member, the Selling Member shall give notice in writing to the Company and to each of the Members ("Offer Notice") (i) designating the number of Units proposed to be sold (the "Offer Units"),

(ii) naming the prospective purchaser of such Units and (iii) specifying the price (the "Offer Price") at and terms (the "Offer Terms") upon which the Selling Member desires to sell the same. During the 30-day period following receipt of such notice by the Company and the Members (the "First Refusal Period"), the Company shall have the assignable right and option to elect to purchase from the Selling Member the Offer Units, at the Offer Price and on the Offer Terms. For the avoidance of doubt, any determination with respect to the Company's right and option under this Article X shall be made by the Board in its discretion.

        10.2.2  If the Company fails to exercise its right to purchase the Offer Units within the First Refusal Period, the Class A Members and Class B Members shall have the right to purchase their pro-rata shares (based upon the total number of Units then held by each of them) of the Offer Units (and any Class A Members and Class B Members who have fully-subscribed for their pro-rata shares may also elect to purchase all or any portion of the Offer Shares that the other Class A Members and Class B Members do not elect to purchase), at the Offer Price and on the Offer Terms and at any time during the period beginning on the earlier of (x) the end of the First Refusal Period and (y) the date of receipt by the Class A Members and the Class B Members of written notice that the Company has elected not to exercise its right to purchase the Offer Shares and ending 30 days thereafter (the "Second Refusal Period"). If any Class A Members or Class B Members do not elect to fully subscribe for their pro-rata share of the Offer Units and two or more Class A Members or Class B Members elect to purchase Offer Units in excess of their pro-rata shares ("Oversubscription") for a total number of Offer Shares in excess of the number of available for Oversubscription, the Offer Units available for Oversubscription under this Section 10.2.2 shall be allocated to such oversubscribing Members pro rata based on the number of Units then held by them.

        10.2.3  Any election to purchase Offer Units pursuant to this Section 10.2 shall be made by irrevocable written notice to the Selling Member, the Company and each Class A Member and Class B Member given at any time during the applicable period. The closing of the purchase of Offer Units by the Company and, if applicable, Class A Members and Class B Members shall take place, and all payments from the Company and, if applicable, the Class A Members and Class B Members shall have been delivered to the Selling Member, by the later of (i) the date specified in the Offer Notice as the intended date of the proposed Transfer and (ii) forty-five (45) days after commencement of the First Refusal Period. At the closing, the Company or Class A Members or Class B Members, as the case may be, shall deliver to the Selling Member a certified or bank check for the Offer Units, payable to the order of the Selling Member, against delivery of certificates or other instruments representing the Offer Units so purchased, appropriately endorsed by the Selling Member.

        10.2.4  If any Offer Units are not elected to be purchased by the Company or Class A Members or Class B Members prior to the expiration of the Second Refusal Period, then at any time during the 90 days following the expiration of the Second Refusal Period, the Selling Member may sell the Offer Units to (but only to) the intended purchaser named in the Offer Notice at the Offer Price and on the Offer Terms, free of all restrictions or obligations imposed by, and free of any rights or benefits set forth in this Agreement, provided that such intended purchaser shall have agreed in writing, pursuant to an instrument of assumption satisfactory in substance and form to the Class A Members and Class B Members, to join in and become a party to this Agreement and to thereby become subject to and bound by all of the

terms and conditions of this Agreement, including, without limitation, any obligation to make Capital Contributions with respect to any then unmet Capital Commitment with respect to the Units acquired.

**10.3    Participation Rights.** If one or more Class A Members (the "<u>Transferring Members</u>") intend to effect, in one or a series of  transactions, a Transfer of more than fifty percent (50%) of the total number of outstanding Class A Units, other than pursuant to a Permitted Transfer or an Approved Sale (a "<u>Tag-Along Transfer</u>"), at least 15 days prior to any Transfer of Units in or as part of the Tag-Along Transfer, the Transferring Member will deliver written notice (the "<u>Sale Notice</u>") to the Company and the other Members (of each Class) specifying in reasonable detail the identity of the prospective transferee(s) (the "<u>Proposed Purchaser</u>") and the terms and conditions of the Transfer.  Notwithstanding the restrictions contained in this <u>Article X</u>, any or all of such other Class A Members, Class B Members, and Management Members with respect to their Participating Class C Units may elect to participate in the contemplated Transfer by delivering written notice (a "<u>Tag-Along Notice</u>") to the Transferring Member or Members within 10 days after delivery of the Sale Notice.  If no Tag-Along Notice is received by the Transferring Member within such 10-day period, none of the other Members shall have the right to participate in the Transfer, and the Transferring Member shall have the right for a 90-day period to transfer to the Proposed Purchaser up to the number of Units stated in the Sale Notice, on terms and conditions no more favorable to the Transferring Member than those stated in the Sale Notice.  If any of the other Class A Members, Class B Members, and Management Members with respect to their Participating Class C Units have elected to participate in such Transfer (such other Members, "<u>Participating Members</u>"), each of the Transferring Member and such Participating Members will be entitled to sell in the contemplated Transfer, at the same price (provided that the price for Units shall be based upon the relative distribution priorities and preferences of each such class in relation to the other) and on the same terms, a number of Units equal to the product of (A) the quotient determined by dividing the number of Units owned by such person by the aggregate number of Units owned by the Transferring Member and the Participating Members in such sale and (B) the number of Units to be sold in the contemplated Transfer.

10.3.2 Any of the Participating Members may elect to sell in any Transfer contemplated under this <u>Section 10.3</u> a lesser number of Units than such Participating Member is entitled to sell hereunder, in which case the Transferring Member shall have the right to sell an additional number of Units in such Transfer equal to the number that such Participating Member has elected not to sell.

10.3.3 The Transferring Member and the Participating Members will bear their pro-rata share (based upon the number of Units sold by such Person of each class in relation to the number of Units sold by all Persons in such Transfer of such class of Units (with each class to bear such expenses based upon the relative distribution priorities and preferences of each such class in relation to the other)) of the out-of-pocket costs of any Transfer pursuant to this <u>Section 10.3</u> which are borne by the Transferring Member to the extent such costs are incurred for the benefit of all Persons participating in the Transfer and are not otherwise paid by the Company or the Proposed Purchaser.   Costs incurred by the Participating Members participating in the Transfer on their own behalf will not be considered costs of the Transfer hereunder.

10.3.4 In connection with a transfer pursuant to this Section 10.3, each Participating Member agrees to execute and deliver any other documentation reasonably required to consummate such transfer on substantially the same terms as are applicable to the Transferring Member.

**10.4    Drag-Along Rights** If one or more Class A Members (also, the "Transferring Members") intends to Transfer any Units (other than a Transfer that would qualify as a Permitted Transfer or an Approved Sale) to a Proposed Purchaser (including the Company) (a "Drag-Along Sale"), upon the request of such Transferring Members, each other Member will sell to such Proposed Purchaser at the same price (provided that the price for Units shall be based upon the relative distribution priorities and preferences of each such class in relation to the other) and on the same terms as such Transferring Members, the number of Units equal to the product of (i) the quotient determined by dividing the number of Units that the Transferring Members propose to transfer and the denominator of which is the total number of Units held by such Transferring Members and (ii) the number of Units then held by such other Member; provided that, as a condition to any Class B Member's participation in any Drag-Along Sale, the Class B Members shall receive upon consummation of the Drag-Along Sale the Hurdle Return (without regard to any potential indemnification or similar liability arising out of or in connection with the Drag-Along Sale).

10.4.1  . Each other Member shall be obligated to join on a pro rata basis (based on the number of Units of the applicable class to be transferred) in any indemnification or other obligations that the Transferring Members are required to provide in connection with the such transfer (other than any such obligations that related solely to a particular Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Units, in respect of which only such Member shall be liable). Each other Member will take all necessary or desirable actions in connection with the consummation of such Transfer as requested by the Transferring Members.

10.4.2 At least 10 days prior to consummating any Drag-Along Sale, the Transferring Members shall, if they determine that the other Members shall participate in such transfer, deliver each such holder written notice (the "Drag-Along Notice"), specifying in reasonable detail the identity of the Proposed Purchaser and the terms and conditions of the transfer.

10.4.3 Each other Member will bear its pro rata share (based upon the number of Units of each class sold by such holder in relation to the number of Units sold by all holders in such Drag-Along Sale (with each class to bear such expenses based upon the relative distribution priorities and preferences of each such class in relation to the other)) of the costs of any sale of Units pursuant to this Section 10.4 borne by the Transferring Members to the extent such costs are incurred for the benefit of all holders of Units and are not otherwise paid by the acquiring party. Costs incurred by the other Members on their own behalf will not be considered costs of the transaction hereunder.

10.4.4 In connection with a transfer pursuant to this Section 10.4, each other Member hereby appoints the Class A Member designated by the Transferring Members as its true and lawful proxy and attorney-in-fact, with full power of substitution, to transfer such Units

pursuant to the terms of such transfer and to execute any purchase agreement or other documentation required to consummate such transfer. Each other Member agrees to execute and deliver any other documentation reasonably required to consummate such transfer. The powers granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive death, incompetency or dissolution of any such other Member.

10.4.5 If a Member receives its proportionate share of the purchase price from a Drag-Along Sale, but has failed to deliver certificates (or other documentation, if applicable) representing its Units as described above, it shall have no voting rights, shall not be entitled to dividends or other distributions and shall have no other rights or privileges granted to such holders under law or this Agreement with respect to such Units.

**10.5    Permitted Transfers.**

The restrictions contained in Section 10.2 will not apply to any Tag-Along Transfer or Drag-Along Transfer, and the restrictions contained in Article X will not apply to (i) a Public Sale, (ii) an Approved Sale, (iii) a Transfer of Units by any Member to a trust or other estate planning vehicle solely for the benefit of such Member and/or such Member's spouse and/or descendants or pursuant to the laws of descent and distribution, (iv) a Transfer to another Member, or (v) on or after the date that is eighteen (18) months following the Effective Date, a Transfer of Units by JL Powell, Inc., the initial Class B Member, to its stockholders; provided, that the restrictions contained in this Agreement will continue to apply to the Units after any such Transfer pursuant to clause (iii), (iv), or (v) above or any Transfer pursuant to a Tag-Along Transfer or a Drag-Along Transfer and the transferees of such Units pursuant to such clauses or pursuant to a Tag-Along Transfer or Drag Along Transfer shall agree in writing as a condition to any such Transfer, to be bound by the provisions of this Agreement; provided further, that the transferees of such Units pursuant to clause (v) shall as a condition to any such Transfer, (a) join in and become a party to this Agreement, (b) make such representations, warranties, and agreements and execute and deliver to the Company such instruments and agreements as the Board in its discretion may require with respect to compliance with applicable law, including, without limitation, applicable securities laws, (c) release any claims such transferee may have against JL Powell or the Company, (d) agree that such Transfer is subject to any claims or remedies the Company may have against JL Powell, including without limitation any claims for indemnification against the Company for which such transferee shall be severally liable, and which claims may be satisfied by the Company only by (i) cancellation and/or redemption of the Class B Units subject to such Transfer or (ii) by offsetting and reducing any amounts otherwise payable or distributable to such transferee with respect to any Class B Units held by such transferee and (e) indemnify and hold harmless the Company from and against any claims, liability, or expense that may arise with respect to or as a result of distribution of Units to such transferee, including, without limitation arising out of any dispute as or challenge to whether such distribution was proper or whether such transferee or any other Person is the proper recipient of such or has any interest or claim to Units distributed. Upon the Transfer of Units pursuant to clauses (iii) or (iv) of this Section 10.5, the transferor will deliver a written notice to the Company and the other parties to this Agreement, which notice will disclose in reasonable detail the identity of such transferee.

**10.6    Sale of the Company.**

If a Majority in Interest approves a sale of all or substantially all of the Company's assets determined on a consolidated basis or a sale of a majority of the Company's outstanding Units to a Person or group of Persons (whether by merger, recapitalization, consolidation, reorganization, combination, sale of Units or otherwise) (collectively an "Approved Sale"), the Company shall deliver written notice to the Members setting forth in reasonable detail the terms and conditions of the Approved Sale (including, to the extent then determined, the consideration to be paid with respect to each class of Units). Each Member will consent to and raise no objections against such Approved Sale, and shall be deemed hereby to have consented to and approved such Approved Sale; provided that, as a condition to any Class B Member's participation in any Approved Sale approved by the holders of less than two-thirds (2/3) of the outstanding Voting Units, the Class B Members shall receive upon consummation of the Approved Sale the Hurdle Return (without regard to any potential indemnification or similar liability arising out of or in connection with the Approved Sale). If the Approved Sale is structured as (i) a merger or consolidation, each Member will waive any dissenter's rights, appraisal rights or similar rights in connection with such merger or consolidation or (ii) a sale of Units (including by recapitalization, consolidation, reorganization, combination or otherwise), each Member will agree to sell all of its Units and rights to acquire Units on the terms and conditions approved by and applicable to a Majority in Interest. Each Member will take all required actions in connection with the consummation of the Approved Sale as requested by a Majority in Interest.

10.6.1 The obligations of the Members with respect to an Approved Sale are subject to the satisfaction of the following conditions: (i) upon the consummation of the Approved Sale and subject to the provisions of this Agreement, each Member will receive the same form of consideration and the same portion of the aggregate consideration as any other holder of Units of the same class (such amount to be based upon the relative distribution priorities and preferences of each such class in relation to the others); (ii) if any holders of a class of Units are given an option as to the form and amount of consideration to be received, each holder of such class of Units will be given the same option; and (iii) each holder of then currently exercisable rights to acquire Units shall be given written notice and an opportunity to either (A) exercise such rights prior to the consummation of the Approved Sale and participate in such sale as Members or (B) upon the consummation of the Approved Sale, receive in exchange for such rights consideration equal to the amount determined by multiplying (1) the same amount of consideration per Unit to be received by holders of such class of Units in connection with the Approved Sale less the exercise price per share of such class of Units or such rights to acquire such class of Units by (2) the number of Units of such class represented by such rights.

10.6.2 If the Company or the holders of the Company's securities enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the Members will, at the request of the Company, appoint a purchaser representative (as such term is defined in Rule 501 promulgated by the Securities and Exchange Commission) reasonably acceptable to the Company. If any Member appoints a purchaser representative designated by the Company, the Company will pay the fees of such purchaser representative, but if any Member declines to appoint the purchaser representative designated by the Company, such holder will appoint

another purchaser representative, and such holder will be responsible for the fees of the purchaser representative so appointed.

10.6.3 Each Member will bear its pro rata share (based upon the number of Units sold by such holder of each class of Units in relation to the number of Units sold by all holders in such Approved Sale of such class of Units (with each class and series to bear such expenses based upon the relative distribution priorities and preferences of each such class and series in relation to the other, such that all costs and expenses are treated as reducing the aggregate consideration to be allocated among all outstanding Units in accordance with the following paragraph)) of the costs and expenses of any sale of Units of any Approved Sale which are incurred by or with the consent of a Majority in Interest to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.  Costs and expenses incurred by Members on their own behalf will not be considered costs of the transaction hereunder.

10.6.4 In the event of an Approved Sale or a transaction (whether or not constituting an Approved Sale) of the type defined in either clause (b) or (c) of the term Liquidity Event, each holder of Units shall receive in exchange for the Units held by such holder the same portion of the aggregate consideration from such transaction that such holder of Units would have received if such aggregate consideration to be paid to all holders of Units in such transaction had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in Section 4.1.1.  Each Member shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from such transaction as requested by a Majority in Interest in order to effectuate the provisions of the foregoing sentence.  Consistent with the foregoing, and for avoidance of doubt, the Members acting by consent of a Majority in Interest shall be permitted to arrange for or cause the Company to arrange for indemnification obligations in connection with any such transaction to operate such that each holder of Units shall be obligated to join on a pro rata basis (based on the number of Units of each applicable class or series) in indemnification obligations on a class-by-class basis in such a manner so that an indemnification obligation constituting an adjustment to the aggregate consideration payable to all Members shall be borne in full by a class or series to the extent that such class or series received a portion of the aggregate consideration from such transaction in accordance with the first sentence of this paragraph which would not have been received by such class or series had the amount of such indemnification obligation not constituted part of the aggregate consideration from such transaction in the first instance.

10.6.5 In connection with an Approved Sale, each Member hereby appoints the Board, acting under the direction or with the consent of a Majority in Interest, as its true and lawful proxy and attorney-in-fact, with full power of substitution, to transfer such Units pursuant to the terms of such Approved Sale and to execute any purchase agreement or other documentation required to consummate such Approved Sale. Each Member agrees to execute and deliver any other documentation reasonably required to consummate the Approved Sale. The powers granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive death, incompetency or dissolution of any such Member.

**10.7    IPO.** If the Board or holders of a Majority in Interest request the Company and all Members, the Company and all Members will take all reasonably necessary or desirable actions in connection with the consummation of an IPO. If such IPO is an underwritten offering and the managing underwriters advise the Company in writing that in their opinion the Company Unit structure or status as a limited liability company will adversely affect the marketability of the offering, each Member will consent to and vote for either a tax reclassification election or a recapitalization, reorganization and/or exchange of the Units into securities that the managing underwriters and the Board find acceptable and will take all reasonably necessary or desirable actions in connection with the consummation of such election and/or the recapitalization, reorganization and/or exchange; provided that the resulting securities are consistent in all material respects with the rights and preferences set forth in Section 4.1.1 as in effect immediately prior to such IPO.

**10.8    Legend.** Each certificate evidencing Units and each certificate issued in exchange for or upon the Transfer of any Units will be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("ACT") NOR HAVE THEY BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE.   NO TRANSFER OF SUCH SECURITIES WILL BE PERMITTED UNLESS A REGISTRATION STATEMENT UNDER THE ACT IS IN EFFECT AS TO SUCH TRANSFER, THE TRANSFER IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR IN THE OPINION OF COUNSEL (WHICH MAY BE COUNSEL FOR THE COMPANY), REGISTRATION UNDER THE ACT IS UNNECESSARY IN ORDER FOR SUCH TRANSFER TO COMPLY WITH THE ACT AND WITH APPLICABLE STATE SECURITIES LAWS.

> THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS AS TO TRANSFER UNDER THE TERMS OF A LIMITED LIABILITY COMPANY AGREEMENT ENTERED INTO BY THIS COMPANY AND THE MEMBERS OF RECORD, A TRUE AND CORRECT COPY OF WHICH IS ON FILE AT THE PRINCIPAL PLACE OF BUSINESS OF THE COMPANY. THE COMPANY WILL FURNISH TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE, UPON WRITTEN REQUEST TO THIS COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE, A COPY OF SUCH AGREEMENT."

**10.9 Void Transfers.**Any Transfer of any Units or other interests in the Company in contravention of this Agreement or which would cause the Company to not be treated as a partnership or similar "pass-through" entity for U.S. federal income tax purposes shall be void and ineffectual and shall not bind or be recognized by the Company or any other party.

**ARTICLE XI**

**PREEMPTIVE RIGHTS**

**11.1 Generally.**Each Member shall have the right to purchase all or part of such Member's pro-rata share (based upon the total number of Units held by each of them) of New Securities (as defined below) which the Company, from time to time, proposes to sell and issue. "New Securities" shall mean any securities of the Company whether now authorized or not, and rights, options or warrants to purchase securities of any type whatsoever that are, or may become convertible into or exchangeable for securities, issued on or after the date hereof, other than those securities described in Section 11.4.

**11.2 Offer to Subscribe.**

In the event the Company proposes to undertake an issuance of New Securities, it shall give all Members written notice of its intention, describing the type of New Securities and the price and the terms upon which the Company proposes to issue the same. Each Member shall have thirty (30) days from the date of receipt of any such notice to agree to purchase up to his, her, or its pro-rata portion of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company, which shall state therein the quantity of New Securities to be purchased. The Company shall, in the event of undersubscription by any Member, give prompt written notice of the undersubscription to all Members who have fully-subscribed for their pro-rata share of the New Securities, who shall have not less than 10 additional days to offer to purchase the undersubscribed New Securities (such re-allotment rights to be allocated among those who offer to purchase the New Securities in proportion to the number of Units owned by each relevant holder).

**11.3 Oversubscription Rights.**

In the event the Members fail to exercise in full such preemptive right, the Company shall have 90 days thereafter to sell the New Securities with respect to which such option was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice. To the extent the Company does not sell all the New Securities offered within said ninety (90) day period, the Company shall not thereafter issue or sell such New Securities without first again offering such securities to the Preferred Members in accordance with the provisions of this Article XI.

**11.4 Exceptions.**

The rights granted under this Article XI shall not apply with respect to securities issued solely in consideration for the acquisition (whether by merger or otherwise) by the Company of all or substantially all of the securities or assets of any other entity or business organization,

securities issued as compensation or payment for goods and services, debt securities with no equity feature, or securities issued solely in consideration for the grant to the Company of marketing rights, distribution rights, license rights or similar rights granted to the Company in consideration of the exchange of proprietary technology, provided the issuance of such securities is approved by the Board.

## ARTICLE XII

### EXCHANGE OF CUSTOMER LISTS

At any time and from time to time after the Effective Date, the Board may share the Company's customer list information with any companies in which the Class A Member is an investor.

## ARTICLE XIII

### ADMISSION OF MEMBERS

**13.1    Substituted Members.**Subject to the provisions of Article X hereof, in connection with the permitted transfer of a Unit of a Member, the transferee shall become a Substituted Member on the effective date of such transfer, which effective date shall not be earlier than the date of compliance with the conditions to such transfer (without any Board or Member consent unless one of the conditions to such transfer is that Board or Member consent is required for the admission of such transferee, in which case such consent must first be obtained), and such admission shall be shown on the books and records of the Company.

**13.2    Additional Members.**Subject to the provisions of Article X hereof, a Person may be admitted to the Company as an Additional Member only upon furnishing to the Board (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, and (b) such other documents or instruments as may be necessary or appropriate to effect such Person's admission as a Member as the Board may deem appropriate in its sole discretion.  Such admission shall become effective on the date on which the Board determines in its sole discretion that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.

## ARTICLE XIV

### WITHDRAWAL AND RESIGNATION OF MEMBERS; REDEMPTIONS

**14.1    Withdrawal and Resignation of Members.**No Member shall have the power or right to withdraw or otherwise resign as a Member from the Company prior to the dissolution and winding up of the Company pursuant to Article XV without the prior written consent of the Board, except as otherwise expressly permitted under this Article XIV.  Any Member, however, that attempts to withdraw or otherwise resign as a Member from the Company without the prior written consent of the Board upon or following the dissolution and winding up of the Company pursuant to Article XV but prior to such Member receiving the full amount of Distributions from the Company to which such Member is entitled pursuant to Article XV shall be liable to the

Company for all damages (including all lost profits and special, indirect and consequential damages) directly or indirectly caused by the withdrawal or resignation of such Member, and such Member shall be entitled to receive the fair value of his equity interest in the Company as of the date of its resignation (or, if less, the amount that such Member would have received on account of such equity interest had such Member not resigned or otherwise withdrawn from the Company), as conclusively determined by the Board, on the sixth month anniversary date (or such earlier date determined by the Board) following the completion of the distribution of Company assets as provided in Article XV to all other Members.  Upon a transfer of all of a Member's Units in a transfer permitted by this Agreement, such Member shall cease to be a Member.

**ARTICLE XV**

**DISSOLUTION AND LIQUIDATION**

**15.1    Dissolution.**The Company shall not be dissolved by the admission of Additional Members or Substituted Members or the attempted withdrawal or resignation of a Member.  The Company shall dissolve, and its affairs shall be wound up, upon:

15.1.1 the vote of the Board holding at least two-thirds of the votes of all members of the Board; or

15.1.2 the entry of a decree of judicial dissolution of the Company under Section 35-5 of the Delaware Act or an administrative dissolution under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XV, the Company is intended to have perpetual existence. An Event of Withdrawal shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

**15.2    Liquidation and Termination.**On dissolution of the Company, the Board shall act as liquidator or may appoint one or more Directors or Members as liquidator.  The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Delaware Act.  The costs of liquidation shall be borne as a Company expense.   Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidators are as follows:

15.2.1 as promptly as possible after dissolution and again after final liquidation, the liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

15.2.2 the liquidators shall cause the notice described in the Delaware Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder;

15.2.3 the liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine); and

15.2.4 all remaining assets of the Company shall be distributed to the holders of Units in accordance with Section 4.1.1 by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, by 90 days after the date of the liquidation).

The Distribution of cash and/or property to a Member in accordance with the provisions of this Section 15.2 and Section 15.3 constitutes a complete return to the Member of its Capital Contributions and a complete Distribution to the Member of its interest in the Company and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Delaware Act.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

**15.3    Deferment; Distribution in Kind.**    Notwithstanding the provisions of Section 15.2, but subject to the order of priorities set forth therein, if upon dissolution of the Company the liquidators determine that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss (or would otherwise not be beneficial) to the Members, the liquidators may, in their sole discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy Company liabilities (other than loans to the Company by Members) and reserves.  Subject to the order of priorities set forth in Section 15.2, the liquidators may, in their sole discretion, distribute to the Members, in lieu of cash, either (i) all or any portion of such remaining Company assets in-kind in accordance with the provisions of Section 15.2.4, (ii) as tenants in common and in accordance with the provisions of Section 15.2.4, undivided interests in all or any portion of such Company assets or (iii) a combination of the foregoing.  Any such Distributions in kind shall be subject to (x) such conditions relating to the disposition and management of such assets as the liquidators deem reasonable and equitable and (y) the terms and conditions of any agreements governing such assets (or the operation thereof or the holders thereof) at such time.  Any Company assets distributed in kind will first be written up or down to their Fair Market Value.  The liquidators shall determine the Fair Market Value of any property distributed in accordance with the valuation procedures set forth in Article XVI.

**15.4    Cancellation of Certificate.**On completion of the distribution of Company assets as provided herein, the Company is terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the Company.  The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 15.4.

**15.5     Reasonable Time for Winding Up.** A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to <u>Sections 15.2</u> and <u>15.3</u> in order to minimize any losses otherwise attendant upon such winding up.

**15.6     Return of Capital.** The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from Company assets).

## ARTICLE XVI

## VALUATION

"<u>Fair Market Value</u>" of any asset, property or equity interest means the amount which a seller of such asset, property or equity interest would receive in an all-cash sale of such asset, property or equity interest in an arms-length transaction with an unaffiliated third party consummated on the day immediately preceding the date on which the event occurred which necessitated the determination of the Fair Market Value (and after giving effect to any transfer taxes payable in connection with such sale), in each case, as such amount is determined by the Board (or, if pursuant to <u>Section 15.3</u>, the liquidators) in its good faith judgment in such manner as its deems reasonable and using all factors, information and data deemed to be pertinent, and in the case of Units shall be based upon the Fair Market Value of the Company as a going concern determined in accordance with the Business Valuation Standards of the American Society of Appraisers and without regard to any minority, marketability, or similar discount. Without limiting any right or remedy of the Company under the Contribution Agreement (including, without limitation, pursuant to Article XI) or this Agreement, the Fair Market Value of the Class B Contribution as agreed by the Members as of the Effective Date is $1,885,965.

## ARTICLE XVII

## GENERAL PROVISIONS

**17.1     Amendments.** The Directors holding a majority of the votes of all members of the Board, without the consent of any Member, may amend any provision of this Agreement, and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith, to reflect:

     (i)     a change in the name of the Company;

     (ii)    admission, substitution, or removal of Members in accordance with this Agreement;

     (iii)   a change that does not adversely affect any Member in any material respect in its capacity as an owner of Units and is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any United States federal

or state agency or judicial authority or contained in any United States federal or state statute; or

(iv)     a change that does not adversely affect any Member in any material respect in its capacity as an owner of Units and cures any ambiguity.

17.1.2  In all other cases this Agreement may be amended or modified upon the consent of the Board and the consent or approval of a Majority in Interest; provided that no such amendment or modification pursuant to this Section 17.1.2 of this Agreement (i) that would materially and adversely affect holders of one class of Units in a manner different than holders of any other class of Units (other than amendments and modifications in connection with the actions of the Board permitted by Section 6.1) shall be effective against the holders of such class of Units without the prior written consent of holders of at least a majority of Units of such class materially and adversely affected thereby or (ii) that would adversely affect holders of one class of Units in a manner different than other holders of such same class of Units (other than amendments and modifications in connection with the actions of the Board permitted by Section 6.1) shall be effective against the holders of such class of Units without the prior written consent of holders of at least a majority of Units of such class adversely affected thereby.  Notwithstanding the foregoing, no amendment or modification to any of the terms and conditions of this Agreement which terms and conditions expressly require the approval or action of certain Persons may be made without obtaining the consent of the requisite number or specified percentage of such Persons who are entitled to approve or take action on such matter.

**17.2     Title to Company Assets.**Company assets shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof.  Legal title to any or all Company assets may be held in the name of the Company, the Board or one or more nominees, as the Board may determine.  The Board hereby declares and warrants that any Company assets for which legal title is held in its name or the name of any nominee shall be held in trust by the Board or such nominee for the use and benefit of the Company in accordance with the provisions of this Agreement.  All Company assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company assets is held.

**17.3     Addresses and Notices.**Any notice provided for in this Agreement will be in writing and will be either personally delivered, or received by certified mail, return receipt requested, or sent by reputable overnight courier service (charges prepaid) to the Company and/or to the relevant Members at the addresses set forth below or at such other address as indicated by the Company's records, or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.  Notices will be deemed to have been given hereunder when delivered personally, three days after deposit in the U.S. mail and one day after deposit with a reputable overnight courier service.

To the Company:

JL Powell LLC
 16860 Three Oaks Road
 Three Oaks, Michigan 49128

Attention:  Board of Directors

<u>To any Member</u>:

At the address for such Member maintained in the records of the Company.

**17.4    Binding Effect.**This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

**17.5    Creditors.**None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company income, loss, gain, deduction or other items, Distributions, capital or property other than as a secured creditor.

**17.6    Waiver.**No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**17.7    Counterparts.**This Agreement may be executed in separate counterparts, each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

**17.8    Applicable Law.**This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. Any dispute relating hereto shall be heard in the state or federal courts of California located in Santa Barbara County, and the parties agree to jurisdiction and venue therein.

**17.9    Severability.**Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein

**17.10    Further Action.**The parties shall execute and deliver all documents, provide all information and take or refrain from taking such actions as may be reasonably necessary to achieve the purposes of this Agreement.

**17.11    Delivery by Facsimile.**This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments

hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation of a contract and each such party forever waives any such defense.

**17.12   Offset.**Whenever the Company is to pay any sum to any Member or any Affiliate or related person thereof, any amounts that such Member or such Affiliate or related person owes to the Company which are not the subject of a good faith dispute may be deducted from that sum before payment.

**17.13   Entire Agreement.**This Agreement, those documents expressly referred to herein and other documents of even date herewith among the parties hereto embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

**17.14   Remedies.**Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

**17.15   Descriptive   Headings;   Interpretation.**The   descriptive   headings   of   this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable, hereof. Without limiting the generality of the immediately preceding sentence, no amendment or other modification to any agreement, document or instrument that requires the consent of any Person pursuant to the terms of this Agreement or any other agreement will be given effect hereunder unless such Person has consented in writing to such amendment or modification. Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Except where provided elsewhere in this Agreement, wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

*     *     *     *     *

**IN WITNESS WHEREOF,** the undersigned have executed or caused to be executed on their behalf this Amended and Restated Limited Liability Company Agreement as of the date first written above.

CLASS A MEMBER:

BLUE HIGHWAYS HOLDINGS III LLC

By: Blue Highways Management III LLC
Its Manager

By: _____
Name: Bruce A. Willard
Title: Manager

CLASS B MEMBER:

JL POWELL, INC.

By: _____
Name: Joshua L. Powell
Title: President

*JL Powell LLC Agreement*

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Amended and Restated Limited Liability Company Agreement as of the date first written above.

CLASS A MEMBER:

BLUE HIGHWAYS HOLDINGS III LLC

By: Blue Highways Management III LLC
Its Manager

By: _____
Name: Bruce A. Willard
Title: Manager

CLASS B MEMBER:

JL POWELL, INC.

By: _____
Name: Joshua L. Powell
Title: President

*JL Powell LLC Agreement*

<u>SCHEDULE I</u>

Class A and Class B Members

| <u>Member</u> | <u>Class A Units</u> | <u>Class B Units</u> | <u>Percentage Share</u> | <u>Contribution / Fair Market Value</u> |
|---|---|---|---|---|
| Blue Highways Holdings III LLC | 570,000 | - | 57% | $2,500,000 |
| JL Powell, Inc. | - | 430,000 | 43% | The Contribution (as defined in the Contribution Agreement) pursuant to Contribution Agreement having a Fair Market Value as of the Effective Date of $1,885,965. |
| Total | 570,000 | 430,000 | | |

SCHEDULE II

Class C Units Granted

| Management Member | Number of Units | Participation Threshold |
|---|---|---|
| Joshua L. Powell | 81,819 | $4,385,965 |