1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

*Contribution Agreement with Schedules – Part 1*

CONTRIBUTION AGREEMENT

*dated as of*

March 10, 2010

*by and between*

JL POWELL INC.,

*and*

JL POWELL LLC

TABLE OF CONTENTS

Page

ARTICLE I  CONTRIBUTION OF ASSETS ................................................................1
   1.1 Agreement to Contribute.................................................................................1
   1.2 Excluded Assets .............................................................................................3

ARTICLE II  ASSUMPTION OF LIABILITIES ........................................................3
   2.1 Assumed Liabilities .......................................................................................3
   2.2 Excluded Liabilities .......................................................................................3
   2.3 No Expansion of Third Party Rights...............................................................4

ARTICLE III  CONSIDERATION, ADJUSTMENTS AND CLOSING.......................5
   3.1 Consideration .................................................................................................5
   3.2 Amount ..........................................................................................................5
   3.3 Indebtedness Limitation and Payment of Certain Indebtedness; Working Capital
   Requirement.........................................................................................................5
   3.4 Time and Place of Closing..............................................................................7

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF JLP AND THE JLP
        STOCKHOLDERS.................................................................................7
   4.1 Organization; Standing and Power .................................................................7
   4.2 Subsidiaries ...................................................................................................8
   4.3 Authority .......................................................................................................8
   4.4 Ownership ......................................................................................................9
   4.5 Financial Statements ......................................................................................9
   4.6 Absence of Certain Changes.........................................................................10
   4.7 Material Contracts........................................................................................12
   4.8 Title to and Condition of the Contributed Assets. .........................................14
   4.9 Real Property ...............................................................................................14
   4.10 Intellectual Property...................................................................................16
   4.11 Inventory ...................................................................................................18
   4.12 Accounts Receivable...................................................................................18
   4.13 Adequacy of Reserves................................................................................19
   4.14 Agents and Suppliers. .................................................................................19
   4.15 Litigation...................................................................................................19
   4.16 Governmental Authorization .......................................................................20
   4.17 Environmental Matters................................................................................20
   4.18 Taxes .........................................................................................................21
   4.19 Employee Benefit Plans; Labor Matters .....................................................22
   4.20 Employees and Consultants ........................................................................25
   4.21 Related-Party Transactions.........................................................................26
   4.22 Brokers' and Finders' Fees.........................................................................26
   4.23 Complete Copies of Materials ....................................................................26
   4.24 Insurance Policies ......................................................................................26

i

4.25  Bank Accounts ............................................................................27
4.26  Product Warranties .....................................................................27
4.27  Powers of Attorney .....................................................................27
4.28  Investment Representations ........................................................27
4.29  Representations Complete. .........................................................28

ARTICLE V  REPRESENTATIONS AND WARRANTIES OF THE COMPANY ..................28
5.1  Organization, Power and Standing ............................................28
5.2  Authority. ...................................................................................29
5.3  Valid Issuance of Units ..............................................................29
5.4  Capitalization .............................................................................29
5.5  No Voting Agreements or Voting Trusts ....................................30
5.6  Required Contribution ................................................................30

ARTICLE VI  CONDUCT OF THE BUSINESS PENDING THE SALE .....................30
6.1  Conduct of the Business Prior to Closing ..................................30
6.2  Absence of Litigation .................................................................33
6.3  Notification of Certain Matters ..................................................33
6.4  Access to Information .................................................................33
6.5  Regulatory and Other Authorizations; Notices and Consents ....33
6.6  No Solicitation of Transactions ..................................................34

ARTICLE VII  ADDITIONAL COVENANTS .............................................35
7.1  Use of Trademarks ......................................................................35
7.2  Employees ...................................................................................35
7.3  Endorsement of Checks, Etc ......................................................35
7.4  Payment of Excluded Liabilities ................................................36
7.5  Termination of the Retirement Plan ...........................................36
7.7  Confidentiality ...........................................................................36
7.8  Injunctive Relief .........................................................................37
7.9  Further Assurances ......................................................................37
7.10  Bulk Sales Laws .........................................................................37
7.11  Taxes ...........................................................................................37
7.12  Cooperation and Records Retention ...........................................38
7.13  Vote in Favor of Contribution ....................................................39
7.14  Limitation on Transfer of Units .................................................39
7.15  Board of Director Representation ...............................................40

ARTICLE VIII  CONDITIONS TO THE CLOSING .....................................40
8.1  Conditions to Obligations of Both Company and JLP ...............40
8.2  Additional Conditions to Obligations of JLP ............................41
8.3  Additional Conditions to the Obligations of Company .............41

ARTICLE IX  CLOSING ....................................................................42
9.1  Form of Documents ....................................................................42
9.2  Company's Deliveries .................................................................42
9.3  JLP's Deliveries ..........................................................................43

ARTICLE X  TERMINATION, AMENDMENT AND WAIVER ...................................................43
    10.1  Termination.................................................................................................................43
    10.2  Effect of Termination.................................................................................................44
    10.3  Waiver.........................................................................................................................44

ARTICLE XI  INDEMNIFICATION ......................................................................................44
    11.1  Survival of Representations, Warranties and Covenants ...........................................44
    11.2  Indemnity ...................................................................................................................45
    11.3  Indemnification Procedures .......................................................................................46

ARTICLE XII  GENERAL PROVISIONS................................................................................48
    12.1  Notices .......................................................................................................................48
    12.2  Interpretation..............................................................................................................49
    12.3  Counterparts................................................................................................................50
    12.4  Entire Agreement; No Third Party Beneficiaries.......................................................50
    12.5  Severability.................................................................................................................50
    12.6  Remedies Cumulative .................................................................................................50
    12.7  Governing Law ...........................................................................................................50
    12.8  Assignment .................................................................................................................50
    12.9  Time of the Essence ....................................................................................................51
    12.10  Rules of Construction .................................................................................................51
    12.11  Headings .....................................................................................................................51
    12.12  Expenses of Transaction ............................................................................................51
    12.13  Specific Performance ..................................................................................................51
    12.14  Further Assurances......................................................................................................51

EXHIBITS

| Exhibit A | Excluded Assets |
|-----------|-----------------|
| Exhibit B | Assumed Liabilities |
| Exhibit C | JLP Disclosure Schedule |
| Exhibit D | Form of Legal Opinion |
| Exhibit E | Form of Company's LLC Agreement |
| Exhibit F | Lease Assignment, Assumption and Amendment |
| Exhibit G | Form of Assumption Agreement |
| Exhibit H | Form of Bill of Sale and Assignment Agreement |

## CONTRIBUTION AGREEMENT

THIS CONTRIBUTION AGREEMENT (this "*Agreement*") is entered into as of March 10, 2010 (the "*Effective Date*"), by and between JL Powell Inc., a Michigan corporation ("*JLP*"), and JL Powell LLC, a Delaware limited liability company (the "*Company*").

## W I T N E S S E T H:

**WHEREAS**, JLP is engaged in the business of selling men's apparel and gear primarily through its retail store and the distribution of catalogs in the United States and sales and advertising through its website (the "*Business*");

**WHEREAS**, JLP desires to contribute to the Company, and the Company desires to accept from JLP, all of JLP's right, title and interest in and to the property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located (including, without limitation, all brands and brand-names), belonging to JLP and relating to the Business as it is currently conducted by JLP as a going concern, as well as any goodwill associated therewith, free and clear of any liabilities or encumbrances, except those liabilities specifically assumed and encumbrances specifically permitted under the terms of this Agreement (the "*Contribution*");

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## CONTRIBUTION OF ASSETS

1.1     Agreement to Contribute.  Upon the terms and subject to the conditions set forth in this Agreement, upon the Closing (as defined in Section 3.4), JLP agrees to contribute, convey, transfer, assign and deliver to the Company, and the Company shall receive from JLP, all right, title and interest existing now or at any time hereafter through the Closing Date (as defined in Section 3.4) (whether or not in inchoate form) in or to the assets, properties and rights of or relating to or used at any time in the Business of every kind, nature and description, real, personal, tangible and intangible, known or unknown, wherever located including, without limiting the generality of the foregoing:

(a)     all of the assets reflected on the Interim Financial Statements (as defined in Section 4.5), other than the Excluded Assets (as defined in Section 1.2) and those assets disposed of after the Balance Sheet Date (as defined in Section 4.5) in the Ordinary Course of the Business (as defined in Section 4.6) which are immaterial either individually or in the aggregate to JLP;

1

(b)     all notes and accounts receivable relating to the Business as of the Closing Date in connection with sales arising out of the Business prior to the Closing Date with recourse to JLP (the "***Accounts Receivable***");

(c)     all marketing materials, training materials, office and reference manuals and similar items associated with the Business;

(d)     all creative materials and advertising and promotional materials necessary or used in connection with the Business, wherever stored or located;

(e)     all franchises, licenses, consents, certificates and other Permits (as defined in Section 4.16(a)) (to the extent the same are legally transferable);

(f)     all JLP Intellectual Property (as defined in Section 4.10(a) hereof);

(g)     all contracts, agreements, contract rights, license agreements, purchase and sales orders, quotations and other executory rights of JLP and commitments of third parties relating to the Business (the "***Contracts***");

(h)     all lease and rent deposits and prepaid expenses (other than those relating to any real estate leases set forth on <u>Exhibit A</u>);

(i)     all furniture, art work, fixtures, equipment (including office equipment), machinery, parts, computer hardware, tools, dies, jigs, patterns, molds, automobiles and trucks and all other tangible personal property, including, without limitation, any of the foregoing which has been fully depreciated, associated with the conduct of the Business (collectively, the "***Equipment***");

(j)     all books of account, general, financial, tax and personnel records, customer and supplier lists including addresses, drawings, files, papers and other records relating to the Business (including all data and other information stored on discs, tapes or other media);

(k)     all inventory relating to the Business, including, without limitation, raw materials, work in process, finished goods, service parts and supplies (collectively, the "***Inventory***");

(l)     all causes of action, judgments and claims or demands of whatever kind or description arising out of or relating to the Business;

(m)     all real property owned or leased by JLP together with all buildings and other structures, facilities or improvements currently or hereafter located thereon; all fixtures, systems, equipment and items of personal property of JLP attached or appurtenant thereto; and all easements, licenses, rights and appurtenances relating to the foregoing (collectively, the "***Real Property***");

(n)     all rights and interests of JLP to the proceeds of insurance claims arising from damage to the Contributed Assets (as defined below) prior to the Closing;

(o)     all rights of JLP, if any, under express or implied warranties from suppliers and vendors of JLPs which are related to the Business;

(p)     all general intangibles used by or useful to the Business, including, without limitation, all corporate goodwill of JLP;

(q)     all cash, cash equivalents and bank accounts and securities accounts owned by JLP at the Closing; and

(r)     all other assets of JLP used or useful to the conduct of the Business, whether or not reflected on the books or records of JLP or the Business.

The assets, properties and rights to be conveyed, contributed, transferred, assigned and delivered to the Company pursuant to this Section 1.1 are sometimes hereinafter collectively referred to as the "***Contributed Assets***."   All of the Contributed Assets shall be contributed to the Company free and clear of any liens, title claims, encumbrances or security interests, other than Permitted Encumbrances (as defined in Section 4.8).   Notwithstanding anything to the contrary in this Agreement, the Company shall not be liable or obligated with respect to any liability, obligation or commitment with respect to any of the foregoing except as expressly provided in Section 2.1 below.

1.2     Excluded Assets.   Notwithstanding the provisions of Section 1.1 hereof, the Contributed Assets to be transferred to the Company pursuant to this Agreement shall not include any of JLP's interest in any assets, properties or rights (contractual or otherwise) listed on Exhibit A hereof (the "***Excluded Assets***").

ARTICLE II

ASSUMPTION OF LIABILITIES

2.1     Assumed Liabilities.   Upon the Closing, the Company shall assume and agree to discharge and perform when due, those liabilities and obligations of JLP, and only those liabilities and obligations of JLP, that are specifically enumerated in Exhibit B hereto (the "***Assumed Liabilities***").

2.2     Excluded Liabilities.   Except with respect to the Assumed Liabilities, the Company shall not assume and shall not in any way be responsible for any of the debts, liabilities, or obligations of JLP, and JLP shall retain, and shall be responsible for paying, performing and discharging when due, all debts, liabilities, or obligations of JLP as of the Closing other than the Assumed Liabilities (the "***Excluded Liabilities***"), including, without limitation:

(a)     the outstanding amount of all principal, interest, fees and expenses in respect of borrowed money, letters of credit, lines of credit, capital leases and installment purchases (in each case, other than those Assumed Liabilities set forth on Exhibit B);

(b)        obligations relating to Taxes (as defined in Section 4.18) of JLP, the Contributed Assets and/or the Business attributable to periods ending on, or occurring prior to, the Closing Date (in each case, other than those Assumed Liabilities set forth on Exhibit B);

(c)        obligations of JLP and/or JLP Stockholders under this Agreement or any agreement entered into in connection with the Contribution;

(d)        liabilities or obligations relating to any litigation or arbitration affecting JLP or the Contributed Assets if such liability or obligation arose in respect of periods prior to the Closing Date;

(e)        liabilities to any Affiliate (as defined in Section 4.7(a)(ix)) of JLP (other than those Assumed Liabilities set forth on Exhibit B);

(f)        obligations with respect to any pension, profit sharing, retirement, employee benefit or similar plan, benefit or arrangement attributable to periods ending on, or occurring prior to, the Closing Date (other than accrued vacation, holiday and sick leave);

(g)        any bonuses, commissions or similar sums earned in respect of periods prior to the Closing and payable to any employee of or consultant to JLP, whether or not payment is anticipated to be made before or after the Closing;

(h)        any rebates, commissions, refunds, discounts, credits or similar sums payable following the Closing to customers of JLP based on agreements or discussions held prior to the Closing that are not Assumed Liabilities set forth on Exhibit B;

(i)        liabilities and obligations of JLP arising out of any actions or omissions of employees, consultants, independent contractors and experts in connection with the performance of services for JLP prior to the Closing; or

(j)        except as otherwise provided in this Agreement, any costs or expenses incurred by JLP or the JLP Stockholders incident to the negotiation and preparation of this Agreement (including any legal fees, placement fees, financial advisory fees or accountants fees).

2.3    <u>No Expansion of Third Party Rights</u>.  The assumption by the Company of the Assumed Liabilities shall not expand the rights or remedies of any third party against the Company or JLP as compared to the rights and remedies which such third party would have had against JLP had the Company not assumed the Assumed Liabilities.  Without limiting the generality of the preceding sentence, the assumption by the Company of the Assumed Liabilities shall not create any third party beneficiary rights except as specifically set forth in this Agreement.

ARTICLE III

CONSIDERATION, ADJUSTMENS AND CLOSING

3.1     Consideration.  Upon the terms and subject to the conditions contained in this Agreement, in consideration for the Contributed Assets and the covenants contained in Section 7.7 hereof and in full payment therefor, (a) the Company will issue to JLP the consideration set forth in Section 3.2 below and (b) the Company will assume the Assumed Liabilities.

3.2     Amount.  The consideration  for the Contributed Assets shall be an aggregate of 430,000 units of the Company's Class B Voting Units  (the "*Class B Units*") representing forty-three percent (43%) of Company's Voting Units (as defined in Section 5.4(a) below) upon issuance of the same (the "*Consideration*") having an aggregate value as agreed to by the Company and JLP equal to $1,885,965 (the "*Consideration Value*"), all of which shall be issued to JLP upon the Closing, subject to adjustment as provided herein; and

3.3     Indebtedness Limitation and Payment of Certain Indebtedness; Working Capital Requirement.  The obligation of the Company to proceed to closing and consummate and effect the Contribution, issuance of the Consideration, and other transactions contemplated by this Agreement shall be subject to the limitation and requirements provided in Sections 3.3(a) and (b) below.

(a)     Limitation on JLP Indebtedness and Payment of Certain Indebtedness.

(i)     One day prior to the Closing Date, JLP shall prepare and deliver to the Company a statement of the aggregate JLP Closing Indebtedness (as defined below) certified as accurate by the President and Chief Financial Officer of JLP (the "*Indebtedness Notice*").  For the purposes of this Agreement, "*JLP Closing Indebtedness*" shall mean the aggregate amount as of the Closing Date of any amounts owed or owing by JLP in excess of $15,000 pursuant to any and all agreements, contracts and instruments to which JLP is a party, or by which any of the Contributed Assets are bound or affected, relating to the borrowing of money (whether under a term facility, a revolving credit facility or otherwise and including, without limitation, reimbursement and other obligations with respect to surety bonds and letters of credit and obligations evidenced by notes, bonds, debentures or similar instruments), capital lease obligations, the conditional purchase on an installment basis of any asset, or the guarantee of any of the foregoing, and any security agreement, indenture, mortgage, pledge or other instrument evidencing such indebtedness (including, without limitation, any amounts owing by JLP pursuant to any loan or credit facility).  Unless otherwise agreed to by the Company pursuant to Section 8.3, the obligation of the Company to proceed to closing and consummate and effect the Contribution, issuance of the Consideration, and other transactions contemplated by this Agreement shall be subject to and contingent upon delivery to the Company of an Indebtedness Notice showing and certifying that JLP Closing Indebtedness is less than $1,954,000.

(ii) JLP hereby covenants and agrees to pay and discharge all JLP Closing Indebtedness that does not constitute an Assumed Liability duly and promptly following the Closing in accordance with all contractual obligations, laws, rules and regulations governing such payment and discharge prior to making any distribution of the Consideration to the JLP Stockholders; provided, however, the Company may elect in its sole discretion to pay and discharge any such Closing Indebtedness and recover the amount of such payments by cancellation and/or redemption of Class B Units held by JLP or by offset and reduction of any amounts otherwise payable or distributable to JLP with respect to Class B Units held by JLP.

(b)     Working Capital Requirement.

(i)     No later than the later of (x) the third day prior to the Closing Date and (y) the Effective Date JLP shall, in consultation with the Company, prepare and deliver to the Company a good faith estimate of JLP Net Working Capital. For the purposes of this Agreement, "*JLP Net Working Capital*" shall mean, as of the Closing Date, JLP's total current assets minus JLP's total current liabilities (but excluding any line of credit and note payable liabilities).

(ii)     The calculation of JLP Net Working Capital (i) shall be prepared in conformity with generally accepted accounting principles of the United States ("*GAAP*") applied on a basis consistent with those used in preparing the Financial Statements (as defined in Section 4.5) and (ii) shall include the same line items as JLP's balance sheet included in the Financial Statements. The calculations of JLP Net Working Capital shall be accompanied by a certificate of the President and Chief Financial Officer of JLP to the effect that such officers have reviewed the calculations of JLP Net Working Capital, that the calculations of JLP Net Working Capital were made in good faith and were prepared in accordance with this Agreement and that such officers have no reason to believe that such calculations may not be reasonably relied on for the purposes of the Closing. Upon the Company's request, JLP shall also deliver to the Company the working papers used in calculating JLP Net Working Capital together with such other evidence supporting the amounts specified therein as the Company may reasonably request.

(iii)     The calculations of JLP Net Working Capital delivered by JLP pursuant to this Section 3.3(b) are referred to herein as the "*Closing Calculations*." No later than two (2) days following receipt by the Company of the Closing Calculations, the Company may object to the Closing Calculations by written notice thereof to JLP (the "*Disagreement Notice*"). The Disagreement Notice shall set forth the Company's good faith estimate of JLP Net Working Capital and the calculation used to determine such amount. JLP and the Company shall, during the two days (or such longer period as the parties may agree) following delivery of the Disagreement Notice (the "*Resolution Period*"), use good faith efforts to reach an agreement regarding the amount of JLP Net Working Capital. Any such resolution by the Company and JLP as to any disputed amounts shall be final, binding and conclusive. Unless otherwise agreed to by the Company pursuant to Section 8.3, the obligation of the Company to proceed to closing and consummate and effect the Contribution, issuance of the Consideration, and other transactions contemplated by this Agreement shall be subject to and contingent upon the determination of the Final Calculations (as defined in Section 3.3(b)(iv) below) showing JLP Net

6

Working Capital of at least $(299,000) and so certified by the President and Chief Financial Officer of JLP.

(iv)      The term "*Final Calculations*" shall mean either (A) in the event the Company does not deliver a Disagreement Notice within the time period specified in Section 3.3(b)(iii), the Closing Calculations, or (B) in the event the Company timely delivers a Disagreement Notice and the Company and JLP reach mutual agreement regarding the final calculation of JLP Net Working Capital, the amount of JLP Net Working Capital so agreed to.

(v)       During the calculation of JLP Net Working Capital and until the determination of the Final Calculations, (i) each party hereto shall provide, or cause to be provided, to the other parties and their authorized representatives, commercially reasonable access to all relevant books, records, workpapers and employees of JLP to the extent such materials or persons are within their possession or control and (ii) the Company and JLP shall cooperate fully in good faith with each other and their authorized representatives, including the provision on a timely basis of all information reasonably necessary or useful for calculating JLP Net Working Capital.

(c)      <u>Dissenting Stockholders</u>.  JLP shall be solely responsible for any payments required to be made to shareholders of JLP who exercise and perfect dissenters' rights under Sections 761 through 774 of the Michigan Business Corporation Act.  JLP shall provide the Company with prompt notice upon any exercise of dissenters' rights by shareholders of JLP.

3.4      <u>Time and Place of Closing</u>.   The transaction contemplated by this Agreement shall be consummated remotely via the exchange of documents and signatures (the "*Closing*") on a date (the "*Closing Date*") to be specified by the Company and JLP, which date shall be as promptly as commercially practicable following the satisfaction, or if permissible, waiver of the conditions set forth in Article VIII, unless another date, place or time is agreed to in writing by the Company and JLP.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF JLP AND THE JLP STOCKHOLDERS

JLP represents and warrants to the Company that the statements contained in this Article IV are true and correct in every material respect, except as set forth in the JLP Disclosure Schedule attached hereto as <u>Exhibit C</u> (the "*JLP Disclosure Schedule*").  The JLP Disclosure Schedule shall be arranged according to specific sections in this Article IV and shall provide exceptions to, or otherwise qualify in reasonable detail, only the corresponding section in this Article IV.   Any reference in this Article IV to an agreement being "enforceable" shall be deemed to be qualified to the extent such enforceability is subject to (i) laws of general application relating to bankruptcy, insolvency, moratorium and the relief of debtors, and (ii) the availability of specific performance, injunctive relief and other equitable remedies.

4.1      <u>Organization; Standing and Power</u>.  JLP is a corporation duly organized, validly existing and in good standing under the laws of the state of Michigan.  JLP has all requisite corporate power and authority to own its properties and to carry on the Business as now

being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect (as defined below) on JLP.  JLP has delivered to the Company a true, correct and complete copy of (a) the Certificate of Incorporation, Bylaws, and Stockholders Agreement or other charter documents, as applicable, of JLP, each as amended to date (collectively, the "*JLP Organizational Documents*"), and (b) the minute books containing all consents, actions and meetings of the Board of Directors and stockholders of JLP.  Such JLP Organizational Documents are in full force and effect. JLP is not in violation of any of the provisions of the JLP Organizational Documents.   The minute books and other records of JLP provided to the Company comprise all of the board and shareholder meeting records in the Company's possession, and the signatures appearing on all documents contained therein are the true signatures of the persons purported to have signed the same.  Section 4.1 of the JLP Disclosure Schedule contains a complete list of the jurisdictions in which JLP is qualified to conduct the Business.  As used in this Agreement, the term "*Material Adverse Effect*" means any event, change, violation, inaccuracy, circumstance or effect that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the Business, operations, condition (financial or otherwise), assets (tangible or intangible), liabilities, employees, properties, prospects, or results of operations of JLP.

        4.2    <u>Subsidiaries</u>.  JLP does not presently own or control, directly or indirectly, any equity or other interest in any other corporation, partnership, limited liability company, association or other business entity.  JLP is not a member of or a participant in any joint venture or partnership.

        4.3    <u>Authority</u>.

        (a)    JLP has all requisite corporate power and authority to enter into this Agreement and the agreements and documents relating hereto (collectively, the "*Transaction Documents*") and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of JLP and no other corporate proceedings on the part of JLP or its stockholders are necessary to authorize and approve this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement and the other Transaction Documents have been duly and validly executed and delivered by JLP and constitute the legal, valid and binding obligations of JLP enforceable against JLP in accordance with their terms.

        (b)    Except as set forth in Section 4.3(b) of the JLP Disclosure Schedule, the execution and delivery of this Agreement and the other Transaction Documents by JLP does not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or result in the creation of a lien or other encumbrance pursuant to, or require any notice to be provided or consent to be obtained pursuant to (i) any provision of the JLP Organizational Documents, (ii) any Material Contract (as defined in Section 4.7), note, bond, mortgage, license, agreement, permit or other instrument, or (iii) any

permit, concession, franchise, license, judgment, order, decree, statute, foreign or domestic law, ordinance, rule or regulation ("**Law**") applicable to JLP or any of JLP's properties or assets. To the extent any consents, approvals or authorizations of any third parties are required to transfer the Contributed Assets to the Company, JLP knows of no reason why all such consents, approvals and authorizations will not be received prior to the Closing Date.

(c)     No consent, approval, order or authorization, registration or permit of, declaration or filing with or notification to, any court, administrative agency, regulatory authority, or commission or other foreign or domestic governmental authority or instrumentality ("**Governmental Entity**") is required on the part of JLP or the JLP Stockholders for or in connection with JLP's execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby, except for such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not have a Material Adverse Effect on JLP or the Business and would not prevent, or materially alter or delay any of the transactions contemplated by this Agreement.

4.4     Ownership.

(a)     The stockholders listed in Section 4.4(a) of the JLP Disclosure Schedule constitute all of the legal and beneficial owners of the common stock, Series A preferred stock, Series B preferred stock, Series C preferred stock and Series D preferred stock of JLP (the "**JLP Stockholders**"), and Section 4.4(a) of the JLP Disclosure Schedule sets forth a complete and accurate list of JLP securities owned by each JLP Stockholder (the "**JLP Securities**"). JLP hereby represents to the Company that, as of the date hereof, each JLP Stockholder identified in Section 4.4 of the JLP Disclosure Schedule is the record or beneficial owner of such JLP Securities free and clear of all liens, encumbrances, claims, proxies or voting restrictions other than pursuant to this Agreement.

(b)     Except as set forth in Section 4.4(b) of the JLP Disclosure Schedule, there are no outstanding options, warrants, convertible or exchangeable securities, stock appreciation rights, or other rights or other contracts or commitments of any character, written or oral, that could obligate JLP to issue any of its stock or any securities or rights which could entitle any person or entity (a "**Person**") to acquire any of its stock or other securities. All of JLP's outstanding securities were offered, issued and sold in compliance with the requirements of the federal securities laws and any applicable state securities or "blue sky" laws.

(c)     Except as set forth in this Agreement, there are no voting agreements or voting trusts with respect to JLP's outstanding stock or other securities. Neither JLP nor any JLP Stockholder has any outstanding obligation (contingent or otherwise) to transfer, purchase, redeem or otherwise acquire any of its JLP Securities or pay any dividend or make any distribution in respect thereof.

4.5     Financial Statements.

(a)     True and complete copies of (i) the consolidated balance sheet of JLP as of December 31, 2009, and the related statements of operations, changes in stockholders' equity and changes in cash flows for the years then ended, together with all related notes and

schedules thereto (collectively referred to herein as the "*Financial Statements*"), and (ii) the unaudited consolidated balance sheet of JLP as of January 31, 2010 (the "*Reference Balance Sheet*"), and the related statements of operations, changes in stockholders' equity and changes in cash flows for the three (3) months ended December 31, 2009 (collectively referred to herein as the "*Interim Financial Statements*"), are attached as Section 4.5(a) of JLP Disclosure Schedule. The Financial Statements and the Interim Financial Statements (including, in each case, any notes thereto) were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by GAAP) and each present fairly, in all material respects, the consolidated financial position of JLP as of the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein (subject, in the case of unaudited statements, to normal and recurring year-end adjustments which were not and are not expected, individually or in the aggregate, to be material). January 31, 2010 is referred to hereinafter as the "*Balance Sheet Date*."

(b)     Except as set forth in Section 4.5(b) of the JLP Disclosure Schedule, there are no debts, liabilities or obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable ("*Liabilities*") of JLP, other than Liabilities (i) reflected or reserved against on the Reference Balance Sheet and (ii) in an individual or aggregate amount not exceeding $15,000 incurred since the Balance Sheet Date in the Ordinary Course of the Business (as defined in Section 4.6). Except as set forth in Section 4.5(b) of JLP Disclosure Schedule, reserves are reflected on the Reference Balance Sheet and on the books of account and other financial records of JLP against all Liabilities of JLP in amounts that have been established on a basis consistent with customary industry practices and in accordance with GAAP. Except as set forth in Section 4.5(b) of JLP Disclosure Schedule, there are no outstanding warranty claims against JLP.

4.6     Absence of Certain Changes. Except as set forth on Section 4.6 of the JLP Disclosure Schedule (under the appropriate subsection), since January 31, 2010, JLP has conducted the Business in a manner that (i) is consistent in nature, scope and magnitude with the past practices of JLP; (ii) does not require authorization by JLP's stockholders or Board of Directors, and does not require any other separate or special authorization of any nature; and (iii) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same line of business as JLP (collectively, the "*Ordinary Course of the Business*"), and there has not occurred:

(a)     any change, event or condition (whether or not covered by insurance) that has resulted in, or might reasonably be expected to result in, a Material Adverse Effect on JLP or the Business;

(b)     any sale, disposition of, or any agreement to sell, lease, assign, license, encumber or otherwise dispose of any of the Contributed Assets or any interest in the Contributed Assets, except for the sale of inventory in the Ordinary Course of the Business;

(c)      any purchase or acquisition of, or agreement, plan or arrangement to purchase or acquire, any property, right or asset of any Person for consideration valued at $15,000 or more, except for the acquisition of inventory in the Ordinary Course of the Business;

(d)      any change in accounting methods or practices for tax or financial reporting purposes (including any change in depreciation or amortization policies or rates) by JLP or any revaluation by JLP of any of the Contributed Assets;

(e)      any increase in (or agreement to increase) the compensation, commission rates or fee arrangements payable by JLP to any officer, director, employee, consultant or agent or any payment or agreement to pay any bonus or similar payment;

(f)      any dividend or distribution to JLP's stockholders or any redemption, recapitalization, or other similar transaction involving JLP;

(g)      any modification, waiver, change, amendment, release, rescission, accord and satisfaction, termination or default of, or with respect to, any material term, condition or provision of any Material Contract (as defined in Section 4.7) or Permit (as defined in Section 4.16);

(h)      any cancellation, or agreement to cancel, any indebtedness or other obligation owing to JLP, including without limitation any indebtedness or obligation of any current or former officer, manager or employee of JLP or any JLP Stockholder;

(i)      any modification or adoption of a Plan (as defined in Section 4.19);

(j)      any damage, destruction or loss of property (whether or not covered by insurance) that has had or could reasonably be expected to have a Material Adverse Effect on JLP;

(k)      any mortgage, pledge, lien, security interest, hypothecation, charge or other encumbrance imposed or agreed to be imposed on or with respect to the Business or the Contributed Assets, other than liens arising with respect to Taxes (as defined in Section 4.18) not yet due and payable, and such minor liens and encumbrances, if any, which arise in the Ordinary Course of the Business and are not material in nature or amount either individually or in the aggregate;

(l)      any commencement, notice or settlement of, or to the knowledge of JLP, any threat of commencement of, any lawsuit or proceeding against or investigation of JLP or any of its officers or managers;

(m)      any entry into any contract or agreement material to the Business, the Contributed Assets, the results of operations, or the financial condition of JLP, other than the transactions contemplated herein; or

(n)      Except as set forth in Section 4.6(n) of the JLP Disclosure Schedule, any negotiation or agreement by JLP to do any of the things described in the preceding clauses (a) through (m) (other than negotiations with the Company and its representatives

4.7    Material Contracts.

(a)    Section 4.7(a) of the JLP Disclosure Schedule lists (under the appropriate subsection) each of the following written or oral contracts and agreements to which JLP is a party (such contracts and agreements being referred to as the "***Material Contracts***"):

(i)    each contract, agreement, invoice, purchase order and other arrangement, for the purchase of Inventory, spare parts, other materials or personal property with any supplier or for the furnishing of services to JLP or otherwise related to the Business under the terms of which JLP:  (A) is obligated to pay or otherwise give consideration of more than $15,000, either individually or in the aggregate, during the twelve (12) month period preceding the date of this Agreement, (B) is obligated to pay or otherwise give consideration of more than $15,000, either individually or in the aggregate, over the remaining term of the contract, or (C) cannot be cancelled by JLP without penalty or further payment and without more than thirty (30) days' notice;

(ii)    each contract, agreement, invoice, sales order and other arrangement, for the sale of Inventory or other personal property or for the furnishing of services by JLP which:  (A) requires consideration or is anticipated to involve consideration of more than $15,000, either individually or in the aggregate, during the twelve (12) month period preceding the date of this Agreement, (B) requires consideration or is anticipated to involve consideration of more than $15,000, either individually or in the aggregate, over the remaining term of the contract, or (C) cannot be cancelled by JLP without penalty or further payment and without more than thirty (30) days' notice;

(iii)    all broker, exclusive dealing or exclusivity, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing, consulting and advertising contracts and agreements to which JLP is a party or any other contract that compensates any Person based on any sales by JLP;

(iv)    all leases and subleases of Real Property;

(v)    all licenses, contracts and other arrangements with respect to any Intellectual Property (as defined in Section 4.10) (other than generally available software licenses);

(vi)    all agreements, contracts or instruments to which JLP is a party relating to the borrowing of money, the leasing of capital equipment, the conditional sale or purchase on an installment basis of any asset, or the guarantee of any of the foregoing, and any security agreement, indenture, mortgage, pledge or title retention agreement or other instrument evidencing indebtedness or by which any of the Contributed Assets is bound or affected;

(vii)    all agreements, contracts and understandings, whether written or oral, relating to JLP or any JLP Stockholder or any Key Employee (as defined below)

12

(viii)       any joint venture, partnership or similar contract or agreement relating to JLP or to which JLP is a party or by which any of the Contributed Assets is bound;

(ix)       all contracts, loans, commitments, leases, instruments and other agreements, written or oral, between JLP and any current or former officer, any JLP Stockholder, any Key Employee or any of their affiliates ("*Affiliates*"), as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*");

(x)       all contracts and agreements for providing benefits under any Plan (as defined in Section 4.19);

(xi)       all contracts by JLP or JLP Stockholders regarding the acquisition, issuance or transfer of any stock or other securities of JLP;

(xii)       any agreement of JLP that is terminable upon or prohibits assignment or a change in ownership or control of JLP, or is silent as to whether consent is required upon assignment or upon a change in ownership or control of JLP;

(xiii)       all other contracts and agreements, whether or not made in the Ordinary Course of the Business, which are material to JLP or to the conduct of the Business in a manner consistent with past practices, or the termination of which could reasonably be expected to have a Material Adverse Effect on JLP; and

(xiv)       any agreement, arrangement, commitment, proposal or understanding that would modify, amend or alter any of the foregoing.

(b)       Each Material Contract (i) is valid and binding on JLP and, to the knowledge of JLP, on the other parties thereto, and is in full force and effect, and (ii) provided the consents and notices (if any) listed on Section 4.3(b) of the JLP Disclosure Schedule are obtained or provided, respectively, prior to Closing, the consummation of the transactions contemplated by this Agreement will not prevent any such Material Agreement from continuing in full force and effect without penalty or other adverse consequence.  JLP is not in breach or violation of, or default under, any Material Contract and, to the knowledge of JLP, no other party to any Material Contract is in breach or violation thereof or default thereunder.

(c)       JLP has delivered or made available to the Company accurate and complete copies of all Material Contracts identified in Sections 4.7(a)(i)-(xiv) of the JLP Disclosure Schedule, including all amendments to such Material Contracts.  Sections 4.7(a)(i)-

(xiv) of the JLP Disclosure Schedule provides an accurate description of the terms of each Material Contract that is not in written form.

(d)     Except as set forth in Section 4.7(d) of the JLP Disclosure Schedule, to the knowledge of JLP, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, (i) result in a breach or violation of, or default under, any Material Contract, (ii) give any entity the right to declare a default, seek damages or exercise any other remedy under any Material Contract, (iii) give any entity the right to accelerate the maturity or performance of any Material Contract or (iv) give any entity the right to cancel, terminate or modify any Material Contract.

4.8     Title to and Condition of the Contributed Assets.

(a)     The Contributed Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, used by JLP to operate the Business as presently operated by JLP and consistent with past practices and include all of the operating assets of JLP.

(b)     JLP has the complete and unrestricted power and unqualified right and authority (and has obtained all required approvals of its stockholders) to contribute, assign, transfer, convey and deliver the Contributed Assets to the Company without penalty or other adverse consequences and no other Person has any agreement, option, understanding, commitment or right to purchase or acquire any of the Contributed Assets from JLP, except for rights to purchase or acquire any portion of the Contributed Assets in the Ordinary Course of the Business.  Following the consummation of the Contribution contemplated by this Agreement and the other Transaction Documents and the execution of the instruments of transfer contemplated by this Agreement and the other Transaction Documents, the Company will own, with good, valid and marketable title, or lease, under valid and subsisting leases, or otherwise acquire the interests of JLP in the Contributed Assets, free and clear of all mortgages, liens, pledges, security interests, charges or encumbrances of any kind or character (collectively, "*Liens*") other than those Liens specifically listed on Section 4.8(b) of the JLP Disclosure Schedule (collectively, the "*Permitted Encumbrances*"), and without incurring any penalty or other adverse consequence, including, without limitation, any increase in rentals, royalties, or license or other fees imposed as a result of, or arising from, the consummation of the Contribution.   The equipment and property of JLP used in the operation of the Business is, taken as a whole, in good operating condition and repair, ordinary wear and tear excepted.

4.9     Real Property.

(a)     Section 4.9(a) of the JLP Disclosure Schedule lists all Real Property owned or occupied by JLP and used or held for use in the Business together with the correct legal description, street address and tax parcel identification number for each.   With respect to each such parcel included in the Real Property, JLP has good and clear record and marketable title to the parcel, insurable by a recognized national title insurance company at standard rates, free and clear of any Liens, easement, covenant or other restriction, except for recorded easements, covenants or other restrictions which do not impair the uses, occupancy or value of the parcel.

(b)     Section 4.9(b) of the JLP Disclosure Schedule lists (i) the street address of each parcel of Real Property leased by JLP and used or held for use in the Business; (ii) the identity of the lessor, lessee and current occupant (if different from lessee) of each parcel of leased Real Property; (iii) the term (referencing applicable renewal periods) and rental payment terms of the leases (and any subleases) pertaining to each parcel of leased Real Property; and (iv) the current use of each parcel of leased Real Property.

(c)     There is no material violation of any Law (including, without limitation, any building, planning or zoning Law) relating to any of the Real Property.  JLP has made available to the Company true and complete copies of each deed for each parcel of owned Real Property and, to the extent available, for each parcel of leased Real Property and all the title insurance policies, title reports, surveys, certificates of occupancy, environmental reports and audits, appraisals, Permits, other title documents and other documents relating to or otherwise affecting the Real Property, the operation of the Business thereon or any other uses thereof.  JLP is in peaceful and undisturbed possession of each parcel of Real Property, and there are no contractual or legal restrictions that preclude or restrict the ability to use the premises for the purposes for which they are currently being used.  All existing water, sewer, steam, gas, electricity, telephone and other utilities required for the construction, use, occupancy, operation and maintenance of the Real Property are adequate for the conduct of the Business as it has been and currently is conducted.  There are no material latent defects or material adverse physical conditions affecting the Real Property or any of the facilities, buildings, structures, erections, improvements, fixtures, fixed assets and personality of a permanent nature annexed, affixed or attached to, located on or forming part of the Real Property.  JLP has not leased or subleased any parcel or any portion of any parcel of Real Property to any other Person, nor has JLP assigned its interest under any lease or sublease listed in Section 4.9(b) of the JLP Disclosure Schedule to any third party.

(d)     JLP has, or has caused to be, delivered to the Company true and complete copies of all leases and subleases listed in Section 4.7(a)(iv) of the JLP Disclosure Schedule and any and all ancillary documents pertaining thereto (including, without limitation, all amendments, consents for alterations and documents recording variations and evidence of commencement dates and expiration dates).

(e)     There are no condemnation proceedings or eminent domain proceedings of any kind pending or, to the best knowledge of JLP, threatened against any of the Real Property.

(f)     All of the Real Property is occupied under valid and current certificates of occupancy or similar Permits, the consummation of the Contribution will not require the issuance of any new or amended certificate of occupancy and, to the best knowledge of JLP, there are no facts that would prevent the Real Property from being occupied after the Closing in the same manner as immediately prior to the Closing.

(g)     All improvements on the Real Property constructed by or on behalf of JLP or, to the best knowledge of JLP, constructed by or on behalf of any other Person, were constructed in compliance with all applicable Laws (including, without limitation, any building, planning or zoning Laws) affecting the Real Property.

15

(h)     No improvements on the Real Property and none of the current uses and conditions thereof violate any applicable deed restrictions or other applicable covenants, restrictions, agreements, existing site plan approvals, zoning or subdivision regulations or urban redevelopment plans as modified by any duly issued variances, and no Permits, licenses or certificates pertaining to the ownership or operation of all improvements on the Real Property, other than Permits which are transferable with the Real Property, are required by any Governmental Entity having jurisdiction over the Real Property.

(i)     All improvements on any Real Property are wholly within the lot limits of such Real Property and do not encroach on any adjoining premises, and there are no encroachments on any Real Property by any improvements located on any adjoining premises.

(j)     There have been no improvements of a value in excess of $15,000, either individually or in the aggregate, made to or construction on any Real Property within the applicable period for the filing of mechanics' liens.

(k)     The rental set forth in each lease or sublease of the leased Real Property is the actual rental being paid, and there are no separate agreements or understandings with respect to the same.

(l)     JLP has, and immediately prior to the Closing the Company will have, the full right to exercise any renewal options contained in the leases and subleases pertaining to the leased Real Property on the terms and conditions contained therein and upon due exercise would be entitled to enjoy the use of each leased Real Property for the full term of the renewal options.

4.10    Intellectual Property.

(a)     Except as set forth in Section 4.10(a) of the JLP Disclosure Schedule, JLP owns or is licensed for, and in any event possesses sufficient and legally enforceable rights with respect to, all Intellectual Property (defined below) that is (or is proposed to be) used, exercised, or exploited ("*Used*") in, or that may be necessary for, the Business as currently conducted in a manner consistent with past practices or as proposed to be conducted ("*JLP Intellectual Property*") without any conflict with or infringement or misappropriation of any rights or property of others ("*Infringement*"). Such ownership, licenses and rights are exclusive (A) except with respect to Inventions (defined below) in the public domain that are not important differentiators of the Business as now conducted in a manner consistent with past practices or as proposed to be conducted and (B) except with respect to standard, generally commercially available, "off-the-shelf" third party products that are not part of any current or proposed product, service or Intellectual Property offering of JLP relating to the Business. No JLP Intellectual Property (excluding Intellectual Property licensed to JLP only on a nonexclusive basis) was conceived or developed directly or indirectly with or pursuant to government funding or a government contract.  As used in this Agreement, "*Intellectual Property*" means (i) inventions (whether or not patentable); trade names, trade marks, service marks, logos, domains, URLs, addresses and other designations ("*Marks*"); works of authorship; data; technology, know-how, trade secrets, ideas and information; designs; formulas; algorithms; processes; schematics; computer software; and all other intellectual and industrial property of

16

any sort ("**Inventions**") and (ii) patent rights; Mark rights; copyrights; mask work rights; *sui generis* database rights; trade secret rights; moral rights; and all other intellectual and industrial property rights of any sort throughout the world, and all applications, registrations, issuances and the like with respect thereto ("**IP Rights**").  Except for photographs taken, and licensed to JLP, by James Powell, all copyrightable matter within JLP Intellectual Property has been created by persons who were employees of JLP at the time of creation and no third party, other than James Powell solely with respect to his photographs, has or will have "moral rights" or rights to terminate any assignment or license with respect thereto.  Except as set forth in Section 4.10(a) of the JLP Disclosure Schedule, JLP has not received any communication alleging or suggesting that or questioning whether JLP has been or may be engaged in, liable for or contributing to any Infringement, nor does JLP have any reason to expect that any such communication will be forthcoming.

(b)     Schedule 4.10(b) of the JLP Disclosure Schedule lists:  (i) all licenses, sublicenses and other agreements to which JLP is a party (or by which it or any JLP Intellectual Property is bound or subject) and pursuant to which any Person has been or may be assigned, authorized to Use, granted any lien or encumbrance regarding, or given access to any JLP Intellectual Property other than distribution of standard object code product pursuant to a standard form end-user, object code, internal-use software license and support/maintenance agreements entered into in the Ordinary Course of the Business; (ii) all licenses, sublicenses and other agreements pursuant to which JLP has been or may be assigned or authorized to Use, or has incurred, or may incur, any obligation in connection with, (A) any third party Intellectual Property that may be incorporated or embodied in, or form all or any part of any current or proposed product, service or Intellectual Property offering of JLP or (B) any JLP Intellectual Property and (iii) each agreement pursuant to which JLP has deposited or is required to deposit with an escrow holder or any other Person all or part of the source code (or any algorithm or documentation contained in or relating to any source code) of any JLP Intellectual Property ("**Source Materials**").  JLP has not entered into any agreement to indemnify, hold harmless or defend any other Person with respect to any assertion of Infringement or warranting the lack thereof.

(c)     No event or circumstance has occurred, exists or is contemplated (including, without limitation, authorization, execution or delivery of this Agreement or the consummation of any of the transactions contemplated hereby) that (with or without notice or the lapse of time) could reasonably be expected to result in (i) the breach or violation of any license, sublicense or other agreement required to be listed on Section 4.10(b) of the JLP Disclosure Schedule, (ii) the loss or expiration of any right or option by JLP (or the gain thereof by any third party) under any such license, sublicense or other agreement or (iii) the release, disclosure or delivery to any third party of any part of the Source Materials.  Further, JLP makes all the same representations and warranties with respect to each license, sublicense and agreement listed on Section 4.10(b) of the JLP Disclosure Schedule as are made with respect to Material Contracts elsewhere in this Agreement.

(d)     There is, to the knowledge of JLP, no unauthorized Use, disclosure, infringement or misappropriation of any JLP Intellectual Property by any third party, including, without limitation, any employee or former employee of JLP.  JLP has not brought or threatened any action, suit or proceeding against any third party for any Infringement of any JLP

17

(e)     JLP has taken all necessary and appropriate steps to protect and preserve the confidentiality of all JLP Intellectual Property with respect to which JLP has exclusivity and that is not otherwise disclosed in published patents or patent applications or registered copyrights ("***JLP Confidential Information***").    All use by and disclosure to employees or others of JLP Confidential Information has been pursuant to the terms of valid and binding written confidentiality and nonuse/restricted-use agreements.

(f)     JLP is not Using, and it will not be necessary to Use, (i) any Inventions of any of its past or present employees or contractors (or people currently intended to be hired) made prior to or outside the scope of their employment by JLP or (ii) any confidential information or trade secrets of any former employer of any such Person.

(g)     To the knowledge of JLP, all Software is free of all viruses, worms, trojan horses and other infections or intentionally harmful routines and does not contain any bugs, errors, or problems of a material nature that could reasonably be expected to materially disrupt its operation or have a material adverse impact on the operation of other software programs or operating systems.   "***Software***" means software, programs, databases and related documentation, in any form (including Internet sites, Internet content and links) that is (i) material to the operation of the Business, including, but not limited to, that operated by JLP on its web sites or used by JLP in connection with processing customer orders, storing customer information, or storing or archiving data, or (ii) manufactured, distributed, sold, licensed or marketed by JLP.

4.11    Inventory.   The Inventory shown on the Reference Balance Sheet or thereafter acquired by JLP, consists of items of a quantity and quality usable or salable in the ordinary course of the normal, day-to-day operations of the Business, except for obsolete items, items of below-standard quality and over-stock items, all of which have been written-off or written-down to net realizable value on the Reference Balance Sheet in a manner consistent with customary industry practices.   The values at which Inventory is carried reflect JLP's inventory valuation policy of using the lower of cost or fair market value, and such valuation policy is consistent with customary industry practices and in accordance with GAAP applied on a consistent basis.   The reserves shown on the Reference Balance Sheet for obsolete and slow moving items, together with the reserves for lower of cost or fair market value adjustments, when combined with the Inventory reflected on the Reference Balance Sheet reflect true net realizable value thereof.   Since January 31, 2010, JLP has continued to replenish inventories in a normal and customary manner consistent with customary industry practices.

4.12    Accounts Receivable.   The Accounts Receivable shown on the Reference Balance Sheet are, and as of the Closing the Accounts Receivable included in the Contributed Assets will be, to the knowledge of JLP, valid and enforceable claims and subject to no set-off or counterclaim.   All the Accounts Receivable arose out of bona fide transactions in the Ordinary Course of the Business.   No portion of the Accounts Receivable is to be paid to any Person other than JLP.   Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of any reserves specifically applicable thereto shown on

the Reference Balance Sheet (which reserves shall be adequate and calculated in accordance with GAAP and consistent with customary industry practices). Except as set forth in Section 4.12 of the JLP Disclosure Schedule, JLP expects that, subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within three (3) months after the Closing Date. There is no contest, claim or right of set-off, other than rebates and returns in the Ordinary Course of the Business consistent with past practices, under any contract, arrangement or agreement with any maker of an Accounts Receivable relating to the amount or the validity of such Accounts Receivable.

4.13    Adequacy of Reserves.  The reserves shown on the Reference Balance Sheet for sales returns were calculated in accordance with GAAP applied on a consistent basis and adequately reflect the sales return rates for revenues recognized in prior periods and JLP's anticipated sales returns.

4.14    Agents and Suppliers.  Section 4.14 of the JLP Disclosure Schedule sets forth a list of all vendors to JLP from whom JLP purchased at least $15,000 of goods or services during the preceding twelve (12) months (the *"Significant Vendors"*), and a list of all representatives, distributors or other agents of JLP (other than employees of JLP) who accounted for revenues of JLP in excess of $15,000 during the preceding twelve (12) months (the *"Significant Agents"*).  To the knowledge of JLP, all such Significant Vendors and Significant Agents will continue such relations with the Company after the Closing. JLP believes that JLP's relationships with its vendors and agents are good commercial working relationships. Except as set forth in Section 4.14 of the JLP Disclosure Schedule, during the previous eighteen (18) months, no Significant Vendor and no Significant Agent has (a) terminated, or to JLP's knowledge, threatened to terminate, its relationship with JLP, (b) decreased materially or to JLP's, threatened to decrease or limit materially, the services, supplies or materials or products supplied to or purchased from JLP or (c) changed or indicated to JLP an intention to change materially the terms and conditions on which it is prepared to trade with or supply JLP. To the knowledge of JLP, no such Significant Vendor or Significant Agent is reasonably likely, as a result of the transactions contemplated by this Agreement, (a) not to trade with or supply the Company after the Closing, or (b) to reduce substantially or otherwise change the terms and conditions of its trading practices with respect to the Business. Except as set forth on Section 4.14 of the JLP Disclosure Schedule, JLP has not entered into any commitment or agreement with Significant Agents or Significant Vendors except in the Ordinary Course of the Business.

4.15    Litigation.  Except as set forth in Section 4.15 of the JLP Disclosure Schedule, there is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or, to the knowledge of JLP, threatened (including allegations that could form the basis for future action) against JLP or any of its properties or officers, directors or stockholders (in their capacities as such). There is no judgment, decree or order against JLP or the JLP Stockholders, or any of its directors or officers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by this Agreement, or that could reasonably be expected to have a Material Adverse Effect on JLP. All litigation to which JLP is a party (or, to the knowledge of JLP, threatened to become a party) is disclosed in Section 4.15 of the JLP Disclosure Schedule. JLP does not have any plans to initiate any litigation, arbitration or other proceeding against any third party. None of the JLP Stockholders has any claim against JLP.

4.16    Governmental Authorization.

(a)    JLP has obtained each federal, state, county, local or foreign governmental consent, license, franchise, approval, certificate, order, permit, grant, or other authorization of a Governmental Entity (i) pursuant to which JLP currently owns, leases, operates or holds any interest in any of its properties related to the Business or (ii) that is required for the operation of the Business or the holding of any such interest, the failure of which to obtain would have a Material Adverse Effect on the conduct of the Business ((i) and (ii) herein collectively called the "**Permits**"), and all of such Permits are in full force and effect and will remain in full force and effect with respect to the Business after the Closing and no suspension or cancellation of any Permit is pending, or to JLP's knowledge, threatened.  JLP has not received any notice or other communication from any Governmental Entity regarding (i) any actual or possible violation of or failure to comply with any term or requirement of any Permit, or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Permit.  Section 4.16(a) of the JLP Disclosure Schedule sets forth all such Permits.

(b)    JLP is not in breach of or default under or violation of, and has not received any notices of violation with respect to, (i) any Law applicable to JLP or the Business or by which any property or asset of JLP is bound or affected, or (ii) any Permit.

4.17    Environmental Matters.

(a)    JLP has complied in all material respects with all applicable Environmental Laws (as defined below).  There is no pending or, to the knowledge of JLP, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request by any Governmental Entity, relating to any Environmental Law involving JLP.  For purposes of this Agreement, "**Environmental Law**" means any federal, state or local law, statute, rule or regulation or the common law relating to the environment or occupational health and safety, including without limitation any statute, regulation or order pertaining to (i) treatment, storage, disposal, generation and transportation of industrial, toxic or hazardous materials or substances or solid or hazardous waste; (ii) air, water and noise pollution; (iii) groundwater and soil contamination; (iv) the release or threatened release into the environment of industrial, toxic or hazardous materials or substances, or solid or hazardous waste, including without limitation emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals; (v) the protection of wildlife, marine life and wetlands, including without limitation all endangered and threatened species; (vi) storage tanks, vessels, abandoned or discarded barrels, and other closed receptacles; (vii) health and safety of employees and other persons; and (viii) manufacture, processing, use, distribution, treatment, storage, disposal, transportation or handling of pollutants, contaminants, toxic or hazardous materials or substances or oil or petroleum products or solid or hazardous waste.  As used herein, the terms "**release**" and "**environment**" shall have the meaning set forth in the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("**CERCLA**").

(b)    There have been no releases of any Materials of Environmental Concern (as defined below) in violation of applicable law into the environment at any parcel of Real Property or any facility formerly or currently owned, operated or controlled, or occupied or

used by JLP. With respect to any such releases of Materials of Environmental Concern, JLP has given all required notices to Governmental Entities (copies of which have been provided to the Company). For purposes of this Agreement, "*Materials of Environmental Concern*" means any chemicals, pollutants or contaminants, hazardous substances (as such term is defined under CERCLA), solid wastes and hazardous wastes (as such terms are defined under the federal Resource Conservation and Recovery Act), toxic materials, oil or petroleum and petroleum products, or any other material subject to regulation under any Environmental Law.

(c)     Set forth in Section 4.17(c) of the JLP Disclosure Schedule is a list of all environmental reports, investigations and audits relating to premises currently or previously owned or operated, or occupied or used by JLP (whether conducted by or on behalf of JLP or a third party, and whether done at the initiative of JLP or directed by a Governmental Entity or other third party) which JLP has possession of. Complete and accurate copies of each such report, or the results of each such investigation or audit, have been provided to the Company.

4.18    Taxes.

(a)     Except as set forth in Section 4.18 of the JLP Disclosure Schedule JLP has filed on a timely basis all Tax Returns (as defined below) that it was required to file and all such Tax Returns were correct and complete in all material respects. JLP has paid, or will pay, on a timely basis all Taxes (as defined below) due on or before the Closing Date, whether or not shown to be due on any such Tax Returns. The unpaid Taxes of JLP for tax periods through the Balance Sheet Date do not exceed the accruals and reserves (excluding reserves for deferred Taxes) for Taxes set forth on the Reference Balance Sheet. All Taxes attributable to the period from and after the Balance Sheet Date and continuing through the Closing Date are attributable to the conduct by JLP of its operations in the Ordinary Course of the Business. JLP has no actual or potential liability for any Tax obligation of any taxpayer other than JLP. All Taxes that JLP is or was required by law to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Entity. For purposes of this Agreement, "*Taxes*" means all taxes, charges, fees, levies or other similar assessments or liabilities, including without limitation income, gross receipts, ad valorem, premium, value-added, excise, severance, stamp, occupation, windfall profits, real property, personal property, sales, use, transfer, withholding, employment, unemployment insurance, social security, business license, business organization, environmental, payroll and franchise taxes imposed by the United States of America or any state, local or foreign government, or any agency thereof, or other political subdivision of the United States or any such government, and any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax or any contest or dispute thereof. For purposes of this Agreement, "*Tax Returns*" means all reports, returns, declarations, statements, forms or other information required to be supplied to a taxing authority in connection with Taxes.

(b)     JLP has delivered to the Company correct and complete copies of all Tax Returns, examination reports and statements of deficiencies assessed against or agreed to by JLP since its date of formation. No Tax Returns of JLP have been audited by the Internal Revenue Service ("*IRS*"). No Tax Returns of any predecessor to the business or operations of JLP that remain open under applicable statutes of limitation (whether an individual or entity)

have been audited by the IRS and the U.S. Federal Income Tax Returns for years ended on or prior to December 31, 2004 are closed by the applicable statute of limitations in respect of such business or operations.   No examination or audit of any Tax Returns of JLP by any Governmental Entity is currently in progress or, to the knowledge of JLP, threatened or contemplated.  JLP has not waived any statute of limitations with respect to taxes or agreed to an extension of time with respect to an assessment of or deficiency in Taxes.

(c)     JLP is not a party to any Tax allocation or sharing agreement or Tax indemnity agreement.  JLP has never filed Tax Returns on a combined, consolidated or unitary basis with any other business entity in any jurisdiction or has otherwise been liable, by contract or otherwise, for any Taxes of any other business entity.

(d)     JLP is not a party to any tax litigation nor is it the subject of any tax audit.  JLP has no reason to suspect any tax litigation attributable to periods ended before or including the Closing Date.  Classifications, definitions, valuation and principles used in the accounts of JLP are in accordance with classifications, definitions, valuations and principles used in the Tax Returns of JLP.  JLP is not and has never been a party to any transaction or agreement which is in conflict with the tax rules on transfer pricing in any relevant jurisdiction.

(e)     None of the assets of JLP is "tax-exempt use property" within the meaning of Section 168(h) of the Code.  None of the assets of JLP directly or indirectly secures any debt the interest on which is tax-exempt under Section 103(a) of the Code.

(f)     JLP has not participated in or cooperated with an international boycott within the meaning of Section 999 of the Code nor has JLP had operations which are or may hereafter become reportable under Section 999 of the Code.

(g)     To the knowledge of JLP, none of the JLP Stockholders are persons other than United States persons within the meaning of the Code.

4.19     Employee Benefit Plans; Labor Matters.

(a)     Section 4.19(a) of the JLP Disclosure Schedule lists (i) all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")) and all bonus, stock option, stock purchase, stock appreciation right, long term incentive plan, restricted stock, incentive, deferred compensation, retiree medical or life insurance, cafeteria benefit, dependent care, director or employee loan, fringe benefit, sabbatical, supplemental retirement, severance or other benefit plans, programs or arrangements, and all employment, termination, severance or other contracts or agreements, whether legally enforceable or not, to which JLP is a party, with respect to which JLP has any obligation or which are maintained, contributed to or sponsored by JLP for the benefit of any current or former employee, officer or manager of JLP, (ii) each employee benefit plan for which JLP could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated, (iii) any plan in respect of which JLP could incur liability under Section 4212(c) of ERISA, and (iv) any contracts, arrangements or understandings between JLP and any employee of JLP including, without limitation, any contracts, arrangements or understandings

relating to a change in control of JLP or a sale of all or substantially all of the assets of JLP (each, a "*Plan*," and collectively, the "*Plans*").

(b)      Each Plan is in writing and JLP has furnished the Company with a true and complete copy of each Plan (or a written summary where the Plan is not in writing) and a true and complete copy of each material document, if any, prepared in connection with each such Plan, including, without limitation, (i) a copy of each trust or other funding arrangement, (ii) each summary plan description and summary of material modifications, (iii) the three (3) most recent annual reports (Form Series 5500 and all schedules and financial statements attached thereto), if any, required under ERISA or the Code in connection with each Plan, (iv) the most recently received IRS determination letter for each such Plan, (v) the most recently prepared actuarial report and financial statement in connection with each such Plan, and (vi) any correspondence with the IRS or the Department of Labor with respect to each such Plan. Except as disclosed on Section 4.19(a) of the JLP Disclosure Schedule, there are no other employee benefit plans, programs, arrangements or agreements, whether formal or informal, whether in writing or not, to which JLP is a party, with respect to which JLP has any obligation or which are maintained, contributed to or sponsored by JLP for the benefit of any current or former employee, officer or manager of JLP. JLP does not have an express or implied commitment, whether legally enforceable or not, (x) to create, incur liability with respect to, or cause to exist, any other employee benefit plan, program or arrangement, (y) to enter into any contract or agreement to provide compensation or benefits to any individual, or (z) to modify, change or terminate any Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(c)      None of the Plans is a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA (a "*Multiemployer Plan*") or a single employer pension plan (within the meaning of Section 4001(a)(15) of ERISA for which JLP could incur liability under Section 4063 or 4064 of ERISA (a "*Multiple Employer Plan*"). None of the Plans provides for or promises retiree medical, disability or life insurance benefits to any current or former employee, officer or manager of JLP other than procedures intended to comply with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*"). Each of the Plans is subject only to the Laws of the United States or a political subdivision thereof.

(d)      None of the Plans provides for the payment of separation, severance, termination or similar-type benefits to any Person or obligates JLP to pay separation, severance, termination or similar-type benefits solely or partially as a result of any transaction contemplated by this Agreement or as a result of a "change in ownership or control," within the meaning of such term under Section 280G of the Code. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby, either alone or together with another event, will (i) result in any payment (including, without limitation, severance, unemployment compensation, golden parachute, forgiveness of indebtedness or otherwise) becoming due under any Plan, (ii) materially increase any benefits otherwise payable under any Plan or other arrangement, (iii) result in the acceleration of the time of payment, vesting or funding of any benefits (including stock options), or (iv) affect in any material respects any Plan's current treatment under any Laws including any Tax or social contribution Law. No Plan provides, or reflects or represents any liability to provide, retiree health to any Person for any reason, except as may be required by COBRA or other applicable statute, and JLP

has never represented, promised or contracted (whether in oral or written form) to any employee (either individually or to employees as a group) or any other Person that such employee(s) or other Person would be provided with retiree health, except to the extent required by statute.

(e)     Each Plan is now and always has been operated in all material respects in accordance with its terms and the requirements of all applicable Laws, regulations and rules promulgated thereunder including, without limitation, ERISA and the Code.  JLP has performed all obligations required to be performed by it under, is not in any respect in default under or in violation of, and has no knowledge of any default or violation by any party to, any Plan.  No action, claim or proceeding is pending or, to the knowledge of JLP, threatened with respect to any Plan (other than claims for benefits in the Ordinary Course of the Business) and no fact or event exists that could give rise to any such action, claim or proceeding.  Neither JLP nor any Person that is a member of the same controlled group as JLP or under common control with JLP within the meaning of Section 414 of the Code (each, an "*ERISA Affiliate*") is subject to any penalty or Tax with respect to any Plan under Section 502(i) of ERISA or Sections 4975 through 4980 of the Code.  Each Plan (other than any stock option or similar plan) can be amended, terminated or otherwise discontinued without material liability to the Company, JLP or any of its ERISA Affiliates (other than ordinary administration expenses).  JLP has not violated any of the health care continuation requirements of COBRA, the requirements of the Family Medical Leave Act of 1993, the requirements of the Health Insurance Portability and Accountability Act of 1996, the requirements of the Women's Health and Cancer Rights Act of 1998, the requirements of the Newborns' and Mothers' Health Protection Act of 1996, or any amendment to each such act, or any similar provisions of state Law applicable to its employees.

(f)     Each Plan intended to qualify under Section 401(a) or Section 401(k) of the Code and each trust intended to qualify under Section 501(a) of the Code has either received a favorable determination, opinion, notification or advisory letter from the IRS with respect to each such Plan as to its qualified status under the Code, including all amendments to the Code effected by the Tax Reform Act of 1986 and subsequent legislation, and no fact or event has occurred since the date of such determination letter or letters from the IRS to adversely affect the qualified status of any such Plan or the exempt status of any such trust, or has remaining a period of time under applicable Treasury regulations or IRS pronouncements in which to apply for such a letter and make any amendments necessary to obtain a favorable determination as to the qualified status of each such Plan.

(g)     JLP has not incurred any liability under, arising out of or by operation of Title IV of ERISA (other than liability for premiums to the Pension Benefit Guaranty Corporation arising in the Ordinary Course of the Business), including, without limitation, any liability in connection with (i) the termination or reorganization of any employee benefit plan subject to Title IV of ERISA or (ii) the withdrawal from any Multiemployer Plan or Multiple Employer Plan, and no fact or event exists which could give rise to any such liability.

(h)     All contributions, premiums or payments required to be made or accrued with respect to any Plan have been made on or before their due dates.  All such contributions have been fully deducted for income tax purposes and no such deduction has been challenged or disallowed by any Governmental Entity and no fact or event exists which could give rise to any such challenge or disallowance.

24

(b)    The consummation of the transactions contemplated herein will not result in (i) any amount becoming payable to any employee, manager or independent contractor of JLP, (ii) the acceleration of payment or vesting of any benefit, option or right to which any employee, manager or independent contractor of JLP may be entitled, (iii) the forgiveness of any indebtedness of any employee, manager or independent contractor of JLP or (iv) any cost becoming due or accruing to JLP or the Company with respect to any employee, manager or independent contractor of JLP.

(c)    JLP is not aware that any of JLP's employees or contractors is obligated under any agreement, commitments, judgment, decree, order or otherwise (an "*Employee Obligation*") that could reasonably be expected to interfere with the use of his or her best efforts to promote the interests of JLP or that could reasonably be expected to conflict with the Business as currently conducted in a manner consistent with past practices or proposed to be conducted. Neither the execution nor delivery of this Agreement nor the conduct of the Business as currently conducted in a manner consistent with past practices or proposed to be conducted, will, to the knowledge of JLP, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any Employee Obligation.

4.21    Related-Party Transactions. Except as set forth on Section 4.21 of the JLP Disclosure Schedule, (a) JLP is not a party to any material contract or arrangement, or indebted, either directly or indirectly, to any of its officers, directors or any JLP Stockholders or their relatives or Affiliates, except for the payment of employee compensation in the Ordinary Course of the Business, and (b) none of such Persons is indebted to JLP or has any direct or indirect ownership interest in, or any contractual relationship with, any Person with which JLP is or was Affiliated or with which JLP has a business relationship, or any Person which, directly or indirectly, competes with JLP (other than the ownership of less than one percent (1%) of the outstanding securities of any publicly traded companies that may compete with JLP).

4.22    Brokers' and Finders' Fees. No finder, broker, agent, financial advisor or other intermediary has acted on behalf of any of the JLP Stockholders or JLP in connection with the negotiation or consummation of this Agreement or the transactions contemplated hereby, and no such Person is entitled to any fee, payment, commission or other consideration in connection therewith as a result of any arrangement made by any of them.

4.23    Complete Copies of Materials. JLP has delivered to the Company true and complete copies (or, with respect to oral agreements, written summaries of the same) of each instrument, agreement, contract, commitment and other document that has been requested by the Company or its agents in writing in connection with this Agreement or that is referred to in the JLP Disclosure Schedule.

4.24    Insurance Policies. Section 4.24 of the JLP Disclosure Schedule sets forth an accurate list of all insurance policies under which JLP is insured, the amounts and types of insurance coverage available thereunder and all insurance loss runs and workers' compensation claims received by JLP since its formation. JLP has delivered to the Company true, correct and complete copies of such insurance policies, all of which are valid and in full force. All premiums due as of the Closing under such policies will have been paid, and JLP is otherwise in compliance with the terms of such policies. JLP has not received any notice of any proposed

material increase in the premiums payable for coverage, or proposed reduction in the scope (or discontinuation entirely) of coverage, under any of such insurance policies. Such policies of insurance are of the type and in amounts customarily carried by Persons conducting business similar to the Business, provide adequate insurance for the Contributed Assets and comply with all applicable laws.

        4.25   Bank Accounts. Section 4.25 of the JLP Disclosure Schedule sets forth a true, correct and complete list showing the name and address of each banking institution, mutual fund or stock brokerage firm in which JLP has accounts or safe deposit boxes, the account numbers or box numbers relating thereto and the name of each Person authorized to draw thereon or to have access thereto.

        4.26   Product Warranties. No product manufactured or sold by JLP is subject to any guaranty, warranty, right of return or other indemnity other than JLP's standard terms and conditions of sale, which are fully and accurately summarized in Section 4.26 of the JLP Disclosure Schedule. There are no existing or to JLP's knowledge, threatened claims against JLP alleging any personal injury, death, or property or economic damages, punitive or exemplary damages, contribution or indemnification, or any material defects in JLP's products, or alleging any material failure of JLP's products to meet specifications.

        4.27   Powers of Attorney. There are no outstanding powers of attorney executed on behalf of JLP or any JLP Stockholder with respect to JLP or the JLP Securities.

        4.28   Investment Representations.

        (a)   JLP hereby confirms that the Class B Units will be acquired by it for investment for its own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that it has no present intention of, directly or indirectly, selling, granting any participation in, or otherwise distributing the same; provided, however, that on or after the date that is eighteen (18) months following the Effective Date JLP may, to the extent permitted by the LLC Agreement (defined in Section 8.3(e)) and with the consent of the Company, which will not be unreasonably withheld but may be subject to such conditions as the Company's board of directors in its discretion deems appropriate for protection of the Company's interests, distribute such Class B Units to the JLP Stockholders upon JLP's liquidation. Neither JLP nor any of the JLP Stockholders have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third person, with respect to any of the Class B Units.

        (b)   JLP believes it has received all the information it considers necessary or appropriate for deciding whether to acquire the Class B Units. JLP has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the Class B Units and the business, properties, prospects and financial condition of the Company. JLP acknowledges that the Class B Units will be subject to the terms and conditions set forth in the Company Organizational Documents.

        (c)   JLP acknowledges that it is able to fend for itself, can bear the economic risk of its investment in the Class B Units, and has such knowledge and experience in

financial or business matters that it is capable of evaluating the merits and risks of the investment in the Class B Units.  JLP has not been organized for the purpose of acquiring the Class B Units.

(d)

JLP understands that the Class B Units will be characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such Class B Units may be resold without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), only in certain limited circumstances.  In this connection, JLP represents that it is familiar with Rule 144 as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

4.29    Representations Complete.   None of the representations or warranties made by JLP herein or in the JLP Disclosure Schedule, or in any certificate furnished by JLP pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.  None of JLP, Joshua L. Powell, any other Key Employee or director of JLP, or any holder of JLP's Series B Preferred Shares, Series C Preferred Shares or Series D Preferred Shares has withheld from the Company any material information relating to the Business, the Contributed Assets and the other transactions contemplated by this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to JLP that the statements contained in this Article V are true and correct.  Any reference in this Article V to an agreement being "enforceable" shall be deemed to be qualified to the extent such enforceability is subject to (i) laws of general application relating to bankruptcy, insolvency, moratorium and the relief of debtors, and (ii) the availability of specific performance, injunctive relief and other equitable remedies.

5.1    Organization, Power and Standing.   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware.  The Company has all requisite limited liability company power and authority to own its properties and to carry on its business and is duly qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect on the Company.  The Company has delivered to JLP a true, correct and complete copy of the Certificate of Formation and LLC Agreement or other charter documents, as applicable, of the Company, each as amended to date (the "*Company Organizational Documents*").  The Company Organizational Documents are in full force and effect.  The Company is not in violation of any of the provisions of the Company Organizational Documents.

5.2    Authority.

(a)    The Company has all requisite limited liability company power and authority to enter into this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Company of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary limited liability company action on the part of the Company, and no other limited liability company proceedings on the part of the Company, its Directors or its members are necessary to authorize and approve this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby. This Agreement and the other Transaction Documents have been duly and validly executed and delivered by the Company and constitute the legal, valid and binding obligations of the Company enforceable against the Company in accordance with their terms.

(b)    The execution and delivery of this Agreement and the other Transaction Documents by the Company does not, and the consummation of the transactions contemplated hereby and thereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or result in the creation of a lien or other encumbrance pursuant to, or require any notice to be provided or consent to be obtained pursuant to (i) any provision of the Company Organizational Documents, (ii) any material contract, note, bond, mortgage, license, agreement, permit or other instrument, or (iii) any Law applicable to the Company or any of the Company's properties or assets.

(c)    No consent, approval, order or authorization, registration or permit of, declaration or filing with or notification to, any Governmental Entity is required on the part of the Company for or in connection with the execution and delivery by the Company of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby, except for (i) such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not have a Material Adverse Effect on the Company and would not prevent, or materially alter or delay any of the transactions contemplated by this Agreement.

5.3    Valid Issuance of Class B Units.  The Class B Units to be issued pursuant to this Agreement, when issued in accordance with this Agreement, will be duly authorized, validly issued, fully paid and nonassessable, and free and clear from any Liens in respect of the issuance thereof, except as provided in this Agreement, the Company Organizational Documents or Liens created by or imposed upon the holder of such Class B Units. Assuming the accuracy of the representations and warranties of JLP and the JLP Stockholders, the Class B Units to be issued pursuant to this Agreement will be issued in compliance with applicable federal and state securities laws.

5.4    Capitalization.

(a)    Immediately prior to Closing, the authorized equity capital of the Company will consist of 570,000 units of Class A voting preferred units, all of which are issued

and outstanding (the "**Class A Units**"), 430,000 units of Class B voting preferred units (the "**Class B Units**"), and 136,363  Class C nonvoting common units, none of which are outstanding ("**Management Pool Units**").   The Class A Units and the Class B Units are referred to collectively as the "**Voting Units**."

(b)     The outstanding Units are all duly and validly authorized and issued, fully paid and nonassessable, and were issued in accordance with the registration or qualification provisions of the Securities Act and any relevant state securities laws, or pursuant to exemptions therefrom.

(c)     Except for this Agreement, the rights provided in the LLC Agreement, and the commitment of Company to issue to certain members of Company's management awards of Class C Units, there are not outstanding any options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from Company of any of its capital stock.

5.5     No Voting Agreements or Voting Trusts.   Except as set forth in this Agreement, the Company Organizational Documents or with respect to the Management Pool Units, there are no voting agreements or voting trusts with respect to Company's outstanding Units or other securities, and neither the Company nor any of its current shareholders or affiliates has any outstanding obligation (contingent or otherwise) to transfer, purchase, redeem or otherwise acquire any of its securities or pay any dividend or make any distribution in respect thereof.

5.6     Required Contribution.  The Company has or as of the Closing Date will have received a capital contribution from Blue Highways Holdings III LLC of $2,500,000 (gross) (the "Class A Capital Contribution").

ARTICLE VI

CONDUCT OF THE BUSINESS PENDING THE SALE

6.1     Conduct of the Business Prior to Closing.

During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, JLP agrees (except to the extent that the Company shall otherwise consent in writing) to carry on the Business in the Ordinary Course of the Business, to pay JLP's debts and Taxes when due (subject to good faith disputes over such debts or Taxes), to pay or perform other obligations when due and, to the extent consistent with the Business, use all reasonable efforts consistent with past practices and policies to preserve intact the present organization of the Business by keeping available the services of JLP's present officers, Key Employees and consultants and preserving JLP's relationships with customers, suppliers, distributors, licensors, licensees, and others having dealings with the Business, to the end that JLP's goodwill and the ongoing Business will not be impaired as of the Closing Date. JLP shall promptly notify the Company of any event or occurrence not in the Ordinary Course of the Business.

(a)     By way of amplification and not limitation of the foregoing, except as specifically contemplated by this Agreement or as specifically set forth in Section 6.1 of the JLP Disclosure Schedule (under the appropriate subsection), between the date of this Agreement and the Closing Date, JLP will not, directly or indirectly, do, or propose to do, any of the following without the prior written consent of the Company:

(i)     amend or otherwise change JLP Organizational Documents;

(ii)     issue, or authorize the issuance of, any stock, or any options, warrants, convertible securities or other rights of any kind to acquire any other ownership interest of JLP (including, without limitation, any phantom interest);

(iii)     sell, lease, license, pledge, grant, encumber or otherwise dispose of or transfer any of the Contributed Assets, except for the sale of Inventory in the Ordinary Course of the Business;

(iv)     fail to maintain the Contributed Assets in good working condition and repair according to the standards it has maintained in the Ordinary Course of the Business, subject only to ordinary wear and tear;

(v)     declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its stock;

(vi)     split, combine, subdivide, redeem or reclassify any of its stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for stock, or purchase or otherwise acquire, directly or indirectly any stock;

(vii)     acquire, sell, lease, encumber or dispose of any assets or property (including without limitation any shares or other equity interests in or securities of any corporation, partnership, association or other business organization or division thereof), other than purchases and sales of assets in the Ordinary Course of the Business;

(viii)     institute or settle any legal proceeding;

(ix)     incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any person, or make any loans or advances;

(x)     authorize any capital expenditure in excess of $10,000, individually or in the aggregate;

(xi)     waive or release any material right or claim except in the Ordinary Course of the Business;

(xii)     pay any bonus or increase or agree to increase the compensation payable or to become payable to any officer, or employee or consultant, or grant any severance or termination pay to, or enter into any employment or severance agreement with,

31

any manager, officer or other employee, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other Plan, agreement, trust, fund, policy or arrangement for the benefit of any manager, officer or employee;

(xiii)    extend any offers of employment to potential employees, consultants or independent contractors or terminate any existing employment agreements;

(xiv)    enter into, amend or terminate any Material Contract;

(xv)    other than in the Ordinary Course of the Business enter into any licensing, distribution, marketing, sponsorship, advertising, merchant program or other similar contracts, agreements or obligations;

(xvi)    pay, discharge or satisfy any Liability (absolute, accrued, asserted, unasserted, contingent or otherwise) except in the Ordinary Course of the Business;

(xvii)    make or change any Tax or accounting election, change any annual accounting period, adopt or change any accounting method or principle, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment relating to JLP, surrender any right to claim refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to JLP, or take any other action or omit to take any action that could reasonably be expected to have the effect of increasing the Tax liability of JLP or the Company;

(xviii)    (A) sell, assign, lease, terminate, abandon, transfer, permit to be encumbered or otherwise dispose of or grant any security interest in and to any item of Intellectual Property, in whole or in part, (B) grant any license with respect to any  Intellectual Property, (C) develop, create or invent any Intellectual Property jointly with any third party, or (D) disclose, or allow to be disclosed, any confidential Intellectual Property, unless such Intellectual Property is subject to a confidentiality or non-disclosure covenant protecting against disclosure thereof;

(xix)    revalue any of the Contributed Assets, including writing down the value of inventory or writing off notes or Accounts Receivable;

(xx)    permit any insurance policy naming it as a beneficiary or a loss payable payee to be cancelled or terminated without notice to the Company;

(xxi)    take any action or commit any omission that would cause a Material Adverse Effect on JLP; or

(xxii)    take, or agree in writing or otherwise to take, any of the actions described in subsections (i) through (xxi) above, or any action which is reasonably likely to make any of JLP's representations or warranties contained in this Agreement untrue or incorrect in any material respect on the date made (to the extent so limited) or as of the Closing Date.

6.2     Absence of Litigation.  JLP shall notify the Company in writing promptly after learning of any claim, action, suit, arbitration, mediation, proceeding or investigation by or before any court, arbitrator or arbitration panel, board or other Governmental Entity initiated by it or against it, or known by JLP to be threatened against JLP, the Business or any of its officers, directors or employees in their capacity as such.

6.3     Notification of Certain Matters.  The Company shall give prompt notice to JLP, and JLP shall give prompt notice to the Company, of (i) the occurrence, or non-occurrence, of any event the occurrence, or non-occurrence, of which would be likely to cause (x) any representation or warranty contained in this Agreement to be untrue or inaccurate or (y) any covenant, condition or agreement contained in this Agreement not to be complied with or satisfied; and (ii) any failure or inability of the Company or JLP, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 6.3 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice. In addition, JLP shall give prompt notice to the Company of any material developments affecting the Contributed Assets, Assumed Liabilities, business, financial condition, operations, results of operations, customer or supplier relations, employee relations, projections or prospects of JLP or the Business.

6.4     Access to Information.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, JLP shall:  (i) provide to the Company, its officers, directors, employees, accountants, agents, advisors or other representatives (collectively, "*Representatives*") access at reasonable times upon prior notice to the directors, managers, officers, employees, agents, properties, offices and other facilities of JLP and to the books and records thereof; and (ii) furnish promptly such information concerning the Business, the Contributed Assets, the Assumed Liabilities, the personnel and other aspects of the Business as the Company or its Representatives may reasonably request.

6.5     Regulatory and Other Authorizations; Notices and Consents .

(a)     Each of JLP and Company shall use its reasonable best efforts to obtain all authorizations, consents, orders and approvals of all Governmental Entities and officials that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the Transaction Documents and will cooperate fully with each other in promptly seeking to obtain all such authorizations, consents, orders and approvals.

(b)     JLP shall give promptly such notices to third parties and use its reasonable best efforts to obtain such third party consents and estoppel certificates as the Company may in its sole and absolute discretion deem necessary or desirable in connection with the transactions contemplated by this Agreement and the other Transaction Documents, including, without limitation, all third party consents that are necessary or desirable in connection with the transfer of the Material Contracts.

(c)     The Company shall cooperate and use all reasonable efforts to assist JLP in giving such notices and obtaining such consents and estoppel certificates; provided, however, that the Company shall have no obligation to give any guarantee or other consideration of any nature in connection with any such notice, consent or estoppel certificate or to consent to any change in the terms of any Material Contract which the Company in its sole and absolute discretion may deem adverse to the interests of the Company or the Business.

(d)     JLP and the Founder will use its or his best efforts to assist the Company in obtaining from the Landlord its executed counterpart to the Lease Assignment, Assumption and Amendment prior to the Closing.

(e)     JLP and Company agree that, in the event any consent, approval or authorization necessary or desirable to preserve for the Business or the Company any right or benefit under any lease, license, contract, commitment or other agreement or arrangement to which JLP is a party is not obtained prior to the Closing, JLP will, subsequent to the Closing, cooperate with the Company in attempting to obtain such consent, approval or authorization as promptly thereafter as practicable.  If such consent, approval or authorization cannot be obtained, JLP will use its best efforts to provide the Company with the rights and benefits of the affected lease, license, contract, commitment or other agreement or arrangement for the term of such lease, license, contract or other agreement or arrangement.

6.6     No Solicitation of Transactions.

(a)     JLP will not, directly or indirectly, and JLP will instruct its officers, directors, employees, stockholders, agents, advisors or other representatives (including, without limitation, any investment banker, attorney or accountant retained by it), not to, directly or indirectly, solicit, initiate or encourage (including by way of furnishing nonpublic information), or take any other action to facilitate, any inquiries or the making of any proposal or offer (including, without limitation, any proposal or offer to one or more JLP Stockholders) that constitutes, or may reasonably be expected to lead to, any Competing Transaction (as defined below), or enter into or maintain or continue discussions or negotiate with any Person in furtherance of such inquiries or to obtain a Competing Transaction, or agree to or endorse any Competing Transaction, or authorize or permit any of the officers, directors, managers or employees of JLP, or any investment banker, financial advisor, attorney, accountant or other representative retained by JLP, to take any such action.  JLP will notify the Company immediately after receipt by JLP (or any of its stockholders or officers, directors, employees, agents, advisors or other representatives) of any proposal for, or inquiry respecting, any Competing Transaction, or any request for nonpublic information in connection with such proposal or inquiry or for access to the properties, books or records of JLP by any Person that informs or has informed JLP that it is considering making or has made such a proposal or inquiry.  Such notice to the Company shall indicate in reasonable detail the identity of the Person making such proposal or inquiry and the terms and conditions of such proposal or inquiry.  JLP immediately shall cease and cause to be terminated all existing discussions or negotiations with any parties conducted heretofore with respect to a Competing Transaction.  JLP agrees not to release any third party from, or waive any provision of, any confidentiality or standstill agreement to which it is a party.

34

(b)    A "***Competing Transaction***" means any of the following involving JLP (other than the sale and purchase of the Business and the Contributed Assets contemplated by this Agreement):  (i) a merger, consolidation, share exchange, business combination or other similar transaction; (ii) any sale, lease, exchange, transfer or other disposition of a material portion of the assets of such party; (iii) a tender offer or exchange offer for any or all of the outstanding voting securities of such party; or (iv) any solicitation in opposition to approval by JLP Stockholders of this Agreement and the transactions contemplated by it.

## ARTICLE VII

## ADDITIONAL COVENANTS

7.1    Use of Trademarks.

(a) Immediately after the Closing, JLP shall change its corporate name to JLP Retail Holding Company, Inc., and amend JLP Organizational Documents accordingly, and shall not use any Mark or corporate name contained in the Intellectual Property or any Mark or corporate name similar or related thereto.  As promptly as practicable following the Closing, JLP shall remove or obliterate any Intellectual Property from letterheads and other materials remaining in its possession or under its control, and JLP shall not use or put into use after the Closing any materials that bear any Mark or corporate name contained in the Intellectual Property or any Mark or corporate name similar or related thereto.

(b)    In connection with this Agreement and the transfer and assignment by JLP of all JLP Intellectual Property to the Company, Joshua L. Powell (the "***Founder***") hereby grants to the Company throughout the world the sole and exclusive right, license, and permission to use his name and endorsement to exploit, turn to account, advertise, and otherwise profit from the Company's goods and services bearing such name, image, and/or endorsement.  The grant made hereunder shall be exclusive to the Company, and the Founder agrees that he shall not, on behalf of himself or any other person or entity, grant any similar right of any kind in connection with any business competitive in any respect with the Company or any of its affiliates and/or subsidiaries.  The Founder further agrees that he will not use his name or permit any other person or entity to use his name, and otherwise will not assert any right to use his name, including but not limited to any right to use his name under the doctrine of fair use, in connection with any business competitive in any respect to the Company or any of its affiliates and/or subsidiaries.

7.2    Employees.  As of the Closing Date, the Company shall have offered employment to each of the Key Employees on terms and conditions acceptable to the Company.  The Company shall not be obligated to offer employment to any other employee of JLP, but the Company shall have the right to offer employment to any employees of JLP as of the Closing Date, on terms and conditions established by the Company in its sole discretion.

7.3    Endorsement of Checks, etc.  JLP hereby irrevocably authorizes the Company following the Closing to endorse for deposit only its name on and collect for the Company's account any checks received in payment of any accounts included in the Contributed Assets, and any refunds of deposits, prepaid expenses and similar amounts.  In the event payment

for any amounts due the Company are received by JLP or the JLP Stockholders, such party will promptly turn the same over to the Company.

7.4     Payment of Excluded Liabilities.  JLP will pay and discharge all Excluded Liabilities as and when resources are available to do so; provided, however, the Company may elect in its sole discretion to pay and discharge any Excluded Liabilities and recover the amount of such payments by cancellation and/or redemption of Class B Units held by JLP or by offset and reduction of any amounts otherwise payable or distributable to JLP with respect to Class B Units held by JLP.

7.5     Payment of Assumed Liabilities.  The Company will pay and discharge all Assumed Liabilities in accordance with their terms as and when the same become due and payable.

7.6     Termination of the Retirement Plan.  Effective as of the Closing Date, JLP shall terminate the J.L. Powell, Inc. 401(k) Retirement Plan (the "401(k) Plan") and shall distribute to the 401(k) Plan participants their accrued benefits as soon as is administratively feasible thereafter. All participants in the 401(k) Plan actively employed by JLP as of the Closing Date shall be 100% vested in their accrued benefits under the 401(k) Plan. In order to facilitate the termination of the 401(k) Plan the Company agrees, upon JLP's request, to provide Seller with non-fiduciary administrative services in connection with the 401(k) Plan's termination (such as distribution to and collection from employees of the paperwork necessary to make distributions) pursuant to an "administrative services only" agreement that will specify the tasks that the Company will undertake on JLP's behalf and the fee that JLP shall pay to the Company for the performance of such tasks. JLP agrees that the Company in providing such services will not be acting in a fiduciary capacity and will not be a fiduciary with respect to the 401(k) Plan and will indemnify and hold harmless the Company from any claims made under ERISA with respect to the 401(k) Plan.

7.7     Confidentiality.   Following the Closing, JLP shall not, directly or indirectly, disclose, divulge or make any unauthorized use of, and JLP shall use its best efforts to prevent its officers, directors, employees, stockholders, agents, advisors or other representatives (including, without limitation, any investment banker, attorney or accountant retained by it) from disclosing, divulging or making any unauthorized use of, any trade secrets or other Confidential Information pertaining to the Business, the Company (including, without limitation, any Affiliate thereof), JLP, or the Contribution, including information of others that JLP has agreed to keep confidential, except to the extent that such information shall have become public knowledge other than by breach of this Agreement by JLP, and except as necessary to file tax returns or other required reports with governmental agencies or as otherwise required by law.  As used herein, the term "*Confidential Information*" shall include any and all non-public information relating to JLP, the Company, or their respective business, operations, financial affairs, performance, assets, technology, research and development, processes, products, contracts, customers, licensees, sublicensees, suppliers, personnel, plans or prospects, whether or not in written form and whether or not expressly designated as confidential, including (without limitation) any such information consisting of or otherwise relating to trade secrets, know-how, technology (including software and programs), designs, drawings, photographs, samples, processes, license or sublicense arrangements, formulae, proposals, product specifications,

36

customer lists or preferences, pricing lists, referral sources, marketing or sales techniques or plans, operating manuals, service manuals, financial information or projections, lists of suppliers or distributors or sources of supply.

7.8    Injunctive Relief.   JLP acknowledges that in view of the nature of the Business and the objectives of the Company in entering into this Agreement, the restrictions and other provisions contained in this Agreement are reasonable and necessary to protect the legitimate business interests of the Company, and that any breach or threatened breach of the provisions of Section 7.7 of this Agreement will cause irreparable injury to the Company for which an adequate monetary remedy does not exist.  Accordingly, in the event of any such breach or threatened breach, the Company shall be entitled, in addition to the exercise of other remedies to seek and obtain injunctive relief, without necessity of posting a bond, restraining JLP and/or the JLP Stockholders from committing such breach or threatened breach.

7.9    Further Assurances.  Each of the parties hereto shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Contributed Assets to the Company, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transaction contemplated hereby.

7.10    Bulk Sales Laws.   Each of the Company and JLP hereby waives compliance by the other with the so-called "bulk sales law" and any other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.  JLP shall indemnify the Company (together with its Affiliates) from and hold it harmless against any liabilities, damages, costs and expenses resulting from or arising out of any action brought or levy made as a result of JLP's failure to pay its liabilities other than Assumed Liabilities owed to creditors, other than those liabilities that have been expressly assumed, on such terms as expressly assumed, by the Company pursuant to this Agreement.

7.11    Taxes.

(a)    JLP shall pay all Taxes imposed upon JLP.  JLP shall also pay, or indemnify the Company for, all Taxes imposed on the Company or any Affiliate of the Company and any Taxes to which the Contributed Assets are subject or for which a lien, claim or encumbrance can be placed upon the Contributed Assets but only in each case to the extent that any such Taxes relate to periods (or portions thereof) ending on or prior to the Closing Date or transactions or events occurring on or prior to the Closing Date.  Liability for any Taxes that JLP is required to satisfy pursuant to this Section 7.11 shall not constitute or be treated as Assumed Liabilities.

(b)    JLP shall properly file all Tax Returns that JLP is required by any applicable law to file with respect to Taxes arising in or related to periods on or prior to the Closing Date or related to transactions or events occurring prior to the Closing Date.  With respect to state and local ad valorem taxes on the Contributed Assets (whether personal or real, owned or leased) for the current Tax year, JLP shall as provided in Section 4.18 be responsible for the payment of all such Taxes for the period up to and including the Closing Date (and thereafter with regard to Taxes related to the Excluded Assets), and the Company shall be responsible for the payment of all such Taxes for the period after the Closing Date (except to the

extent such Taxes are related to the Excluded Assets). For all purposes of this Agreement, (i) all such Taxes assessed on an annual basis shall be prorated on the assumption that an equal amount of Tax applies to each day of the year, regardless of how installment payments are billed or made and (ii) any supplemental property Taxes or assessments which arise out of a revaluation of a Contributed Asset which revaluation would not have occurred except for the change in ownership of the Contributed Asset shall be allocated to periods after the Closing Date and shall accordingly be borne by the Company. Any payment of Taxes due from one party to the other pursuant to the foregoing provisions of this Section 7.11 shall be paid at the Closing Date. If the current year's Taxes and assessments are not available at the Closing Date, for the purposes of apportionment between JLP and the Company and payment pursuant to this Section 7.11, the amount thereof shall be estimated on the basis of the prior year's Taxes and assessments, and any incremental payment shall be adjusted after receipt of the final Tax statements, but within fifteen (15) days after such statements are provided by the applicable Tax authorities. For purposes of this Agreement income and similar Taxes (including any franchise or other Taxes measured by reference to income or receipts) for any taxable period that includes the Closing Date shall be allocated to the period up to and including the Closing Date, on the one hand, and the period following the Closing Date, on the other hand, by utilizing the so-called closing of the books method whereby the tax for each of such periods is separately computed as though the Closing Date constituted the end of a taxable period.

(c)     JLP shall be liable for and shall hold the Company harmless against any real property transfer or gains, sales, use, transfer, value added, stock transfer, and stamp taxes, any transfer, recording, registration, and other fees, and any similar Taxes which become payable in connection with the transactions contemplated by this Agreement and the Transaction Documents. JLP, after the review and consent by the Company, shall file such applications and documents as shall permit any such Tax to be assessed and paid on or prior to the Closing Date in accordance with any available pre-sale filing procedure. The Company shall execute and deliver all instruments and certificates reasonably necessary to enable JLP to comply with the foregoing. The Company shall complete and execute a resale or other exemption certificate with respect to the inventory items sold hereunder, and shall provide JLP with an executed copy thereof. JLP and the Company agree to take all actions reasonably necessary to minimize any sales, use and other transfer taxes and fees incurred in connection with the assignment, conveyance, transfer and/or delivery of the Contributed Assets hereunder, including, without limitation the transfer via means of electronic transmission of all assets capable of being so transmitted.

7.12    Cooperation and Records Retention. JLP and the Company shall (i) each provide the other with such assistance as may reasonably be requested by them in connection with the preparation of any Tax Returns, or in connection with any audit or other examination by any taxing authority or any judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other, with any records or other information which may be reasonably relevant to any such Tax Return, audit or examination, proceeding or determination, and (iii) each provide the other with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, JLP and the Company shall retain, until the applicable statute of limitations (including any extensions) have expired, copies of all Tax Returns, supporting work schedules and other records or information which

may be relevant to such Tax Returns for all tax periods or portions thereof ending before or including the Closing and shall not destroy or otherwise dispose of any such records without first providing the other party with a reasonable opportunity to review and copy the same. The Company shall keep the original copies of the records at its facilities in Michigan and elsewhere, if applicable, and, at JLP's expense, shall provide copies of the records to JLP upon JLP's request.

### 7.13    Vote in Favor of Contribution.

(a)    During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, JLP will obtain the requisite consents and waivers of the JLP Stockholders (i) in favor of and necessary to authorize the transactions contemplated by this Agreement, (ii) against any Competing Transaction or any other action that could reasonably be expected to delay or not to facilitate approval of the Contribution, (iii) against any action or agreement that could reasonably be expected to result in a breach of any covenant, representation or warranty or any other obligation or agreement of JLP under this Agreement or that could reasonably be expected to result in any of the conditions to JLP's obligations under this Agreement not being fulfilled, and (iv) in favor of any other matter facilitating the consummation of the transactions contemplated by this Agreement.

(b)    JLP shall prevent any JLP Stockholder from, directly or indirectly, (i) selling, pledging, encumbering, assigning, transferring, distributing or otherwise disposing of any or all of such JLP Stockholder's JLP Securities or any interest in such JLP Securities, (ii) depositing any JLP Securities or any interest in such JLP Securities into a voting trust or entering into a voting agreement or arrangement with respect to any Seller Interests or granting any proxy with respect thereto (other than as contemplated herein), or (iii) entering into any contract, commitment, option or other arrangement or undertaking with respect to the direct or indirect acquisition or sale, assignment, pledge, encumbrance, transfer or other disposition of any JLP Securities.

### 7.14    Limitations on Transfer of Class B Units.

(a)    JLP agrees, as a condition to receipt of Class B Units, to execute and become a party to the LLC Agreement.

(b)    JLP understands and agrees that any certificates evidencing the Class B Units to be issued in connection herewith may bear one or all of the following legends:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT."

"THE RIGHT TO SELL OR OTHERWISE TRANSFER THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN A CONTRIBUTION AGREEMENT AND A A LIMITED LIABILITY COMPANY AGREEMENT, COPIES OF WHICH ARE ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY."

7.15   Board of Director Representation.   The Company, JLP and the JLP Stockholders shall take all necessary action such that immediately after the Closing, the members of the Company's Board of Directors shall be Bruce A. Willard and William End (who shall be the "*Class A Directors*" as defined in Company's Organizational Documents), Joshua L. Powell, and Martin Laird Koldyke  (who shall be the "*Class B Directors*" as defined in Company's Organizational Documents).

ARTICLE VIII

CONDITIONS TO THE CLOSING

8.1   Conditions to Obligations of Both Company and JLP.   The respective obligations of the Company and JLP to consummate and effect the Contribution contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived in writing by the other party hereto:

(a)   JLP Stockholder Approval.   This Agreement and the Contribution shall have been approved and adopted by the affirmative vote of the requisite JLP Stockholders in accordance with applicable law and the Certificate of Incorporation of JLP.

(b)   No Injunctions or Restraints; Illegality.   No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Contribution shall be in effect, nor shall any proceeding brought by an administrative agency or commission or other Governmental Entity seeking any of the foregoing be pending; nor shall there be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Contribution, which makes the consummation of the Contribution illegal. In the event an injunction or other order shall have been issued, each party agrees to use its reasonable diligent efforts to have such injunction or other order lifted.

(c)   Governmental Approval.   The Company and JLP shall have timely obtained from each Governmental Entity all approvals, waivers and consents, if any, necessary for consummation of or in connection with the Contribution and the several transactions contemplated hereby.

(d)   Third Party Consents; Assignments.   The Company shall have been furnished with evidence satisfactory to it of the consent or approval of all lenders, lessors and other third parties whose consent or approval is required in order for JLP to consummate the transactions contemplated by this Agreement and to transfer the Contributed Assets to the

Company (including, without limitation, all consents, approvals and authorizations set forth in Section 4.3(b) of the JLP Disclosure Schedule).

      8.2    <u>Additional Conditions to Obligations of JLP</u>.  The obligations of JLP to consummate and effect the Contribution contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following condition: the holders of the Class A Units shall have made the Class A Capital Contribution to the Company and entered into the Company's LLC Agreement.

      8.3    <u>Additional Conditions to the Obligations of Company</u>.  The obligations of the Company to consummate and effect the Contribution contemplated hereby shall be subject to the satisfaction at or prior to the Closing of each of the following conditions, any of which may be waived in writing by the Company:

      (a)    <u>Secretary's Certificate</u>.  The Company shall have received (i) a certificate executed by the Secretary of JLP attaching and certifying as to matters customary for a transaction of this sort, including, without limitation, the true, correct and complete copies of JLP's Organizational Documents, as amended to date, and true, correct and complete copies of the resolutions of JLP's Board of Directors and consent of JLP Stockholders and other holders of JLP securities approving and adopting this Agreement and the transactions relating hereto; and (ii) such other documents relating to the transactions contemplated by this Agreement as the Company may reasonably request.

      (b)    <u>Third Party Consents; Assignments</u>.  The Company shall have been furnished with evidence satisfactory to it of the consent or approval of all lenders, lessors and other third parties whose consent or approval is required in order for JLP to consummate the transactions contemplated by this Agreement and to transfer the Contributed Assets to the Company (including, without limitation, all consents, approvals and authorizations set forth in Section 4.3(b) of the JLP Disclosure Schedule).

      (c)    <u>Legal Opinion</u>.  The Company shall have received the opinion of Pedersen & Houpt, counsel to JLP, or another counsel reasonably satisfactory to the Company as to the matters described in <u>Exhibit D</u> hereto.

      (d)    <u>Key Employees</u>.  Each of the Key Employees shall be employed in good standing by JLP and shall have accepted an offer of employment with the Company commencing on the Closing Date on terms and conditions acceptable to the Company.

      (e)    <u>Execution of Company's LLC Agreement</u>.  JLP shall have entered into the Company's Amended and Restated LLC Agreement attached hereto as <u>Exhibit E</u> (the "***LLC Agreement***").

      (f)    <u>Proprietary Information Agreements</u>.  Each employee of and consultant to JLP shall have entered into a non-disclosure agreement and proprietary information agreement in a form satisfactory to the Company.

      (g)    <u>Determination of JLP Closing Indebtedness and Final Calculations</u>. The JLP Closing Indebtedness (as defined in Section 3.3(a)) and Final Calculations (as defined

in Section 3.3(b)(iv)) shall have been determined in accordance with Section 3.3(a) and Section 3.3(b)(iv), respectively.

(h)     <u>Indebtedness Notice</u>.     The Company shall have received the Indebtedness Notice.

(i)     <u>Tax Clearance</u>.   JLP shall provide the Company with a clearance certificate or similar document(s) which may be required by any state taxing authority in order to relieve the Company of any obligation to withhold any portion of the Purchase Price.

(j)     <u>Termination of Employee Plans</u>.   Effective as of the Closing Date, JLP shall terminate its Group Health Insurance, and Term Life and Accidental Death and Disability Insurance Plans (the "Employee Welfare Benefit Plans"). JLP shall provide the Company with evidence, reasonably satisfactory to the Company, as to the termination of the Employee Welfare Benefit Plans. In order to facilitate the termination of the Employee Welfare Benefit Plans the Company agrees to provide JLP upon JLP's request with non-fiduciary administrative services in connection with the terminations (such as distribution to and collection from employees of the paperwork necessary to settle claims under the Employee Welfare Benefit Plans during the run out period following the Closing) pursuant to an "administrative services only" agreement that will specify the tasks that the Company will undertake on JLP's behalf with respect to each Employee Welfare Benefit Plan and the fee that JLP shall pay to the Company for the performance of such tasks. JLP agrees that the Company in providing such services will not be acting in a fiduciary capacity and will not be a fiduciary with respect to any of the Employee Welfare Benefit Plans and will indemnify and hold harmless the Company from any claims made under ERISA with respect to any of the Employee Welfare Benefit Plans.

(k)     <u>Amendment of Lease</u>.   The lease between JLP and FSB Warehouse, LLC (the "**Landlord**") dated July 1,2008 pertaining to the office and warehouse located at 16860 Three Oaks Rd, Three Oaks, Michigan 49128, shall have been amended pursuant to a Lease Assignment, Assumption and Amendment consistent with the terms set forth in <u>Exhibit F</u> (the "**Lease Assignment, Assumption and Amendment**").

ARTICLE IX

CLOSING

9.1     <u>Form of Documents</u>.   At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this Article IX.  All documents which JLP shall deliver shall be in form and substance reasonably satisfactory to the Company and the Company's counsel.  All documents which the Company shall deliver shall be in form and substance reasonably satisfactory to JLP and JLP's counsel.

9.2     <u>Company's Deliveries</u>.   Subject to the fulfillment or waiver of the conditions set forth in Sections 8.1 and 8.3, the Company shall execute and/or deliver to JLP all of the following:

(a)     the Consideration, subject to JLP's execution and delivery of a counterpart to the Company's LLC Agreement;

42

(b)     an executed counterpart to the Assumption Agreement substantially in the form of <u>Exhibit G</u> attached hereto (the "***Assumption Agreement***);

(c)     a duly executed and acknowledged counterpart to the Lease Assignment, Assumption, and Amendment;

(d)     any certificates or other documents required to be delivered pursuant to Section 8.2.

9.3     <u>JLP's Deliveries</u>.  Subject to the fulfillment or waiver of the conditions set forth in Sections 8.1 and 8.2, JLP shall deliver to the Company physical possession of all tangible Contributed Assets, and shall execute (where applicable in recordable form) and/or deliver or cause to be executed and/or delivered to the Company all of the following:

(a)     an executed Bill of Sale and Assignment Agreement substantially in the form of <u>Exhibit H</u> attached hereto (the "***Bill of Sale***"), and such other instruments, in form and substance satisfactory to the Company, as may be requested by the Company to transfer the Contributed Assets to the Company or evidence such transfer on the public records;

(b)     an executed counterpart of the Assumption Agreement;

(c)     an executed counterpart to the Lease Assignment, Assumption, and Amendment duly executed by the Landlord and JLP, duly acknowledged;

(d)     an executed counterpart Company's LLC Agreement;

(e)     certificates of good standing of JLP, issued not earlier than five (5) days prior to the Closing Date by the Secretary of State of Michigan; and

(f)     any opinions, certificates or other documents required to be delivered pursuant to Section 8.3.

ARTICLE X

TERMINATION, AMENDMENT AND WAIVER

10.1     <u>Termination</u>.  This Agreement may be terminated and the Contribution and other transactions contemplated by this Agreement may be abandoned at any time prior to the Closing Date, notwithstanding any requisite approval and adoption of this Agreement and the transactions contemplated by this Agreement as follows:

(a)     by mutual written consent of JLP and the Company;

(b)     by either the Company or JLP if the Closing Date shall not have occurred on or before March 10, 2010; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing Date to occur on or before March 10, 2010;

43

(c)     by either Company or JLP in the event that any Governmental Entity shall have issued an order, decree or ruling or taken any other action which is final and non-appealable which would (i) prevent the consummation of the Contribution; (ii) prohibit the Company from owning or operating any portion of the Business; or (iii) otherwise restrain, enjoin or prohibit the Contribution or the transactions contemplated by this Agreement; or

(d)     by Company if, between the date hereof and the time scheduled for the Closing, (i) an event or condition occurs that has resulted in or that may be expected to result in a Material Adverse Effect on JLP; or (ii) JLP makes a general assignment for the benefit of creditors, or any action shall be instituted by or against JLP seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up or reorganization, arrangement, adjustment, protection, relief or composition of its debts under any Law relating to bankruptcy, insolvency or reorganization.

10.2     Effect of Termination.

(a)     In the event of a termination of this Agreement pursuant to Section 10.1, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except (i) as set forth in Sections 7.7, this Article X and Article XII; and (ii) that nothing herein shall relieve either party from liability for any breach of this Agreement.

10.3     Waiver.   Either JLP or the Company may (i) extend the time for the performance of any of the obligations or other acts of the other party; (ii) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto; or (iii) waive compliance with any of the agreements or conditions of the other party contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement.   The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

ARTICLE XI

INDEMNIFICATION

11.1     Survival of Representations and Warranties.   The representations and warranties of JLP and the JLP Stockholders contained in this Agreement shall survive the Closing Date for a period of twelve (12) months; provided, however, that the representations and warranties set forth in Sections 4.1 (Organization; Standing and Power), 4.2 (Subsidiaries), 4.3 (Authority), 4.8 (Title to and Condition of the Contributed Assets), 4.9 (Real Property), 4.10 (Intellectual Property), 4.11 (Inventory), 4.17 (Environmental Matters), 4.18 (Taxes), and 4.19 (Employee Benefit Plans; Labor Matters), and Section 4.28 (Investment Representations) (the "**Basic Representations**") shall survive until the end of the respective applicable statutes of limitations.   The representations and warranties of the Company contained in this Agreement shall not survive beyond the Closing Date.  Neither the period of survival nor the liability of JLP with respect to the representations and warranties of JLP shall be affected by any investigation

made at any time (whether before or after the Closing Date) by or on behalf of the Company or by any actual, implied or constructive knowledge or notice of any facts or circumstances that the Company may have as a result of any such investigation or otherwise. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by the Company to JLP, then the relevant representations and warranties shall survive as to such claim until such claim has been finally resolved.

      11.2   Indemnity.

      (a)    After the Closing Date, the Company and its Affiliates (including, after the Closing Date, the Business and the Contributed Assets), officers, directors, employees, agents, successors and assigns (collectively, the "***Company Indemnified Parties***") shall be indemnified and held harmless by JLP for any and all liabilities, losses, damages of any kind, diminution in value, claims, costs, expenses, fines, fees, deficiencies, interest, awards, judgments, amounts paid in settlement and penalties (including, without limitation, attorneys', consultants' and experts' fees and expenses and other costs of defending, investigating or settling claims) suffered, incurred, accrued (in accordance with GAAP) or paid by them (including, without limitation, in connection with any action brought or otherwise initiated by any of them) (collectively, "***Losses***"), without adjustment for any insurance recovery or tax deduction relating thereto, arising out of or resulting from:

      (i)    any inaccuracy or breach of any representation or warranty (without giving effect to any qualification as to materiality (or similar qualifications) contained therein) made by JLP in the Transaction Documents;

      (ii)    the breach of any covenant or agreement made by JLP in the Transaction Documents;

      (iii)    Liabilities, whether arising before or after the Closing Date, that are not expressly assumed by the Company pursuant to this Agreement;

      (iv)    any breach of contract or other claims made by any party alleging to have had a contractual or other right to acquire JLP's capital stock or assets;

      (v)    any cost, loss or other expense (including the value of any Tax deduction lost) as a result of the application of Section 280G of the Code to any of the transactions contemplated by this Agreement plus any necessary gross up amount;

      (vi)    any claim by creditors of JLP against the Company arising out of or based upon the failure of a party hereto to notify creditors or take other actions to comply with applicable state bulk sales or bulk transfer laws;

      (vii)    any claim, allegation or assertion by any Person or Government Entity that the issuance or distribution of any JLP Securities or Class B Units is, was, or would be in violation of this Agreement, the LLC Agreement, or any applicable state or federal securities laws;

(viii)       any Taxes required to be paid for by JLP pursuant to Section 7.11 (including any loss, damage, liability or expense incurred in contesting or otherwise incurred in connection with any such Taxes); or

(ix)       any claim, allegation or assertion by any Person or Government Entity arising out of or based upon the failure of JLP to comply with corporate formalities required pursuant to the Michigan Business Corporation Act or to take requisite corporate actions with respect to any transaction;

(x)       any claim or Liability related to or arising out of or resulting from the Excluded Assets.

(b)       As used herein, Losses are not limited to matters asserted by third parties, but include Losses incurred or sustained by the Company Indemnified Parties in the absence of claims by third parties.

(c)       Notwithstanding anything to the contrary contained in this Agreement, except with respect to (A) claims for equitable remedies, (B) claims based on fraud or willful misrepresentation or misconduct, and (C) Losses arising from matters described in Section 11.2(a)(vii), no indemnification payment by JLP with respect to any indemnifiable Losses otherwise payable under Section 11.2(a) and arising out of or resulting from the causes enumerated in Section 11.2(a) shall be payable until such time as all such indemnifiable Losses shall aggregate to more than $100,000, after which time JLP shall be liable in full for all indemnifiable Losses (including the first $100,000); provided, however, that the limitations set forth above in each of clauses (i) and (ii) shall not be operative with respect to Losses arising from breaches of any of the Basic Representations or any cost, loss or other expense set forth in Sections 11.2(a)(iii) and (vii).

(d)       In no event will any JLP Stockholder have any liability for Losses (other than any Losses resulting from claims based on fraud or willful misrepresentation or misconduct by any such JLP Stockholder) under this Article XI which shall be payable other than by cancellation and/or redemption of Class B Units held such JLP Stockholder and by offsetting and reducing any amounts otherwise payable or distributable to such JLP Stockholder with respect to any Class B Units held by such JLP Stockholder; provided, however, if cash distributions are made on the Class B Units or the Class B Units have been subsequently transferred, the Company shall have recourse against such distributees to the extent of such distribution or the amounts received in respect of the Class B Units or the transferees' interests in JLP.

11.3    Indemnification Procedures.  (a) For purposes of this Agreement, a party against which indemnification may be sought is referred to as the "*Indemnifying Party*" and the party which may be entitled to indemnification is referred to as the "*Indemnified Party*".

(a)       The obligations and liabilities of Indemnifying Parties under this Article XI with respect to Losses arising from actual or threatened claims or demands by any third party which are subject to the indemnification provided for in this Article XI ("*Third Party Claims*") shall be governed by and contingent upon the following additional terms and

46

conditions:   if an Indemnified Party shall receive notice of any Third Party Claim, the Indemnified Party shall give the Indemnifying Party notice of such Third Party Claim within ninety (90) days of the receipt by the Indemnified Party of such notice; provided, however, that the failure to provide such notice shall not release an Indemnifying Party from any of its obligations under this Article XI except to the extent that such Indemnifying Party is materially prejudiced by such failure.   The notice of claim shall describe in reasonable detail the facts known to the Indemnified Party giving rise to such indemnification claim, and the amount or good faith estimate of the amount arising therefrom.

(b)   If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice (such counsel to be reasonably acceptable to the Indemnified Party) if it gives notice of its intention to do so to the Indemnified Party within ten (10) days of the receipt of such notice from the Indemnified Party; provided, however, that, the Indemnifying Party shall not have the right to assume the defense of the Third Party Claim if (i) any such claim seeks, in addition to or in lieu of monetary damages, any injunctive or other equitable relief, (ii) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of the ability of the Indemnifying Party to provide indemnification in accordance with the provisions of this Agreement with respect to such proceeding, (iii) there is reasonably likely to exist a conflict of interest that would make it inappropriate (in the judgment of the Indemnified Party in its reasonable discretion) for the same counsel to represent both the Indemnified Party and the Indemnifying Party, or (iv) settlement of, or an adverse judgment with respect to, the Third Party Claim, may establish, in the good faith judgment of the Indemnified Party, a precedential custom or practice adverse to the business interests of the Indemnified Party or would increase the tax liability of the Indemnified Party; and provided further, that if, by reason of the claim of such third party a lien, attachment, garnishment or execution is placed upon any of the property or assets of such Indemnified Party, the Indemnifying Party, if it desires to exercise its right to assume such Third Party Defense, must furnish a satisfactory indemnity bond to obtain the prompt release of such lien, attachment, garnishment or execution.   If the Indemnifying Party assumes the defense of a Third Party Claim, it will conduct the defense actively and diligently, and will hold all Indemnified Parties harmless from and against all Losses caused by or arising out of any settlement thereof.   The Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably requested by the Indemnifying Party.   Except with the written consent of the Indemnified Party (not to be unreasonably withheld), the Indemnifying Party will not, in the defense of a Third Party Claim, consent to the entry of any judgment or enter into any settlement (i) which does not include as an unconditional term thereof the giving to the Indemnified Party by the third party of a release from all liability in respect of such suit, claim, action, or proceeding, (ii) unless there is no finding or admission of any violation of law by the Indemnified Party (or any affiliate thereof) or any violation of the rights of any Person and no effect on any other claims of a similar nature that may be made by the same third party against the Indemnified Party, (iii) or which imposes any form of relief other than monetary damages.

(c)     In the event that the Indemnifying Party fails or elects not to assume the defense of an Indemnified Party against such Third Party Claim, which the Indemnifying Party had the right to assume under this Section 11.3, the Indemnified Party shall have the right, at the expense of the Indemnifying Party, to defend or prosecute such claim or litigation in such manner as it may reasonably deem appropriate and may settle such claim or litigation after giving written notice thereof to the Indemnifying Party, on such terms as such Indemnified Party may deem appropriate and the Indemnified Party may seek prompt reimbursement (subject to the provisions of Section 11.2(c)) from the Indemnifying Party for any Losses incurred in connection with such settlement. If no settlement of such claim or litigation is made, the Indemnified Party may seek prompt reimbursement (subject to the provisions of Section 11.2(c)) from the Indemnifying Party for any Losses arising out of any judgment rendered with respect to such claim or litigation. Any Losses for which an Indemnified Party is entitled to indemnification hereunder shall be promptly paid as incurred.   If the Indemnifying Party does not elect to assume the defense of a Third Party Claim which it has the right to assume hereunder, the Indemnified Party shall have no obligation to do so.

(d)     In the event that the Indemnifying Party is not entitled to assume the defense of the Indemnified Party against such Third Party Claim pursuant to this Section 11.3, the Indemnified Party shall have the right to undertake the defense and, with the prior consent of the Indemnifying Party (not to be unreasonably withheld) consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim in any manner it may reasonably deem appropriate. In each case, the Indemnified Party shall conduct the defense of the Third Party Claim actively and diligently, and the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably requested by the Indemnified Party. If no settlement of such Third Party Claim is made, the Indemnified Party may seek prompt reimbursement (subject to the provisions of Section 11.2(c)) from the Indemnifying Party for any Losses arising out of any judgment rendered with respect to such claim. Any Losses for which an Indemnified Party is entitled to indemnification hereunder shall be promptly paid as suffered, incurred or accrued (in accordance with GAAP). The Company may elect to recover any Losses for which the Company is entitled to indemnification hereunder by cancellation and/or redemption of Class B Units held by the Indemnifying Party or its transferees and by offset and reduction of any amounts otherwise payable or distributable to the Indemnifying Party or its transferees with respect to any Class B Units held by such Indemnifying Party or its transferees.

ARTICLE XII

GENERAL PROVISIONS

12.1   Notices.     All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties at the following address (or at such other address for a party as shall be specified by like notice):

48

(a)     if to Company, to:

JL Powell LLC
c/o Blue Highways Holdings III LLC
1111 Mission Ridge Road
Santa Barbara, CA 93103
Attention:  Bruce Willard
Facsimile No.: (805) 565-3506

with a copy to:

Bachelder & Dowling, P.A.
120 Exchange Street, Suite 400
Portland, ME 04101
Attention:  Stephan G. Bachelder, Esq.
Facsimile No.: (207) 775-6441

(b)     if to JLP, to:

JL Powell, Inc.
16860 Three Oaks Road, Suite A
Three Oaks, Michigan 49128
Attention:  Josh Powell
Facsimile No.: (269) 756-9766

with a copy to:

Pedersen & Houpt
161 North Clark Street
Suite 3100
Chicago, IL 60601-3242
Attention:  Susan Burke, Esq.
Facsimile No.: (312) 261-1120.

12.2    Interpretation.  When a reference is made in this Agreement to Exhibits, Sections or Schedules, such reference shall be to an Exhibit, Section or Schedule to this Agreement unless otherwise indicated.  The words "*include*," "*includes*" and "*including*" when used herein shall be deemed in each case to be followed by the words "without limitation."  In this Agreement, any reference to any event, change, condition or effect being "*material*" with respect to any entity or group of entities means any material event, change, condition or effect related to the condition (financial or otherwise), properties, assets (including intangible assets), liabilities, business, prospects, operations, or results of operations of such entity or group of entities.  In this Agreement, any reference to a party's "*knowledge*" means such party's actual knowledge after due and diligent inquiry of officers, directors, managers and other employees of such party reasonably believed to have knowledge of such matters, and JLP shall be deemed to have "knowledge" of a particular fact or other matter if Joshua L. Powell or any other officer, director or other representative of JLP has Knowledge of such fact or other matter.  The phrase

49

"*made available*" in this Agreement shall mean that the information referred to has been made available if requested by the party to whom such information is to be made available. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

    12.3 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

    12.4 <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement, the other Transaction Documents and the documents and instruments and other agreements specifically referred to herein or delivered pursuant hereto (including the Exhibits) (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and (b) except as otherwise specifically set forth herein, are not intended to confer upon any other Person any rights or remedies hereunder.

    12.5 <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

    12.6 <u>Remedies Cumulative</u>. Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

    12.7 <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that state and without regard to any applicable conflicts of law. In any action between the parties hereto arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement: (a) each of the parties irrevocably consents to service of process by first class certified mail, return receipt requested, postage prepaid, and (b) each of the parties irrevocably waives any and all rights to a trial by jury in any legal proceeding arising our of or related to this Agreement or the transactions contemplated hereby.

    12.8 <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of JLP and the Company. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

12.9   Time of the Essence.  For purposes of this Agreement and the transactions contemplated by this Agreement, time is of the essence.

12.10   Rules of Construction.

(a)   For purposes of this Agreement, whenever the context requires: the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b)   The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c)   Except as otherwise indicated, all references (i) to any agreement (including this Agreement), contract or Law are to the agreement, contract or Law as amended, modified, supplemented or replaced from time to time; and (ii) to any Government Entity include any successor to that Government Entity.

12.11   Headings.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

12.12   Expenses of Transaction.  All costs and expenses incurred in connection with the negotiation, execution and delivery of the Transaction Documents, the Contribution and the other transactions contemplated by this Agreement (including, without limitation, the fees and expenses of financial advisors, accountants and legal counsel) (i) if incurred by the Company, shall be paid by the Company and (ii) if incurred by JLP or the JLP Stockholders, shall be paid by JLP and the JLP Stockholders; provided, however, if the Closing occurs the Company shall pay or reimburse JLP for such costs and expenses, up to a maximum of $40,000.

12.13   Specific Performance.  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof in addition to any other remedy at law or in equity.

12.14   Further Assurances.  Each party hereto shall execute and cause to be delivered to each other party hereto such instruments and other documents, and shall take such other actions, as such other party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

JL POWELL LLC

By: Blue Highways Holdings III LLC,
its Manager

By: Blue Highways Management III LLC,
its Manager

By: _____
Name:  Bruce A. Willard
Title:  Manager

**JLP:**

JL POWELL INC.

By: _____
Name:  Joshua L. Powell
Title:  President

Solely for purposes of Section 7.1(b):

By: _____
Name:  Joshua L. Powell

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

**JL POWELL LLC**

By: Blue Highways Holdings III LLC,
its Manager

By: Blue Highways Management III LLC,
its Manager

By: _____
Name:  Bruce A. Willard
Title:  Manager

**JLP:**

**JL POWELL INC.**

By: _____
Name:  Joshua L. Powell
Title:  President

Solely for purposes of Section 7.1(b):

By: _____
Name:  Joshua L. Powell