1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT K

*Loan and Security Agreement 07-29-11*

_____
Complaint for Declaratory Relief

# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (hereinafter called "**Agreement**") is between **JL POWELL LLC**, a Delaware limited liability company, whose address is 16860 Three Oaks Road, Three Oaks, Michigan 49128 (hereinafter called "**Borrower**" or "**Grantor**") and **BLUE HIGHWAYS HOLDINGS III LLC**, a Delaware limited liability company (hereinafter called "**Lender**").

1. <u>Line Of Credit</u>. Lender hereby establishes for a period extending to October 31, 2011 (the "**Draw Term**") a non-revolving line of credit (the "**Credit Facility**") for Borrower in the principal amount of FOUR HUNDRED THOUSAND AND NO/100THS DOLLARS ($400,000) (the "**Credit Line**"). In connection herewith, Borrower shall execute and deliver to Lender a promissory note in the original principal sum of FOUR HUNDRED THOUSAND AND NO/100THS DOLLARS ($400,000) in the form attached as Exhibit A hereto (the "**Note**"). All sums advanced on the Credit Line or pursuant to the terms of this Agreement (each an "**Advance**") shall become part of the principal of said Note.

2. <u>Grant of Security Interest</u>. Subject to the terms and conditions of the Note and this Agreement, Grantor, for consideration as defined herein, and to secure the full and prompt payment, observance and performance when due of all present and future obligations and indebtedness of Borrower to Lender, whether at the stated time, by acceleration or otherwise, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, whether or not of the same or similar class or of like kind to any indebtedness incurred contemporaneously with the execution of this Agreement, and whether now or hereafter existing, or due or to become due, and whether such indebtedness from time to time is reduced and thereafter increased, or entirely extinguished and thereafter reincurred, including without limitation, the following:

(a) Any and all amounts owed by Borrower, under, in connection with, and/or pursuant to the indebtedness evidenced by the Note, including the outstanding principal balance with interest thereon according to the provisions thereof, and all obligations thereunder, in connection therewith and/or pursuant to any and all agreements and other documents in connection therewith; and

(b) All sums advanced or expenses or costs paid or incurred (including without limitation reasonable attorneys' fees and other legal expenses) by Lender pursuant to or in connection with the Note or any other agreements and documents in connection therewith plus applicable interest on such sums, expenses or costs; and

(c) Any extensions, modifications, changes, substitutions, restatements, renewals or increases or decreases of any or all of the indebtedness referenced above;

and hereby grants to Lender a continuing security interest in and to, all of Grantor's rights in and to all Collateral now or hereafter owned or acquired by Grantor or in which Grantor now has or hereafter has or acquires any rights, and wherever located. The Security Interests are granted as security only and shall not subject the Lender to, or transfer to the Lender, or in any way affect or modify, any obligation or liability of the Grantor with respect to any Collateral or any transaction in connection therewith.

3.      <u>Definitions</u>. The following terms shall have the following meanings:

"**Accounts**" means all Accounts as that term is defined in Article 9 of the UCC;

"**Chattel Paper**" means all Chattel Paper as that term is defined in Article 9 of the UCC;

"**Class A Units**" means the Class A Units of the Borrower;

"**Collateral**" means, collectively, all of the following: (i) all Accounts (including Health-Care Insurance Receivables); (ii) all Chattel Paper; (iii) all present and future Commercial Tort Claims; (iv) all Consignments; (v) all Contracts; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Intellectual Property; (xi) all General Intangibles (including Payment Intangibles); (xi) all Instruments (including Promissory Notes); (xii) all Inventory; (xiii) all Investment Property; (xiv) all Software; (xv) all money, cash or cash equivalents; (xvi) all other Goods and personal property, whether tangible or intangible; (xvii) all Supporting Obligations and Letter-of-Credit Rights (whether or not the Letter of Credit is evidenced by a writing) of Grantor; (xviii) all books and records pertaining to any of the Collateral (including, without limitation, credit files, computer programs, printouts and other computer materials and records but excluding customer lists); and (xix) to the extent not otherwise included, all other property of any Grantor and all products and Proceeds of all or any of the Collateral described in clauses (i) through (xviii) hereof;

provided, that Collateral shall not include any Excluded Property.

"**Commercial Tort Claims**" means all Commercial Tort Claims as that term is defined in Article 9 of the UCC;

"**Consignments**" means all Consignments as that term is define in Article 9 of the UCC**;**

"**Contracts**" means all contracts, undertakings, franchise agreements or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments, as those terms are defined above and below) in or under which the Borrower may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account, and any agreement relating to the terms of payment or the terms of performance thereof;

"**Copyrights**" means (a) all copyrights of the United States or any other country; (b) all copyright registrations filed in the United States or in any other country; and (c) all proceeds thereof;

"**Copyright License**" means all agreements, whether written or oral, providing for the grant by the Borrower of any right to use any Copyright;

"**Deposit Accounts**" means all Deposit Accounts as that term is defined in Article 9 of the UCC;

"**Documents**" means all Documents as that term is defined in Article 9 of the UCC;

2

"**Encumbrance(s)**" means all Encumbrance(s) as that term is defined in Article 9 of the UCC;

"**Equipment**" means all Equipment as that term is defined in Article 9 of the UCC;

"**Excluded Property**" means (i) any lease, license, contract, Equipment, General Intangible, Copyright License, Trademark License, Patent License, property right or agreement to which Grantor is a party or any of its rights or interests thereunder if and only for so long as the grant of a security interest hereunder shall constitute or result in a material breach or default under any such lease, license, contract, Equipment, General Intangible, Copyright License, Trademark License, Patent License, property right or agreement or would give rise to a right to terminate any such Equipment, General Intangible, Copyright License, Trademark License, Patent License (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable law or principles of equity); provided, however, that such security interest shall attach immediately to any portion of such lease, license, contract, Equipment, General Intangible, Copyright License, Trademark License, Patent License, property rights or agreement that does not result in any of the consequences specified above, and (ii) any rights or property to the extent that any valid enforceable law or regulation applicable to such rights or property prohibits the creation of a security interest therein;

"**Fixtures**" means all Fixtures as that term is defined in Article 9 of the UCC;

"**General Intangibles**" means all General Intangibles as that term is defined in Article 9 of the UCC;

"**Goods**" means all Goods as that term is defined in Article 9 of the UCC;

"**Grantor**" means JL POWELL LLC, a Delaware limited liability company.

"**Health-Care-Insurance Receivables**" means all Health-Care-Insurance Receivables as that term is defined in Article 9 of the UCC;

"**Instruments**" means all Instruments as that term is defined in Article 9 of the UCC;

"**Intellectual Property**" means all of the following now owned or hereafter acquired by Grantor or in which Grantor has or acquires any rights: (a) all Patents, patent rights and patent applications, Copyrights and copyright applications, Trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, applications for registration of trademarks, trade names and service marks, fictitious names registrations and trademark, trade name and service mark registrations, and all derivations thereof; and (b) Patent Licenses, Trademark Licenses, Copyright Licenses and other licenses to use any of the items described in the preceding clause (a)

"**Inventory**" means all Inventory as that term is defined in Article 9 of the UCC;

"**Investment Property**" means all Investment Property as that term is defined in Article 9 of the UCC;

3

"**Letters of Credit**" means all Letters of Credit as that term is defined in the Article 5 of the UCC;

"**Letter-of-Credit Rights**" means all Letter-of-Credit Rights as that term is defined in Article 9 of the UCC;

"**Patents**" means all of the following now owned or hereafter acquired by Grantor or in which Grantor now has or hereafter acquires any rights: (a) all letters patent of the United States and all reissues and extensions thereof, (b) all applications for letters patent of the United States and all divisions, continuations and continuations-in-part thereof or any other country, including, without limitation, any thereof referred to in any schedule attached hereto and (c) all proceeds thereof, including the goodwill of the business connected with the use of and symbolized by the Patents;

"**Patent License**" means all agreements, whether written or oral, providing for the grant by the Borrower of any right to manufacture, use or sell any invention covered by a Patent, including, without limitation, any thereof referred to in any schedule attached hereto;

"**Payment Intangibles**" means all Payment Intangibles (as that term is defined in Article 9 of the UCC);

"**Proceeds**" means all Proceeds as that term is defined in Article 9 of the UCC;

"**Promissory Note(s)**" means as that term is defined in Article 9 of the UCC;

"**Security Interest**" means the security interests granted to the Lender pursuant to Section 2, as well as all other security interests created or assigned as additional security for the Secured Obligations pursuant to the provisions of this Agreement

"**Software**" means all Software as that term is defined in Article 9 of the UCC;

"**Supporting Obligations**" means all Supporting Obligations as that term is defined in Article 9 of the UCC;

"**Tangible Chattel Paper**" means all Tangible Chattel Paper as that term is defined in Article 9 of the UCC;

"**Trademarks**" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and the goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether registered in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof or otherwise, including, without limitation, any thereof referred to in any schedule attached hereto; (b) all renewals thereof; and (c) all proceeds thereof, including the goodwill of the business connected with the use of and symbolized by the Trademarks;

"**Trademark License**" means any agreement, written or oral, providing for the grant of any right to use any Trademark.

"**UCC**" means the Uniform Commercial Code as in effect from time-to-time in the State of Delaware; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the Security Interests in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Delaware, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"**Units**" means the Class A Units and any other units of any other class or series of limited liability company interests in the Grantor, whether now or hereafter authorized and however designated, which have the right to participate in the distribution of earnings and assets (upon dissolution, liquidation or winding-up) of the Grantor;

4.  <u>Representations, Warranties and Covenants of Grantor</u>. Grantor expressly represents, warrants and covenants to Lender as follows:

(a)  The address appearing with Grantor's signature below is the address of Grantor's principal office. If any part of the Collateral is not located at Grantor's principal office, it will be located at such other locations as Grantor, or any other entity affiliated with Grantor, may utilize in its business from time to time, and Grantor hereby covenants to notify Lender of any such additional location(s).

(b)  If Grantor does not keep the records concerning the Collateral and concerning accounts, general intangibles, mobile goods and contract rights at Grantor's principal office, same will be located at such other locations as Grantor, or any other entity affiliated with Grantor, may utilize in its business from time to time, and Grantor hereby covenants to notify Lender of any such additional location(s).

(c)  Grantor will give Lender sixty (60) days prior written notice of any change in (i) Grantor's principal office, the location of the Collateral or the location of the records described above, or (ii) the Ownership of Grantor's business, (iii) the principals responsible for the management of Grantor's business, (iv) Grantor's company structure or identity, or (v) Grantor's name or trade name, or prior to commencing to use an assumed name not set forth in this Agreement.

(d)  If any of the Collateral is to be or has been attached to real estate, the legal description of the real estate is attached to this Agreement as Schedule A and made a part hereof.

(e)  If Grantor does not have a record interest in the real estate described above, the record Owner is indicated on the attached Schedule A.

(f)  Without the prior written consent of Lender, Grantor will not move, sell, lease, permit any encumbrance on or otherwise dispose of the Collateral, other than its inventory in the ordinary course of its business. Grantor represents and warrants that Grantor and/or one or more of the Grantor's affiliated entities are the owners of the Collateral, free and clear of all liens, charges,

5

interests, and encumbrances, other than in favor of Lender, that no other person or other entity has any interest in the Collateral whatsoever, and that Grantor will defend same against all adverse claims and demands.

(g) Grantor will keep the Collateral insured by such companies, in such amounts and against such risks as shall be acceptable to Lender, and the Lender hereby acknowledges that the current levels of insurance maintained by Grantor are acceptable for the first year of the Note, with loss payable and additional insured clauses in favor of Lender as are satisfactory to Lender. Grantor will deposit such insurance policies with Lender. Grantor hereby assigns to Lender and grants to Lender a security interest in any return of unearned premium due upon cancellation of any such insurance and directs the insurer thereunder to pay to Lender all amounts so due. All amounts received by Lender in payment of insurance losses or return of unearned premium may, at Lender's option, be applied to the indebtedness by Lender, or all or any part thereof may be used for the purpose of repairing, replacing or restoring the Collateral. Notwithstanding the foregoing, if there is no default under the Note, at the request of the Grantor, and upon the approval of Lender in its sole discretion, amounts received by Lender in payment of insurance losses or return of unearned premium shall be used for the purpose of repairing, replacing or restoring the Collateral. If Grantor fails to maintain satisfactory insurance, Lender shall have the option, but not the obligation, to obtain such insurance in such amounts as Lender deems necessary, and Grantor agrees to repay, with interest at the highest rate applicable to any indebtedness which this Agreement secures, all amounts so expended by Lender.

(h) Borrower represents and warrants to Lender that all financial statements, income tax returns and credit information delivered by Borrower to Lender accurately reflect the financial condition and operations of Borrower at the times and for the periods therein stated.

(i) Lender shall not be deemed to have waived any of its rights in any Collateral unless such waiver is in writing and signed by an authorized representative of Lender. No delay or omission by Lender in exercising any of Lender's rights shall operate as a waiver thereof or of any other rights. Lender shall have, in addition to all other rights and remedies provided by this Agreement or applicable law, the rights and remedies of a secured party under the Uniform Commercial Code.

(j) Grantor will maintain the Collateral in good condition and repair, reasonable wear and tear excepted, and will pay promptly all taxes, levies, and encumbrances and all repair, maintenance and preservation costs pertaining to the Collateral. If Grantor fails to make such payments, Lender shall have the option, but not the obligation, to pay the same and Borrower agrees to repay, with interest at the highest rate applicable to any indebtedness which this Agreement secures, all amounts so expended by Lender. Grantor will at any time and from time to time, upon request of Lender, give any representative of Lender access during normal business hours to inspect the Collateral or the books and records thereof.

(k) Borrower agrees to pay to Lender on demand all expenses, including reasonable attorney fees and expenses, incurred by Lender in protecting or enforcing its rights in the Collateral or otherwise under this Agreement. After deducting all said expenses, the remainder of any proceeds of sale or other disposition of the Collateral shall be applied to the indebtedness due Lender in such order of preference as Lender shall determine.

(l) Grantor hereby agrees to faithfully preserve and protect Lender's security interest in the Collateral at all times, and further agrees to execute and deliver, from time to time, any and all further, or other, documents, instruments, continuation statements and perform or refrain from performing such acts, as Lender may reasonably request to effect the purposes of this Agreement and to secure to Lender the benefits of all the rights, authorities and remedies conferred upon Lender by the terms of this Agreement. Grantor shall permit, or cause to be permitted, at Grantor's expense, representatives of Lender to inspect and make copies of the books and records of Grantor relating to the Collateral at any reasonable time or times upon prior notice.

(m) Pursuant to its terms, the outstanding balance of the Note is immediately convertible into Class A Units of the Borrower at the request of the Lender made on or before the Maturity Date, or if applicable, the Extended Maturity Date.

(n) The Grantor has the requisite limited liability company power and authority to enter into and perform its obligations under the Note and loan documents, including, without limitation, this Agreement, and delivery of the Class A Units Issued at Conversion (as such term is defined in the Note) to the Lender in accordance with the terms hereof and thereof. All limited liability company action on the part of the Grantor necessary for the authorization, execution and delivery of, and the performance by the Grantor of its obligations under the Note and such loan documents to which the Grantor is a party has been taken, and no further consent or authorization of any Person, including without limitation, any of the Grantor's respective directors or members or any governmental authority, is required under any organizational document, contract to which the Grantor is a party, any governmental requirement or otherwise. The board of directors of the Grantor has unanimously determined that the sale and issuance of the Class A Units Issued at Conversion and the consummation of the transaction contemplated hereby and by the Note and other loan documents, are in the best interests of the Grantor.

5. <u>Loan Disbursements</u>. Disbursements under the Note shall be made directly by the Lender to Borrower pursuant to the written request (in the form attached hereto as Exhibit A) of the Chief Executive Officer of the Borrower together with such documentation as may be reasonably required by Lender to document the use of each such disbursement from the Note. Disbursements are limited to Four Hundred Thousand Dollars ($400,000) in the aggregate made on or before October 31, 2011. Borrower shall provide no less than two (2) Business Days written notice to the Lender for each disbursement requested. Lender, or its designated agent, will review the Borrower's written request and make a decision within twenty-four (24) hours of receipt. If the Lender determines to honor Borrower's written request, Lender will send as soon as possible after making such determination the requested disbursement to Borrower by wire transfer of immediately available funds to such account(s) as the Borrower shall specify by written notice to the Lender.

6. <u>Repayment; Prepayment; Conversion of Note</u>.

(a) This loan facility is a non-revolving line of credit. Prior to the Maturity Date or, if applicable, the Extended Maturity Date, Borrower may not repay in cash any principal amount due under the Note without Lender's prior written consent.

(b) Borrower may not prepay in whole or in part any principal amount due under the Note without Lender's prior written consent.

(c) Lender has the right at any time on or prior to the Maturity Date or, if applicable, the Extended Maturity Date to convert any part of or the entire outstanding principal amount of the Note into Class A Units of the Borrower pursuant to the terms of the Note.

7. <u>Defaults</u>. The occurrence of any of the following events shall constitute a default hereunder:

(a) the Borrower shall default in the payment of principal of or interest on the Note or any other obligation to Lender as and when the same shall be due and payable and, in the case of a payment default, such default shall continue for five (5) Business Days after the date such payment was due, or the Borrower shall fail to perform or observe any other covenant, agreement, term, provision, undertaking or commitment under the Note, this Loan Agreement or any other agreement or document secured hereby or any other encumbrance or agreement securing the Note which remains uncured for ten (10) Business Days after the delivery to the Borrower of written notice that the Borrower is in default hereunder or thereunder;

(b) The breach of or failure to perform promptly any obligation or covenant set forth in this Agreement, the Note or any other agreement secured hereby or securing the Note unless otherwise approved in advance by Lender.

(c) The suspension of business, insolvency, failure generally to pay debts as they became due, or the commission of any act constituting or resulting in a business failure, in each case on the part of the business of Grantor; the concealment or removal of any substantial portion of Grantor's property with the intent to hinder, delay or defraud any one or more creditors, or the making of any other transfer which is fraudulent or otherwise voidable under the Bankruptcy Code or other applicable federal or state law; the existence or creation of any lien, including without limitation any tax or judgment lien, upon the Collateral or any substantial part of Grantor's property; an assignment for the benefit of creditors; the commencement of any proceedings by or against Grantor (under the Bankruptcy Code or otherwise) seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking the appointment of a receiver, trustee or custodian for Grantor or for the Collateral or a substantial part of the property of Grantor; or the institution by Grantor or any other person or entity of any liquidation, dissolution or reorganization proceedings with respect to Grantor;

(d) The failure to effectively and promptly discharge, stay or indemnify against, to Lender's satisfaction, any lien or attachment against any of Grantor's property or the Collateral;

(e) Any representation or warranty contained herein or in any other document delivered by or on behalf of Grantor to Lender shall be false or misleading when made;

(f) If Lender, in good faith, believes the prospect of payment secured by this Agreement is impaired, or believes that any of the Collateral is in danger of loss, misuse, seizure or confiscation;

8. <u>Remedies</u>.

(a) Upon the occurrence of any default under this Agreement, Lender is authorized in its discretion to declare any or all of the indebtedness to be immediately due and payable without demand or notice to Grantor, and may exercise any one or more of the rights and remedies granted pursuant to this Agreement or given to a secured party under applicable law, including without limitation the Uniform Commercial Code, such rights and remedies to include without limitation the right to take possession and sell, lease or otherwise dispose of the Collateral. If reasonable notice of any disposition of Collateral or other enforcement is required, such requirement will be met if such notice is mailed, postage pre-paid, to the address of Grantor shown below Grantor's signature on this Agreement at least fifteen (15) days prior to the time of disposition or other enforcement. Grantor agrees that upon demand by Lender after default, Grantor will promptly assemble the Collateral and make the Collateral available to Lender at a place convenient to Lender.

(b) Grantor agrees that all of the Collateral and all of the other security which may be granted to Lender in connection with the obligations secured hereby constitute equal security for all of the obligations secured hereby, and agrees that Lender shall be entitled to sell, retain or otherwise deal with any or all of the Collateral, in any order or simultaneously as Lender shall determine in its sole and absolute discretion, free of any requirement for the marshaling of assets or other restriction upon Lender in dealing with the Collateral or such other security.

(c) Upon the occurrence of any default under this Agreement, Grantor hereby irrevocably constitutes and appoints Lender (and any employee or agent of Lender) as Grantor's true and lawful attorney-in-fact with full power of substitution, in Lender's name or Grantor's name or otherwise, for Lender's sole use and benefit, at Grantor's cost and expense, to exercise the following powers with respect to the Collateral:

(1) To demand, sue for collection, receive, and give acquittance for any and all monies due or owing with respect to the Collateral;

(2) To receive, take, endorse Grantor's name on, assign and deliver any checks, notes, drafts, documents or other instruments taken or received by Lender in connection with the Collateral;

(3) To settle, compromise, prosecute, or defend any action or proceeding with respect to the Collateral;

(4) To sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds thereof, as fully as if Lender were the absolute Grantor thereof.

(5) To sign Grantor's name to and file financing statements or such other documents and instruments as Lender may deem appropriate.

(6) To take any and all action that Lender deems necessary or proper to preserve its interest in the Collateral, including without limitation, the payment of debts of Grantor that might impair the Collateral or Lender's security interest therein, the purchase of insurance on the Collateral, the repair or safeguard of the Collateral, or the payment of taxes thereon.

      (7)    To notify account debtors of Lender's security interest in Grantor's accounts and to instruct them to make payment directly to Lender.

      (8)    To assume management (by Lender or by an affiliate of Lender) of the Grantor's business.

  (d)    Grantor agrees that the powers of attorney granted herein are coupled with an interest and shall be irrevocable until full, final and irrevocable payment and performance of the indebtedness secured hereby; and that neither Lender nor any officer, director, employee or agent of Lender shall be liable for any act or omission, or for any mistake or error of judgment, in connection with any such powers.

  (e)    Notwithstanding the foregoing, Lender shall be under no duty to exercise any such powers, or to collect any amount due on the Collateral, to realize on the Collateral, to keep the Collateral, to make any presentment, demand or notice of protest in connection with the Collateral, or to perform any other act relating to the enforcement, collection or protection of the Collateral.

  (f)    This Agreement shall not prejudice the right of Lender at its option to enforce the collection of any indebtedness secured hereby or any other instrument executed in connection with this transaction, by suit or in any other lawful manner. No right or remedy is intended to be exclusive of any other right or remedy, but every such right or remedy shall be cumulative to every other right or remedy herein or conferred in any other agreement or document for the benefit of Lender, or now or hereafter existing at law or in equity.

  9.    <u>Miscellaneous</u>.

  (a)    This Agreement and the security interest in the Collateral created hereby shall terminate when the indebtedness has been fully, finally and irrevocably paid and all other obligations of Borrower to Lender have been performed in full. Prior to such termination, this shall be a continuing agreement.

  (b)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, EXCEPT TO THE EXTENT THE LAWS OF ANOTHER JURISDICTION ARE MANDATORILY APPLICABLE. GRANTOR HEREBY IRREVOCABLY AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AND/OR GRANTOR AT THE ADDRESS PROVIDED FOR NOTICES UNDER THIS AGREEMENT.

  (c)    GRANTOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION (INCLUDING BUT NOT LIMITED TO) ANY CLAIMS, CROSS-CLAIMS OR THIRD PARTY CLAIMS ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE

TRANSACTIONS CONTEMPLATED HEREIN. GRANTOR ALSO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT THEY MAY HAVE TO ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES. GRANTOR ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS LOAN, INCLUDING THIS AGREEMENT, BY, INTER ALIA, THE PROVISIONS OF THIS PARAGRAPH.

(d)     This Agreement shall inure to the benefit of Lender, its successors and assigns and to any other holder who derives from Lender title to or an interest in the indebtedness which this Agreement secures, and shall be binding upon Grantor, its successors and assigns.

(e)     In case any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been included.

(f)     The Grantor agrees to cooperate promptly with the Lender and its agent in the correction or completion of the loan closing documents if deemed necessary or desirable by Lender. Grantor understands that this may include correction or execution of a new note and security agreement to reflect the agreed terms.

(g)     Any provision to the contrary notwithstanding contained herein or in the Note or in any other instrument now or hereafter evidencing, securing or otherwise relating to any secured indebtedness, neither Lender nor any other holder of the secured indebtedness shall be entitled to receive or collect, nor shall Borrower be obligated to pay, interest on any of the secured indebtedness in excess of the maximum rate of interest at the particular time in question, if any, which, under applicable law, may be charged to Borrower (herein the "Maximum Rate"), provided that the Maximum Rate shall be automatically increased or decreased, as the case may be, without notice to Borrower from time to time as of the effective time of each change in the Maximum Rate, and if any provision herein or in the Note or in such other instrument shall ever be construed or held to permit the collection or to require the payment of any amount of interest in excess of that permitted by applicable law, the provisions of this paragraph shall control and shall override any contrary or inconsistent provision herein or in the Note or in such other instrument. The intention of the parties being to conform strictly to the usury limitations under applicable law, the Note, this Agreement, and each other instrument now or hereafter evidencing or relating to any secured indebtedness shall be held subject to reduction to the amount allowed under said applicable law as now or hereafter construed by the courts having jurisdiction.

(h)     All notices pursuant to this Loan Agreement shall be in writing and shall be directed to the addresses set forth below or such other address as may be specified in writing, by certified or registered mail, return receipt requested by the party to which or whom notices are to be given. Notices shall be deemed to be given upon sender's obtaining a receipt (or refusal of receipt) from the U.S. Postal Service for such certified or registered mail delivery, upon personal delivery to an officer of the Borrower, or the day following prepaid delivery to a recognized overnight commercial carrier.

(i)     The singular used herein shall include the plural.

11

  (j) If more than one party shall execute this Agreement as "Borrower", the term "Borrower" shall mean all such parties executing this Agreement, and all such parties shall be jointly and severally obligated hereunder.

  (k) A photocopy or other reproduction of this Agreement or of any financing statement is sufficient as a financing statement and may be filed as a financing statement in any government office.

[Remainder of this page left intentionally blank]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date written below.

Dated as of July 29, 2011.

**BORROWER/GRANTOR:**

JL POWELL LLC, a Delaware limited liability company
Address: 16860 Three Oaks Road
Three Oaks, Michigan 49128

Name: Joshua L. Powell
Title: Chief Executive Officer

Name: Martin Laird Koldyke
Title: Class B Director

**LENDER:**

BLUE HIGHWAYS HOLDINGS III, LLC,
a Delaware limited liability company

By: Blue Highways Management III, LLC,
Its Manager

Name: Bruce A. L. Willard
Title: Manager
Address: 454 Beaver Dam Rd., Vail, CO 81657

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date written below.

Dated as of July 29, 2011.

**BORROWER/GRANTOR:**

JL POWELL LLC, a Delaware limited liability company
Address: 16860 Three Oaks Road
Three Oaks, Michigan 49128

_____
Name: Joshua L. Powell
Title:   Chief Executive Officer

_____
Name: Martin Laird Koldyke
Title:   Class B Director

**LENDER:**

BLUE HIGHWAYS HOLDINGS III, LLC,
a Delaware limited liability company

By: Blue Highways Management III, LLC,
Its Manager

_____
Name: Bruce A. L. Willard
Title:   Manager
Address: 454 Beaver Dam Rd., Vail, CO 81657

Exhibit A

Form of Disbursement Request

Blue Highways Holdings III, LLC
1111 Mission Ridge Road
Santa Barbara, CA 93103
Attention: Bruce A. L. Willard
[Date]

Dear Mr. Willard:

The undersigned, JL Powell LLC, refers to the Convertible Note of the undersigned (the "Note") and the Loan and Security Agreement (the "Loan Agreement"; the terms defined therein being used herein as therein defined), between the undersigned and Blue Highways Holdings III, LLC (the "Lender"), each dated as of July 29, 2011, and hereby gives you notice, irrevocably, pursuant to Section 5 of the Loan Agreement that the undersigned hereby requests a disbursement, and in that connection sets forth below the information relating to such disbursement (the "Proposed Disbursement") as required by Section 5 of the Loan Agreement:

  (i)  The Business Day of the Proposed Disbursement is _____ ___, _____.
  (ii)  The aggregate amount of the Proposed Disbursement is $_____.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Disbursement:

(a) No Event of Default has occurred and is continuing, or would result from such Proposed Disbursement or from the application of the proceeds therefrom.
(b) Attached as Schedule I hereto is a true and correct detailed break-down showing the manner in which the proceeds of the Proposed Disbursement will be expended in accordance with the budget approved by the board of directors of the undersigned (the "Approved Budget").
(c) Attached as Schedule II hereto is a true and correct cash balance report (showing day-end balances).
(d) The proceeds of the Proposed Disbursement will be disbursed to pay items due and payable in accordance with the Approved Budget.

Delivery of an executed counterpart of this Disbursement Request by telecopier shall be effective as delivery of an original executed counterpart of this Disbursement Request.

        Very truly yours,

        JL POWELL LLC


        By: _____
        Name: Joshua L. Powell
        Title: Chief Executive Officer

A-1

Schedule A

Legal Description

The premises situated in the Township of Three Oaks, County of Berrien, and State of Michigan, and described as follows:

That part of Lot 24, Original Plat of the Village of Three Oaks, according to the plat thereof recorded in Liber 5 of Deeds, page 84 and that part of the former Michigan Central Railroad right of way in the Southwest Quarter of Section 2, Township 8 South, Range 20 West, all described as follows:  Commencing at a point where the West line of Oak Street intersects the South line of the Michigan Central Railroad Company's main line right of way, as acquired by the Michigan Central Railroad Company from Moses Chamberlain and Mary Chamberlain, his wife, by Warranty Deed, dated August 6, 1847, recorded August 21, 1847 in Liber P of Deeds, page 411; thence West, along the South line of said right of way, 30.0 feet to a point; thence North, along a line parallel to the Northerly projection of the West line of Oak Street 61.5 feet, more or less, to a point 13.5 feet South, measured at right angles, from the centerline of the Michigan Central Railroad Company's Eastbound main track; thence East, parallel to and at an equal distance from the centerline of said Eastbound main tract, a distance of 228.0 feet to a point; thence South 111.5 feet to the Southeast corner of land acquired by the Michigan Railroad Company from Henry Chamberlain (widower) by Warranty Deed, dated June 18, 1898, and recorded June 28,1898, in Liber 125 of Deeds, page 95; thence West 132.0 feet to a point on the East line of Oak Street; thence North, along the East line of Oak Street, 50.0 feet to a point on the South line of the Michigan Central Railroad Company's said main line right of way; thence West, along said Southerly right of way line which is also the Northern boundary of the Northerly terminus of Oak Street, 66.0 feet, more or less, to the place of beginning.

Tax Parcel No. 11-47-0340-0024-00-7