1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT Q

*Minutes of the JL Powell LLC Board 01-31-13*

---

Complaint for Declaratory Relief

## MINUTES OF
## THE BOARD OF DIRECTORS OF
## JL POWELL LLC

The Board of Directors of JL Powell LLC, a Delaware limited liability company (the "Company"), met telephonically at 12:00 PM EST on January 31, 2013. The Directors in attendance were Bruce Willard, Chairman and Class A Director; William End, Class A Director; and William Dargie, Class A Director. Stephan Bachelder was also in attendance.

### BUSINESS OF THE MEETING

Background: The meeting took place in response to the following facts and circumstances, all of which were acknowledged during the discussion described below.

The Company and Blue Highways Holdings III LLC, a Delaware limited liability company (the "Lender") previously entered into the following agreements with the Company: (i) $500,000 Convertible Note dated as of October 20, 2010 and corresponding Loan and Security Agreement covering all assets of the Company; (ii) $400,000 Convertible Note Loan dated as of July 29, 2011 and corresponding Loan and Security Agreement covering all assets of the Company; and (iii) $500,000 Promissory Note dated as of August 7, 2012 and corresponding Loan and Security Agreement covering all assets of the Company (collectively, the "Credit Obligations"). The Lender has a perfected security interest in all assets of the Company as described in the above-referenced Security Agreements (as those terms are described in the Credit Obligations; collectively, the "Collateral"). The Company is in default under the terms of the Credit Obligations, the indebtedness is now wholly due and owing, and the Company cannot presently satisfy such indebtedness and does not expect to be able to satisfy such indebtedness in the foreseeable future.

On January 14, 2013, Will Dargie, the CEO of the Company, received a letter sent on and dated January 11, 2013 attached hereto as Exhibit A (the "Notice"), from Wendy J. Paradis, an attorney representing the Lender, which provided a notice pursuant to Section 9-620 of Title 6 of the Delaware Code of acceleration of the indebtedness and a proposal to retain the Collateral in full satisfaction of the obligations owed to the Lender. On January 14, 2013, Mr. Dargie delivered a copy of the Notice to the directors of the Board, including Martin Laird Koldyke, who at such time was the sole Class B Director of the Company, Mr. Powell having resigned on April 2, 2012. Mr. Koldyke forthwith tendered his resignation, stating that he considered his resignation to be retroactive to December 31, 2012, when he had orally indicated to Mr. Willard an intent to resign.

Mr. Koldyke indicated that he had not contacted any shareholders of the Class B Member with regard to the Notice.

In light of Messrs. Powell's and Koldyke's resignation, which resulted in the Class B Member not having a Class B Director on the Board, Mr. Dargie delivered a copy of the Notice to Robert Boyle, the resident agent (pursuant to the most recent 2012 Annual Report filed to the Michigan Department of Licensing and Regulatory Affairs) of the Class B Member, and to Frank Brumfield, the landlord of the property currently leased by the Company and also a shareholder of the Class B Member.

Mr. Dargie sought advice from independent counsel, Mr. Douglas J. (DJ) Drennan, and based on that advice, the Chairman determined it would be appropriate to hold this telephonic meeting to discuss the Board's options in responding to the Notice. It was noted that the Company's options included, without limitation, filing for bankruptcy, objecting to the Notice or permitting the transfer to the Lender of all of the Company's right, title and interest in the Collateral pursuant to and in accordance with Section 9-620 of Title 6 of the Delaware Code (the "Transfer") in full satisfaction of the Company's obligations to the Lender.

Mr. Brumfeld had contacted Mr. Willard on a few occasions prior to this Board meeting to explore possible alternative approaches. Those discussions were ongoing at the time of this meeting.

Mr. Willard opened the telephonic meeting shortly after 12:00 PM EST to consider all options available to the Board in response to the Notice.

Mr. Dargie noted that the Company's sales have continued to decline, with weak performance in the 4th Quarter of 2012 (normally the Company's most important sales period). Mr. Dargie further noted that the Company was not in a position to repay the loans. Because the amount of the Credit Obligations exceeds the Company's unrestricted cash reserves of approximately $300,000, repayment of the loans would put the Company into insolvency and terminate the business. Finally, attempting to raise cash to repay the loans was unlikely because the realizable value of the Collateral is less than the amount of the Lender's secured claim on those assets. It was also noted that the realizable value of the Collateral is far less than the combination of the debt and the preference owed to the Lender, as Class A Member, pursuant to the terms of the Company's Amended and Restated Limited Liability Company Agreement, as amended.

Mr. Dargie and Mr. Willard discussed the prospects for the business, noting that a great deal would ride on the success of the Spring books. Mr. Dargie expressed cautious optimism that the Spring catalogs, with the full creative input of our new Creative Director, Ilene Soloff, would produce stronger sales, but noted that the success of that season remained uncertain.

Mr. End noted his experience with companies facing similar financial situations, and discussed his understanding that as a company approaches insolvency, or in fact is insolvent, in considering the available options a board of directors has a duty to consider, among other things, preservation of the value of the collateral for the benefit of the creditor, as the creditor is the residual beneficiary of any remaining company value. It

2

was noted that the Board had previously determined that the Credit Obligations are bona fide and that the Company had not identified any bona fide claims, counterclaims, rights of setoff or other defenses to the payment of the obligations pursuant to the Credit Obligations, and Mr. Dargie indicated that Mr. Drennan had not given any contrary advice.

Mr. End again asked to review the liquidation value of the Company's assets. Mr. Dargie noted that prior estimations of liquidation value had always been far less than the amount of the Credit Obligations. The Board discussed the Company's current liquidation value and came to the conclusion that, taking into account a discount price for the Company's inventory and the amount of the Company's account payables, the liquidation value of the Company's assets was approximately $250,000, far less than the amount of the Credit Obligations.

It was noted that, having reviewed the ramifications of filing for bankruptcy with bankruptcy counsel, the Board had previously concluded that the time, expense and results of any such bankruptcy filing would be counterproductive and severely damaging, if not fatal, to the business of the Company.

Mr. Willard inquired again into the costs of bankruptcy, and it was generally agreed that costs for a Chapter 11 bankruptcy could easily reach $250,000. The Board noted that the costs to the Company and its constituents of bankruptcy were far greater than the costs of the foreclosure. Mr. End noted that his understanding that in almost all cases Chapter 11 bankruptcies end in liquidation of the debtor's assets and termination of the debtor's business. If the Company were to file for bankruptcy, in light of the costs of bankruptcy and the liquidation value of the Company's assets, there was no possibility that an equity holder would receive a distribution in any resulting liquidation and it was highly unlikely the Company's business would survive.

Mr. End also noted that, on the other hand, were the Company to allow the foreclosure to proceed, the Company's business might survive. He also noted that in view of the Board's understanding of the Lender's discussions with de facto representatives of the Class B Member, there was at least a possibility that the Lender would issue a stake in any new entity to the Class B Member in return for their cooperation in this process, thus providing all shareholders with a possible return. Specifically the Board discussed the Lender's offer to certain de facto representatives of the Class B Member that would afford the Class B Member an opportunity to continue to participate in the business with an approximately 15% interest following certain preferential returns.

The Board noted the Class B Member's voluntary failure to engage or participate in this critical Board decision. It was also noted that such failure is consistent with the Class B Member's prior history with respect to financial investment and support of the Company and the management decisions of the Board. For example, the Class B Member (i) rejected any opportunities to participate in any loans, (ii) failed to fill Class B

Director vacancies on the Board, and (iii) failed to participate meaningfully in any discussions in the Fall when the Board considered a recapitalization of the Company.

The Board noted that the Lender was considering the possibility of leaving or reverting sufficient cash to pay all or a portion of the Company's unsecured debts. In addition, the Board noted that the Lender expressed an interest in entering discussions with Mr. Brumfield to surrender and terminate the lease arrangement.

After substantial open discussion of individual reactions to the points described above, all of the Board members concluded that it is in the best interests of the business itself, the Company, the Lender and the Company's equity holders to permit the Transfer upon expiration of the notice period set forth in the Notice. It was concluded that the Transfer is the least expensive and time consuming of the options available to the Board and causes the least amount of damage to the business of the Company. By enabling a smooth transition to the Lender it provides the best opportunity to preserve the value of the Collateral and thereby encourages and enables the Lender to continue the business of the Company and affords some possibility of a return to the Company's equity holders.

Following the above discussion, the following resolution was moved, seconded and approved unanimously:

**RESOLVED**, that, the Company shall not object to the Transfer;

**FURTHER RESOLVED**, that any and all actions heretofore taken by any officer or Director of the Company in connection with the subject matter of this Consent, be, and hereby are, in all respects confirmed, approved and ratified; and

**FINALLY RESOLVED**, that the officers of the Company are hereby authorized and directed to do and perform any and all such acts, including execution of any and all documents and certificates, as they shall deem necessary or advisable, to carry out the purpose of the foregoing resolutions.

There being no further business to come before the Board, the meeting was adjourned at approximately 1:00 PM EST.

Capitalized terms used and not defined in these minutes have the meanings given such terms in the LLC Agreement.

[*Signature Page Follows*]

Respectfully submitted by:

_____
Stephan G. Batchelder

Approved:

_____
Bruce A. Willard

_____
William End

_____
William Dargie

Date:   January 31, 2013

Respectfully submitted by:

                                                       Stephan G. Bachelder

Approved:                                  *[signature]*
                                                     Bruce A. Willard

                                                     William End

                                                     William Dargie

Date:   January 31, 2013

Respectfully submitted by:

_____
Stephan G. Bachelder

Approved:

_____
Bruce A. Willard

*William T. End* (signature)
_____
William End

_____
William Dargie

Date: January 31, 2013

Respectfully submitted by:

_____
Stephan G. Bachelder

Approved:

_____
Bruce A. Willard

_____
William End

*/s/ William Dargie*
_____
William Dargie

Date:   January 31, 2013

**EXHIBIT A**

[The Notice]